IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY,
an unincorporated nonprofit association, on behalf of itself and its members,

    Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

    Defendant.

---

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

---

### I.  The Restrictions on Plaintiff's Rights Are Subject to Strict Scrutiny

#### a.  The Burdens on Plaintiff's Freedom of Association Rights Are Not Only Severe, But Strike Directly at the Heart of the Association's Purpose

Defendant Secretary of State concedes that laws imposing a severe burden on a political party's associational rights are subject to strict scrutiny. Opp. at 3. She contends, however, that Proposition 8's requirement that Plaintiff allow unaffiliated voters to participate in its primary elections does not "significantly burden" Plaintiff's constitutionally-protected freedom of association because the law's opt-out provision allows it to choose not to participate in the primary election at all. *Id*. at 3-4.

The District Court for the District of Utah expressly rejected such an "alternate choice gets us off the strict scrutiny hook" argument in *Utah Republican Party v. Herbert*, 144 F. Supp. 3d 1263 (D. Utah 2015). That case invalidated a 2014 Utah law that required political parties to have unaffiliated voter participate in their state-funded primary election if they chose to be desig-

nated as a Qualified Political Party ("QPP") rather than a Registered Political Party ("RPP"). Citing the Fourth Circuit's decision in *Miller v. Brown*, 503 F.3d 360 (4th Cir. 2007), the state had argued that because the party had a choice whether to proceed as a QPP (and be bound by the unaffiliated voter mandate) or as an RPP (and not be so bound), it was not "forced" to accept unaffiliated voters and therefore the unaffiliated mandate was not a "severe burden" subject to strict scrutiny. 144 F.Supp.3d at 1279. The court rejected the argument. "The ability to choose saved the law in *Miller* from a facial challenge," the court noted, "but after the primary method was chosen, and the political party was forced to 'conduct a mandatory open primary for the selection of a party candidate,' the law did not survive an as-applied challenge." *Id*. (citing *Miller,* 503 F.3d at 371).[1] Utah's law *as applied* was likewise a severe burden on political parties and therefore subject to strict scrutiny, a test which the State failed to meet, the court held, after rejecting many of the same governmental interests advanced by the Secretary here. *Id.* at 1280-83.

The Utah District Court's conclusion is in accord with the line between "severe" and "lesser" burdens that the Supreme Court has itself drawn. In *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), the high Court held that a ban on "fusion" ballot designations imposed only a lesser burden on associational rights because the party was still free to endorse whom it wants and even to try to persuade the dual-nominated candidate to be listed on the ballot as its nominee rather than the nominee of another party. *Id.* at 360-61. Significantly, *Timmons* distinguished two other Supreme Court cases in which the burden on a political party's First

---

[1] The same "facial" versus "as applied" distinction renders *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F.Supp.2d 655 (D.S.C. 2011), inapplicable. *See id.* at 661 n.4 (not addressing as-applied challenge).

Amendment rights had been held to be severe: *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214 (1988), and *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986). "*Tashjian* and *Eu* involved regulation of political parties' internal affairs and core associational activities," the Court noted, while "Minnesota's fusion ban does not." *Timmons*, 520 U.S. at 360.

The statute at issue here falls on the *Tashjian* and *Eu* side of that line. Whether the party wishes to limit its primary election to its own registered voters is a "core associational activity" severely undermined by Proposition 108's unaffiliated voter mandate. Indeed, as Plaintiff noted in its opening brief, "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee." *California Democratic Party v. Jones*, 530 U.S. 567, 575 (2000). And how the party's governing body decides the method for choosing its nominees is a matter within its own, constitutionally-protected internal affairs, the conduct of which is altered dramatically by the opt-out provision's supermajority vote requirement. *Eu*, 489 U.S. at 230 ("Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders.")[2]

In sum, Proposition 108 imposes a severe burden on Plaintiff's First Amendment rights,

---

[2] The Secretary claims that the Supreme Court's decision in *Jones* is distinguishable for three reasons. The first, on the issue whether Plaintiff is "forced" to accept unaffiliated voters, is addressed above. The second, focused on *dicta* in footnote 8 of the case suggesting that a system in which the voter is limited to only one party's ballot might be "constitutionally distinct," is address in Plaintiff's opening brief at p. 5, n.1. The third is the Secretary's suggestion that the Supreme Court's decision in *Jones* requires "evidence that unaffiliated voters have actually influenced the outcome of any Colorado primary," or "survey evidence of voters' intentions." Opp. at 5, citing *Jones*, 530 U.S. at 578. *Jones* imposes no such requirement, however; its discussion of the evidence that had been introduced in the trial court merely bolstered the determination it had already made, namely, that California's blanket primary violates the principles set forth in cases such as *Eu* and *Tashjian*. *Jones*, 530 U.S. at 578; *see also id.* at 580 ("It is unnecessary to cumulate evidence" that policy positions were altered as a result of the blanket primary).

3

thus subjecting the law to strict scrutiny.[3]

### b. The Burden on Plaintiff's Free Speech Rights Is Also Severe

The Secretary claims that Plaintiff has not cited a single case supporting its compelled speech claim. Plaintiff cited several black-letter compelled speech cases, however, and made what it thought was an obvious connection between them and Proposition 108's mandate that a candidate chosen in an open primary where unaffiliated voters may well determine the person (by electing a candidate that a majority of the party's voters did not support) to be listed on the general election ballot as *the Party's nominee* is compelled speech. Such a candidate is not *the Party's nominee*, but is in fact, in such circumstances, a nominee where unaffiliated voters provided the decisive level of support.

That obvious connection with the compelled speech line of cases is supported by the Supreme Court's observation in *Jones* that, despite being elected in a primary open to voters not affiliated with the political party, it nevertheless "remains the case … that the candidate of each party who wins the greatest number of votes 'is the nominee of that party at the ensuing general election." *Jones*, 530 U.S. at 570; *see also id.* at 579 (noting expert opinion finding it "inevitable … that parties will be forced in some circumstances to give their official designation to a candidate who's not preferred by a majority or even a plurality of party members."). Forcing the party to lend its name to a candidate not of its own choosing is compelled speech, and the law that compels such a result is subject to strict scrutiny.

### c. Equal Protection claims arising out of infringements of fundamental rights are subject to strict scrutiny whether or not a suspect class is involved.

---

[3] The Secretary's claim that the "balance of equities" is in its favor is based on the assertion that Plaintiff's constitutional rights are not severely burdened. Without that basis, the balance of equities is decidedly in favor of protecting Plaintiff's constitutional rights.

The Secretary also asserts that Plaintiff's equal protection claims are not subject to strict scrutiny because Plaintiff is not a suspect class. But suspect class status is only one of two routes to strict scrutiny in equal protection analysis; the other is when fundamental rights are involved.

Plaintiff's vote dilution claim does not require suspect class status, because the thing being diluted – one's vote – is a fundamental right. *See, e.g., Goosby v. Osser*, 409 U.S. 512, 519–20 (1973) ("our decisions [require] the application of the more stringent compelling state interest test when either a fundamental right, such as the right to vote, was allegedly infringed, … or when the statutory classifications were drawn on the basis of suspect criteria, such as wealth or race") (internal citations omitted); *Reynolds v. Sims*, 377 U.S. 533 (1964).

In *Michel v. Anderson*, 14 F.3d 623 (DC Cir. 1994), the D.C. Circuit entertained a vote dilution claim in a context having nothing to do with race or other suspect classifications. Representative Michel filed sued challenging the ability of delegates from various non-State jurisdictions to cast votes in the House of Representatives Committee of the Whole, asserting that his vote was thereby diluted (from 1/435 to 1/440). The Court recognized his vote dilution claim, rejecting it only on the ground that a vote by delegates in the Committee of the Whole did not violate the Constitution's requirement that only members of Congress could vote.

The vote dilution at issue here is much more pronounced, with potentially 1.8 million unaffiliated voters able to swamp the 929,000 or so registered Republican voters. Such a dilution of the fundamental right to vote is subject to strict scrutiny under the "fundamental rights" wing of equal protection analysis.

Plaintiff's claim that Proposition 108 treats it differently than minor political parties,

5

which are permitted to hold primary elections limited to their own party's registered voters, likewise implicates a fundamental right—the freedom of association—that subjects the classification to strict scrutiny despite it not being a suspect classification.

    II.    **Colorado's Purported Interests Do Not Override Plaintiff's First Amendment Rights**

Because the restrictions on Plaintiff's constitutional rights imposed by Proposition 8 are subject to strict scrutiny, they can be sustained only if the government is able to demonstrate that the restrictions are narrowly tailored to further compelling governmental interests. The interests asserted by the Secretary cannot withstand such scrutiny.

The Secretary offers four distinct interests that she claims are sufficient to override Plaintiff's constitutional rights. None suffice; indeed, two have previously been rejected by the Supreme Court, and the other two are actually undermined by the very opt-out provision that the Secretary claims saves the open primary from being a severe infringement of those rights.

    a.    **Increased voter participation and promoting fairness have been rejected by the Supreme Court.**

The first interest proffered by the Secretary is variously described as a "system in which unaffiliated voters have an adequate opportunity to participate"; "facilitating greater voter participation"; and giving unaffiliated voters "the opportunity to vote in publicly financed primary elections." However the Secretary describes it, this is quite similar to the "third" interest asserted by the State in *Jones*, namely, ensuring that disenfranchised persons – meaning, those "unable to participate" in a party's closed primary – enjoy the right to an effective vote. 530 U.S. at 583.[4]

---

[4] The sixth interest described by the Court in *Jones*, "increasing voter participation," was not referring to unaffiliated voters being allowed to vote in party primaries, but rather to the claim that

6

The Court described that interest as "nothing more than reformulation of an asserted state interest we have already rejected—recharacterizing nonparty members' keen desire to participate in selection of the party's nominee as 'disenfranchisement' if that desire is not fulfilled." *Id.*

The high Court rejected that interest in strong terms: "We have said … that a 'nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications.'" *Id*. (quoting *Tashjian*, 479 U.S. at 215-16 n.6). The Court added that the "voter's desire to participate does not become more weighty simply because the State supports it." *Id.* at 583-84. And it offered a remedy to the voter who feels himself "disenfranchised": "simply join the party." "That may put him to a hard choice," the Court noted, "but it is not a state-sponsored restriction upon *his* freedom of association, whereas compelling party members to accept his selection of their nominee *is* a state-imposed restriction upon theirs." *Id.* at 584.

The Secretary's concern that if major political parties were permitted to hold primaries consisting only of party members, unaffiliated voters "would be either unable to select candidates for the general election or forced to discard their deliberate choice to remain unaffiliated with any particularly party," Opp. at 8-9 (citing *PARABLE* Order at 28[5]), is the same "hard

---

with more centrist nominees, more voters would likely participate in the election. The Court described that interest as "just a variation" on the asserted interest in affording voters greater choice, which the Court held was "hardly a compelling interest, if indeed it is even a legitimate one." *Jones*, 530 U.S. at 584-85.

[5] That the district court in *PARABLE* accepted such an argument cannot be squared with the Supreme Court's holding in *Jones.* That part of the opinion should also be treated as *dicta*, addressing as it does the likelihood of success on the merits after already having determined the case had to be dismissed for lack of standing. Finally, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011) (quoting 18 Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed.2011)).

choice" that the Court rejected as grounds for violating the Party's associational rights. It is no more availing here than it was in *Jones*.

The Secretary's second asserted interest is in "promoting fairness," which appears to be "fair candidate winnowing," Opp. at 7, and "an administratively sound way to winnow the fields of candidates who identify with shared political views," *id*. at 9.  Such an interest is also explicitly foreclosed by *Jones*.  There, the interest was described as "producing elected officials who better represent the electorate and expanding candidate debate beyond the scope of partisan concerns," which the Court said were "simply circumlocution for producing nominees and nominee positions other than those the parties would choose if left to their own devices." *Jones*, 530 U.S. at 582. These interests "reduce to nothing more than a stark repudiation of freedom of association: Parties should not be free to select their own nominees because those nominees, and the positions taken by those nominees, will not be congenial to the majority." *Id*. The Court refused to countenance such an "inadmissible" interest. "[W]innow[ing] the field of candidates" to those "who identify with shared political views" is just another way of advocating for the same "stark repudiation of freedom of association" foreclosed by *Jones.*

      **b.  The two other interests asserted by the Secretary are actually undermined by Proposition 108's Opt-Out Provision**

The remaining two interests asserted by the Secretary are "ensuring administrative efficiency" and "preserving the integrity of the nominating process." As with the asserted interest in "promoting fairness" addressed above, the Secretary is a bit vague as to the substance of these interests, or whether they are even separate interests. "Ensuring administrative efficiency" is later paired with "stability," Opp. at 9, and also with the need to prevent regular "vacillation" and "undue voter confusion," which all seem to be connected in some way to "preserving the integrity of

8

the nominating process." Plaintiff therefore treats all these formulations as merely different descriptions of the same interest in preserving election integrity.

"Stability," prevention of regular "vacillation" among nomination methods, and prevention of "undue voter confusion" are all offered as interests supporting Proposition 108's extraordinarily high, "three-fourths-of-the-total-membership" threshold for the Party to opt out of the open primary. The problem with the Secretary's reliance on these interests as support for the opt-out is that they are only furthered if the opt-out is not achieved, completely undermining the Secretary's claim that the open primary default is really merely a choice made by the Party.

Colo. Rev. Stat. § 1-4-702(1) makes this problem clear. Any vote to opt-out of the open primary is only good for the election cycle in which the vote occurs. Colo. Rev. Stat. § 1-4-702(1) (providing that the opt-out vote "shall occur no later than October 1 of the year preceding the year in which an assembly or convention nominating process is to be used."). Should a three-fourths vote actually be achieved in any given election cycle, the nominating process would revert back to the open primary default for the next election cycle unless another three-fourth's vote could be obtained at the outset of that election cycle. The high threshold necessary to "ensure[] that a party must have a strong commitment to opting out" of the open primary in one election cycle, as the Secretary sees it, therefore serves as high barrier to stability for the succeeding election cycle, creating the very vacillation and voter confusion the Secretary bemoans.

The Secretary's asserted interest in increased voter participation would also be severely undermined were a political party ever to achieve the supermajority vote requirement necessary to opt out of the open primary. The opt out provision provides that a party opting out of the open

9

primary may only nominate candidates for the general election ballot "by assembly or convention." Colo. Rev. Stat. § 1-4-702(1). Such an alternative would necessarily *exclude* from the process most of the nearly 1 million voters registered with the party – all but the relatively few (3,000 to 4,000 or so) who are chosen as delegates to the statewide assembly or convention.[6]

### III. Timing Issues Are Not An Impediment to the Issuance of a Preliminary Injunction Five Months Before the Primary Election

The Secretary claims that the *Purcell* doctrine "counsel(s) against intervention." Opp. at 13 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)). But her "counsel" claim is undercut by the actual holding in *Purcell*, in which the Ninth Circuit enjoined a state election law—without explanation or justification—less than four weeks before the election. *Purcell*, 549 U.S. at 6. The Ninth Circuit's injunction was issued after the district court had already rejected the request, not because it was sought too close to the election, but because plaintiffs were unlikely to succeed on the merits. *Purcell*, 549 U.S. at 3. The Supreme Court's decision vacating the Ninth Circuit's last-minute injunction did not take issue with the district court's consideration of the request for an injunction less than two months before the election.

The Supreme Court and lower courts have routinely noted how imminent was the elec-

---

[6] The Secretary's cavalier suggestion that Plaintiff could conduct a private primary in Colorado is logistically infeasible and would risk serious violations of federal and constitutional law. The Help America Vote Act ("HAVA"), codified at 52 U.S.C. § 21083(a)(1)(A)(v), obligates each state to maintain a statewide voter registration list for immediate electronic access by state "election officials," but Colorado law excludes private parties from the definition of "election official." C.R.S. § 1-1-104(10). Without access to the SCORE system, private primary administrators could not verify voter eligibility in real time, opening the door for duplicate voting (and illegal vote dilution), both in the "private primary" itself and by voters who participate in that primary and then re-register as unaffiliated in order to vote in the state-sponsored primary election.

tion at issue in *Purcell*, and either denied (or stayed) an injunction because the election was similarly imminent or declined to apply that doctrine to requests for injunctive relief brought months before an election.[7]

In sum, the injunctive relief Plaintiff seeks here is "not on the 'eve of an election'" as the courts have defined that phrase. *Patino v. City of Pasadena*, 229 F.Supp.3d 582, 589 (S.D. Tex. 2017) (citing *Veasey v. Perry*, 769 F.3d 890, 894 (5th Cir. 2014)). The requested injunction is not barred by *Purcell*.

The Secretary also contends that enjoining Proposition 108 "would create significant risks to the election process," and that "Colorado would need to launch a substantial effort to educate voters about the change ahead of the June 3, 2024 party affiliation deadline." Opp. at 13. The Secretary's Deputy Elections Director has previously testified, however, that the necessary changes to the SCORE voter registration system would require a "development sprint [of] two weeks, which is followed by two weeks of quality assurance, which is followed by two weeks of user acceptance testing"—6 weeks total, not the five months available here. *PARABLE* hearing Tr. at 168:1-3.[8]

---

[7] *Compare, e.g.*, *Husted v. Ohio State Conference of N.A.A.C.P.*, 135 S.Ct. 42 (2014) (staying an injunction affirmed on September 24 before an election for which early voting was to begin September 29); *with, e.g. Frank v. Walker*, 135 S.Ct. 7 (2014) (lifting the September 12 stay of an April injunction regulating an election for which early voting began October 20); *Holland v. Williams*, 457 F. Supp. 3d 979, 997 (D. Colo. 2018) ("In *Purcell*, it was a month before the election when an injunction was ordered. … Here, it is nearly five months before the 2018 elections.").
[8] The Deputy Elections Director also testified that such an effort would require "1,500 hours to do the development." *PARABLE* tr. at 167:22. That claim is simply not credible, given that the SCORE system must already accommodate requests by minor political parties, filed no later than 75 days before the primary election to limit participation in their primaries to party members. CRS § 1-4-1304(1.5)(c).

11

The Secretary's assertion that *laches* bars Plaintiff's claims suffers the same fate. *Colorado Union of Taxpayers, Inc. v. Griswold*, No. 20-CV-02766-CMA-SKC, 2020 WL 6290380 (D. Colo. Oct. 27, 2020), relied on by the Secretary, was filed on September 11, 2020 and a motion for preliminary injunction filed 6 days later – a mere 6 weeks before the election. That is a far cry from the preliminary injunction motion filed in this case on December 22, 2023 – a full six months before the June election. *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), also relied on by the Secretary, equally supports Plaintiff. The lawsuit in that case was filed on February 18, 2016, challenging Kansas' proof of citizenship requirement for voter registration. A motion for preliminary injunction was filed on February 25, 2016, seeking to enjoin the requirement for the upcoming primary election scheduled for August 2, 2016 – a little over 5 months away. *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1124 (D. Kan.). The district court held that Plaintiffs' delay in bringing the suit did not undermine its claim of irreparable injury, which involved, as this case does, the right to vote, and the Tenth Circuit affirmed that determination, noting that "delay is only one factor to be considered among others" in a determination of irreparable injury, and that "there is no categorical rule that delay bars the issuance of an injunction." *Fish*, 840 F.3d at 753 (10th Cir. 2016).[9]

Respectfully Submitted,

---

[9] Plaintiff also disputes the Secretary's contention that any delay was "unreasonable." As the Court knows, Plaintiff sought to have the entire case litigated on an expedited timetable without the need for what would be a duplicative, interim preliminary injunction. Joint Proposed Scheduling Order, at 5, 6, 8 (Dkt. #30, filed Oct. 26, 2023). The Secretary opposed that schedule, seeking instead a discovery cut-off of May 26, 2024 and a dispositive motions deadline of June 25, 2024. *Id.* at 8. The Magistrate Judge issued a scheduling order on November 16, 2023 largely accepting the Secretary's timetable rather than Plaintiff's. Plaintiff's Motion for Preliminary Injunction was then filed on December 22, 2023, more than 6 months before the next primary election.

/s/ John C. Eastman
John C. Eastman
Anthony T. Caso
CONSTITUTIONAL COUNSEL GROUP
1628 N Main St #289
Salinas, CA 93906
Telephone: (909) 257-3869
FAX: (714) 844-4817
E-mail: jeastman@ccg1776.com

Randy B. Corporon
LAW OFFICES OF RANDY B. CORPORON P.C.
2821 S. Parker Road, Suite 555
Aurora, CO 80014
Telephone: (303) 749-0062
FAX: (720) 836-4201
E-mail: rbc@corporonlaw.com

*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of January, 2024 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ John C. Eastman