IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY, an unincorporated nonprofit association, on behalf of itself and its members,

      Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

      Defendant.

_____

## ORDER
_____

      This matter is before the Court on the Motion for Preliminary Injunction [Docket No. 39] filed by plaintiff Colorado Republican Party ("the Party").  Defendant Jena Griswold, in her official capacity as the Colorado Secretary of State (the "Secretary"), filed a response opposing plaintiff's motion.  Docket No. 51.  The Party filed a reply.  Docket No. 63.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## I.    BACKGROUND

### A.  Findings of Fact

      The Court held a two-day evidentiary hearing on the preliminary injunction motion on January 23-24, 2024.  Docket Nos. 67-68.  The Court makes the following findings of fact based on evidence introduced at the hearing.

### *1) Proposition 108*

      In 2016, Colorado voters approved a ballot initiative, Proposition 108, allowing voters not affiliated with a political party to vote in nonpresidential primary elections.

*See* Ex. 17 at 7; Colo. Rev. Stat. §§ 1-2-218.5(2), 1-4-101(2)(b), 1-4-104, 1-4-702(1), 1-7-201(2.3).[1]  Proposition 108 requires all major political parties to nominate candidates for the general election through a semi-open primary system; however, major political parties may opt out of the primary system and elect to use a closed assembly or convention nomination process.  *See* Colo. Rev. Stat. §§ 1-4-101(3), 1-4-702(1).  Colorado law defines a "[m]ajor political party" as "any political party that at the last preceding gubernatorial election was represented on the official ballot either by political party candidates or by individual nominees and whose candidate at the last preceding gubernatorial election received at least ten percent of the total gubernatorial votes cast."  Colo. Rev. Stat. § 1-1-104(22).  The Colorado Republican Party and the Colorado Democratic Party are major political parties under this definition.  *See* Ex. 24 at 1, ¶ 1.

In the semi-open primary system, unaffiliated voters are entitled to vote in the primary election of a major political party without affiliating with that party.  Colo. Rev. Stat. §§ 1-4-101(2)(b), 1-7-201(2.3).  However, voters affiliated with a political party may only vote in their party's primary.  *See* Colo. Rev. Stat. §§ 1-4-101(2)(a), 1-7-201(2).  During a primary election, unaffiliated voters receive a mailing containing the primary ballots of all major political parties, but the voter "may cast the ballot of only one major political party."  Colo. Rev. Stat. § 1-4-101(2)(b).  Voters affiliated with a political party receive only the ballot of their political party.  *See* Colo. Rev. Stat. §§ 1-4-101(2)(a), 1-7-201(2).  The State of Colorado (the "State") and the counties pay for all expenses incurred in administering primary elections.  Colo. Rev. Stat. § 1-4-101(5).

---

[1] In 2016, Colorado voters approved another ballot initiative, Proposition 107, allowing unaffiliated voters to vote in presidential primary elections.  However, the constitutionality of Proposition 107 is not challenged in this lawsuit.  *See* Docket No. 1.

A major political party may choose to opt out of the semi-open primary system "if at least three-fourths of the total membership of the party's state central committee" vote in favor of an assembly or convention nomination process.  Colo. Rev. Stat. § 1-4-702(1).  The vote must occur no later than October 1 of the year preceding the year in which the assembly or convention will occur.  *Id*.  A party's closed assembly or convention process is not funded by the State.

A minor political party[2] may "prohibit unaffiliated electors from voting in the party's primary election so long as the prohibition is in accordance with the party's constitution, bylaws, or other applicable rules.  Any minor party choosing to prohibit unaffiliated electors from voting in its primary election must notify the secretary of state of the prohibition not less than seventy-five days prior to the primary election."  Colo. Rev. Stat. § 1-4-1304(1.5)(c).

Since the passage of Proposition 108 in 2016, no major political party has opted out of the semi-open primary system.  Primary elections occurred in 2018, 2020, and 2022.  In the past four years, only one minor political party has participated in a primary election.  Minor parties typically use the assembly nomination process.

Proposition 108 is considered a "semi-open" primary system because unaffiliated voters may participate in either major party's primary, while affiliated voters may only participate in their party's primary.  In contrast, an open primary is a system in which

---

[2] "Minor political party" means "a political party other than a major political party that satisfies one of the conditions set forth in section 1-4-1303(1) or has submitted a sufficient petition in accordance with section 1-4-1302."  Colo. Rev. Stat. § 1-1-104(23).  Minor parties and major parties receive differing treatment throughout the election process.  For example, major parties receive preferential selection of election judges and top billing on ballots.

registered voters can participate in any party's primary, regardless of their party affiliation.  A closed primary is a system in which only registered members of a political party can vote in that party's primary.[3]

### 2)  Colorado Republican Party's State Central Committee

Pursuant to Colorado law, the state central committee for each political party has "the power to make all rules for party government."  Colo. Rev. Stat. § 1-3-105(1).  A state central committee must consist of certain members identified by statute[4] and "any additional members as provided for by the state central committee bylaws."  Colo. Rev. Stat. § 1-3-103(2)(a).  Dave Williams, the Party's chairman, testified that he has the discretion to control the location of the Party's opt-out vote and whether the vote is held in person or remotely.  The Party's bylaws also permit voting by proxy.  Ex. 4 at 8.

On September 21, 2019, the Party's state central committee (the "Committee") held a meeting at which a member of the Committee moved for the Party to opt out of the 2020 primary, but the motion failed.  Ex. 5 at 1.  Only 56.9 percent of the total membership of the Committee attended the meeting, which was less than the 75 percent opt-out threshold.  Ex. 24 at 3, ¶ 12.  Chairman Williams testified that the Party could not feasibly opt out of the semi-open primary due to the attendance level at the September 2019 meeting.

---

[3] Prior to the enactment of Proposition 108, Colorado law required a voter to "be affiliated with a political party in order to vote in that party's primary election."  Ex. 17 at 7.

[4] Those individuals include "the chairpersons and vice-chairpersons of the several party county central committees, together with the elected United States senators, representatives in congress, governor, lieutenant governor, secretary of state, state treasurer, attorney general, members of the board of regents, members of the state board of education, state senators, and state representatives."  Colo. Rev. Stat. § 1-3-103(2)(a).

At a meeting on September 18, 2021, the Committee voted on whether the Party should opt out of the 2022 primary; there were 171.6 votes in favor and 241.3 votes against opting out.  Ex. 24 at 2-3, ¶¶ 8-9.[5]  At that time, the Committee had 521 members and 441 members attended the meeting, *id.* at 3, ¶ 10, indicating that only 32.9 percent of the total Committee's membership voted in favor of opting out.  At the meeting, the Committee voted unanimously to authorize the Party or its members to bring a lawsuit challenging the constitutionality of Proposition 108.  *Id.*, ¶ 11; *see also* Ex. 8 (the Committee's resolution authorizing a lawsuit).[6]

At a meeting on September 30, 2023, the Committee voted on whether the Party should opt out of the 2024 primary; there were 259 votes in favor and 143.5 votes against opting out.  Ex. 9; Ex. 24 at 2, ¶ 5.  Therefore, 64.3 percent of the Committee members who voted at the meeting voted in favor of opting out.  Ex. 9.[7]  On October 7, 2023, the Committee adopted a resolution reaffirming the Committee's support for this lawsuit to challenge the constitutionality of Proposition 108.  Ex. 24 at 2, ¶ 7; Ex. 10 at 1-2.  Ninety-one percent of participating members voted in favor of the resolution.  Ex. 10 at 1.

---

[5] There are fractional votes because, pursuant to the Party's bylaws, certain members have less than a full vote.  *See* Ex. 24 at 3 n.1.

[6] On February 24, 2022, five members of the Committee and a non-profit association brought a lawsuit challenging the constitutionality of Proposition 108.  *See Parable v. Griswold*, 22-cv-00477-JLK, Docket No. 1.  Senior District Judge John L. Kane dismissed the case, finding that plaintiffs lacked standing to assert most claims and that the remaining portion of claim five should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  *Id.*, Docket No. 61 at 6.

[7] The Party did not present evidence regarding how many total members the Committee had in September 2023.

Suzanne Taheri, a current member of the Committee, testified that other votes within the Committee are often approved by more than 75 percent of the Committee's members.  Richard Wadhams, a former member of the Committee, testified that many Committee votes exceeded a 75 percent threshold when he was chairman.  For example, Mr. Wadhams won an opposed race for the chairman position in 2009 with 85 percent of the vote.

### 3)  Administration of Primary Elections

Pursuant to Colo. Rev. Stat. § 1-1-107(1)(a), the Secretary is responsible for supervising the conduct of primary and general elections in Colorado.  Hilary Rudy, the Deputy Elections Director for the Secretary's Office, testified about the administration of primary elections.  SCORE is the statewide voter registration database and system for managing elections.  At the county level, the clerk and recorder offices use SCORE to update voter registration and contact information in real-time.  During an election, the Secretary's Office and the counties use SCORE to issue, receive, and validate ballots. Members of the public, including political parties, can purchase data from the SCORE system.  The Party has a data subscription from SCORE that includes historical voter information, including names, contact information, party affiliation, and which primary election the voter participated in.

SCORE determines which ballot style each voter is eligible to receive based on the voter's residence, party affiliation, and other statuses.  For example, a Republican voter in Arapahoe County would receive a Republican primary ballot, containing any state-wide races, county-specific races for Arapahoe County, and ballot initiatives. Meanwhile, an unaffiliated voter in Arapahoe County would receive a major party

packet, containing both the Republican and Democrat primary ballots for the voter's district.

In Colorado, whether a voter participated in a specific party's primary is publicly available information through SCORE.  However, how a voter cast his or her ballot is confidential under voter secrecy laws.

### 4)  Demographics of Colorado Voters

Before the passage of Proposition 108, the voter affiliation of Colorado's electorate was 35 percent unaffiliated, 33 percent Republican, and 31 percent Democrat.  Ex. 18 at 1.  In 2020, Colorado adopted a voter registration system that automatically registers new voters as unaffiliated voters.  As of November 1, 2023, there were 1,871,868 registered active unaffiliated voters, 929,561 registered active Republican voters, and 1,053,385 registered active Democrat voters in Colorado.  Ex. 24 at 1, ¶ 3.[8]

Public opinion polling of Colorado voters indicates that unaffiliated voters may align more closely with Republican voters on the importance of certain issues and may align more closely with Democrat voters on the importance of other issues.  *See* Ex. 25 at 8.  For example, in a poll conducted by the Colorado Polling Institute, 39 percent of Republican voters and 34 percent of unaffiliated voters identified "crime and public safety" as a top issue for the government to address, while only 14 percent of Democrat voters identified "crime and public safety" as a top issue.  *Id*.

---

[8] An active voter is a voter who is registered in the State with a current address. A voter becomes inactive if election-related mail sent by a county to a voter is returned to the county as undeliverable.

5) **Impact of Proposition 108 on the Party and Voter Participation Levels**

Former Republican state legislator Kevin Lundberg and Chairman Williams both testified that their campaign costs increased after the enactment of Proposition 108 due to the need for increased marketing efforts to unaffiliated voters.  In response to a question about the impact of Proposition 108 on messaging strategies, Mr. Lundberg testified, "I'll admit that I don't really craft my message according to who is out there as much as simply telling [voters] who I am."  Ms. Taheri testified that candidates in the Party do not modify their policy positions to appeal to unaffiliated voters.

John Sides, a professor of political science at Vanderbilt University, testified that, in states with semi-open primary systems, there is no evidence that any meaningful number of voters registered with a political party have changed their party affiliation to unaffiliated in order to vote in a rival party's primary election.  Similarly, academic literature demonstrates that the likelihood of party raiding, which is defined as voters changing their affiliation to vote in a rival party's primary for the specific purpose of weakening that party, is very rare.

Professor Sides testified that knowing the number of unaffiliated voters who participated in a major party's primary election in Colorado does not provide enough information to determine whether the unaffiliated voters' participation resulted in the selection of a different candidate than would have been selected in a closed primary. For unaffiliated voters to change the outcome of a primary election, unaffiliated voters would need to have different candidate preferences from Party members and vote in significant numbers.  Professor Sides was unaware of any conclusive empirical evidence showing that unaffiliated voters have changed the outcome of any primary

8

election in the United States.  Furthermore, there is no evidence demonstrating any relationship between primary rules and the ideologies of winning candidates or that open primary rules result in more moderate candidates.

Professor Sides' analysis showed that, after the passage of Proposition 108, voter turnout in Colorado's 2018 and 2022 primary elections increased by nine points compared to voter turnout in the 2010 and 2014 primary elections.  The higher voter turnout rate in Colorado's semi-open primary system is consistent with academic studies showing that voter turnout rates are higher in states with more open primary systems.

### 6)  Deadlines for the June 2024 Primary Election

The next state primary election in Colorado is scheduled for June 25, 2024.  Ex. 15 at 11.  The deadline for a minor political party to notify the Secretary that it is prohibiting unaffiliated voters from voting in its primary is April 11, 2024.  *Id*. at 7.  The Secretary must certify the names and set the order of the ballots by April 26, 2024.  *Id*. at 8.  County clerks must transmit ballots to military and overseas voters by May 11, 2024.  *Id*. at 9.  Voters who are affiliated with a political party may change or withdraw their affiliation up until June 3, 2024 if they wish to vote in a different party's primary election.  *Id*.  Unaffiliated voters may change their affiliation up until election day.

Ms. Rudy testified that, if the Court entered a preliminary injunction in this case, the Secretary's Office would need between six to nine months to develop, test, and implement coding changes to the SCORE system in order to alter the system's process

for issuing primary ballots to unaffiliated voters.[9]  The Secretary's Office cannot implement any coding changes to SCORE between January 5 to April 1, 2024, which is the blackout period for the administration of the March 2024 presidential primary.[10]  A new blackout period begins on April 26, 2024 for the administration of the June 2024 primary.  If a preliminary injunction had been issued five months ago, Ms. Rudy testified that the Secretary's Office would have had enough time to develop and implement changes to the SCORE system in time for the June 25, 2024 primary election.

**B.  Procedural History**

The Party filed this action on July 31, 2023 to challenge the constitutionality of Proposition 108.  Docket No. 1.  The Party asserts five claims: (1) Proposition 108 violates the Party's right to freedom of association under the First Amendment; (2) Proposition 108's opt-out provision violates the Party's right to freedom of association under the First Amendment; (3) Proposition 108 violates the Party's right to freedom of speech under the First Amendment; (4) Proposition 108 violates the Equal Protection Clause of the Fourteenth Amendment by diluting the votes of the Party's members; and (5) Proposition 108 violates the Equal Protection Clause of the Fourteenth Amendment by treating major political parties and their members differently from minor political parties and their members.  *See id*. at 10-21.  The Party challenges the constitutionality of Proposition 108 on its face and as-applied.  *Id*. at 1.[11]

---

[9] When Proposition 108 was enacted, the Secretary's Office spent 1,500 hours of development time to implement changes to SCORE's functionality.
[10] During a blackout period, the Secretary's Office does not release any coding changes into the SCORE system, unless the change is a critical security fix.
[11] A "facial challenge considers the restriction's application to all conceivable parties, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case.  Though the same substantive standard applies to both

On December 22, 2023, the Party filed a preliminary injunction motion.  Docket No. 39.  The Party requests that the Court enjoin the Secretary from enforcing Proposition 108, "in whole or in part, against Plaintiff, and affording to major political parties the same right that is available to minor political parties under [Colo. Rev. Stat.] § 1-4-1304(1.5)(c) to notify the Secretary of State by April 11, 2024, whether they wish to prohibit unaffiliated electors from voting in their primary elections."  *Id*. at 15.  Alternatively, the Party requests that the Court "enjoin the three-fourths supermajority requirement of the opt-out provision of Proposition 108 and [Colo. Rev. Stat.] § 1-4-702, permitting major political parties such as Plaintiff to determine by simple majority vote whether to opt out" of the semi-open primary system.  *Id*.  On January 10, 2024, the Secretary filed her response.  Docket No. 51.  On January 18, 2024, the Party filed its reply.  Docket No. 63.

## II.    LEGAL STANDARD

A preliminary injunction is not meant to "remedy past harm but to protect plaintiffs from irreparable injury that will surely result without [its] issuance" and "preserve the relative positions of the parties until a trial on the merits can be held."  *Schrier v. Univ. of Colo*., 427 F.3d 1253, 1258, 1267 (10th Cir. 2005).  To obtain a preliminary injunction, "the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that

---

facial and as-applied challenges, the latter demands a developed factual record and the application of a statute to a specific person."  *Harmon v. City of Norman*, *Oklahoma*, 61 F.4th 779, 789 (10th Cir. 2023) (citations and internal quotations omitted).  Facial challenges to statutes are "typically strongly disfavored."  *Frank v. Lee*, 84 F.4th 1119, 1151 (10th Cir. 2023).

the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The third and fourth factors "merge" when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020).

"[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984); *see also Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019).[12]

---

[12] The Secretary argues that the Party seeks a disfavored injunction. Docket No. 51 at 3. In the Tenth Circuit, three types of preliminary injunctions are disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (citation omitted). To obtain a disfavored injunction, the moving party must make a "strong showing" on the "likelihood-of-success-on-the-merits and the balance-of-harms factors." *Free the Nipple-Fort Collins*, 916 F.3d at 797 (quoting *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)). The Court declines to evaluate whether the injunction is disfavored because, as discussed below, the Party has failed to demonstrate a likelihood of success on the merits under the normal standard for a preliminary injunction. *See id.* at 797-98 (declining to address whether injunction was disfavored because plaintiffs prevailed under the heightened standard).

III.    ANALYSIS

The Party argues that it is entitled to a preliminary injunction because it is likely to succeed on the merits of all five constitutional claims.  Docket No. 39 at 3-11.  The Party asserts that "[i]t is well-settled that a showing of the infringement of a constitutional right requires no further showing of irreparable injury" and "the State's interest in enforcing an unconstitutional law does not outweigh Plaintiff's interest in having its constitutional rights protected."  *Id*. at 12 (citing *Free the Nipple-Fort Collins*, 916 F.3d at 805; *Awad*, 670 F.3d at 1131).  The Secretary argues that the Party is not likely to succeed on the merits of its constitutional claims; the *Purcell* doctrine counsels against court intervention in Colorado's ongoing election planning activities; and the Party's delay in filing a preliminary injunction motion undermines its claim of irreparable harm and supports applying the doctrine of laches.  Docket No. 51 at 3-16.

### A.    Likelihood of Success on the Merits

The Court will first consider whether the Party is likely to succeed on the merits of its constitutional claims.  *See RoDa Drilling Co*., 552 F.3d at 1208.

#### 1)   First and Second Claims – First Amendment Freedom of Association

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas."  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997).  The Supreme Court has recognized that "the freedom to join together in furtherance of common political beliefs . . . necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.  That is to say, a corollary of the right to associate is the right not to associate."  *Cal. Democratic Party v. Jones*,

530 U.S. 567, 574 (2000) (citations and quotations omitted); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986).  "In no area is the political association's right to exclude more important than in the process of selecting its nominee.  That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views."  *Jones*, 530 U.S. at 575.  Accordingly, Supreme Court cases "vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.'"  *Id*. (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)).

"On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."  *Timmons*, 520 U.S. at 358.  "The Constitution grants states the right to prescribe '[t]he Times, Places and Manner of Holding Elections for Senators and Representatives,' Art I, § 4, cl. 1, and the Supreme Court has held that states enjoy similar authority to regulate their own elections."  *Utah Republican Party v. Cox*, 892 F.3d 1066, 1076 (10th Cir. 2018) (citing *Tashjian*, 479 U.S. at 217).  "States have a major role to play in structuring and monitoring the election process, including primaries."  *Jones*, 530 U.S. at 572.  These regulations "will invariably impose some burden upon individual voters and political parties."  *Utah Republican Party*, 892 F.3d at 1077.

Amidst this "confluence of interests," courts analyze electoral regulations using the *Anderson–Burdick* balancing test.  *Id.*  Under *Anderson–Burdick*,

> a court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983))).  Election regulations that impose "severe burdens" on a party's associational or free speech rights are subject to strict scrutiny, and the Court will only uphold the regulation if it is "narrowly tailored to serve a compelling state interest."  *Id.* (quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008); *Timmons*, 520 U.S. at 358.  "However, when regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'"  *Utah Republican Party*, 892 F.3d at 1077 (quoting *Clingman*, 544 U.S. at 586-87).  "No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms."  *Timmons*, 520 U.S. at 359.

"[T]he severity of the burden that a primary system imposes on associational rights is a factual, not a legal, question," on "which the Party bears the burden of proof."  *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1123, 1125 (9th Cir. 2016).  The Supreme Court has previously addressed the constitutionality of: (i) a closed primary system, which restricted primary participation to registered voters of each party, *Tashjian*, 479 U.S. 208; (ii) a blanket primary system, where the primary ballot listed

every candidate regardless of party affiliation and allowed the voters to choose freely among the candidates, *Jones*, 530 U.S. 567; (iii) a non-partisan, blanket primary system, where the top two winners advanced to the general election, *Wash. State Grange*, 552 U.S. 442; and (iv) a semi-closed primary system, which allowed a political party to open its primary to unaffiliated voters, but not registered voters of other parties. *Clingman*, 544 U.S. 581. The Supreme Court and the Tenth Circuit have never addressed the constitutionality of a semi-open primary system like Proposition 108.

### a)  *Whether Proposition 108 Imposes a Severe Burden on the Party's Associational Rights*

The Party argues that Proposition 108 imposes a severe burden on its associational rights under *Jones* because the law forces the Party to allow unaffiliated voters to participate in its primary elections. Docket No. 39 at 3-6. The Party also asserts that the three-fourths opt-out provision is a severe burden because the threshold is "nearly impossible to meet" and allows a small minority of members to thwart an opt-out vote. *Id*. at 7-8. Furthermore, the Party argues that Proposition 108 is unconstitutional because it "prohibits a party from choosing a primary election (conducted with access to county and state resources) limited only to Republican voters." *Id*. at 8.[13]

The Secretary argues that Proposition 108 does not severely burden the Party's associational rights because major parties have "the *choice* between participating in the primary or opting out." Docket No. 51 at 3-4 (citing *Greenville Cnty. Republican Party*

---

[13] At the hearing, the Party asserted that Proposition 108 is facially unconstitutional under *Jones*, but also unconstitutional as applied to the Party. However, the Party did not clearly distinguish the differences between its facial and as-applied challenges.

*Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 664-66 (D.S.C. 2011)).[14]  The Secretary contends that Proposition 108 differs considerably from the primary system that the Supreme Court struck down in *Jones*.  *Id*. at 4-5.  Furthermore, the Secretary argues that the Party has presented no evidence suggesting that a three-fourths voting requirement is impossible to meet.  *Id*. at 5.  Finally, the Secretary contends that states may restrict parties' candidate nomination procedures to particular formats, such as a convention or primary, and political parties have no constitutional right to force taxpayers to fund their "favored process."  *Id*. at 6-7.

The Court finds that Proposition 108 is distinguishable from the Supreme Court's decision in *Jones*.  In *Jones*, the Supreme Court held that California's blanket primary system – which "list[ed] every candidate regardless of party affiliation and allow[ed] the voter to choose freely among them" – violated the political parties' associational rights. *Jones*, 530 U.S. at 570, 586.  First, *Jones* acknowledged that a "blanket primary" may "be constitutionally distinct from the open primary, in which the voter is limited to one party's ballot."  *Id*. at 577 n.8 (internal citation omitted).  The Court therefore expressly left open the question of the constitutionality of an open primary.  *See id*. ("[t]his case does not require us to determine the constitutionality of open primaries").  Second, California's blanket primary was a mandatory system that "force[d] political parties to associate with" unaffiliated voters and voters affiliated with rival parties, *see id*. at 577, whereas Proposition 108 provides an opt-out mechanism for major political parties.  *See*

---

[14] In *Greenville*, the court held that South Carolina's open primary system – which provided an opt-out mechanism to use a closed convention process if three-fourths of the total membership of the party's state convention voted to opt out – did not facially burden any political party's associational rights.  *Greenville*, 824 F. Supp. 2d at 659, 663-66.

Colo. Rev. Stat. § 1-4-702(1); *see also Greenville*, 824 F. Supp. 2d at 665 (finding that South Carolina's open primary system with an opt-out provision was distinguishable from the mandatory system in *Jones* because South Carolina provided "alternative mechanisms" for political parties to gain access to the general election ballot through the opt-out provision); *Miller v. Brown*, 503 F.3d 360, 367 (4th Cir. 2007) (finding that it was "constitutionally significant" that the primary law in *Jones* was "both mandatory and exclusive").  Accordingly, the Court rejects the Party's argument that *Jones* decides this case as a matter of law.

Regarding the Party's facial freedom of association challenge, the Court finds that the Party has failed to show that Proposition 108 imposes a severe burden on all political parties.  Facially, Proposition 108 offers major political parties a choice between participating in a state-run, semi-open primary system allowing unaffiliated voters to participate or holding a closed assembly or convention nomination process limited to party members.  *See* Colo. Rev. Stat. §§ 1-4-101(3), 1-4-702(1); *see also Miller*, 503 F.3d at 367 ("by merely choosing any of these other options, a party is free to limit its candidate selection process to voters who share its political views.  Thus, the 'forced association' that the Supreme Court has condemned [in *Jones*], simply is not present here."); *Greenville*, 824 F. Supp. 2d at 666 (finding that South Carolina's open primary law did not facially burden political parties' rights to freedom of association because parties were free to choose between the open primary or opt-out and have a closed convention).

The Party has identified no authority suggesting that a supermajority opt-out voting requirement is facially unconstitutional.  In *Initiative & Referendum Inst. v.*

*Walker*, 450 F.3d 1082, 1085, 1085, 1105 (10th Cir. 2006), the Tenth Circuit denied a facial First Amendment challenge to Utah's constitutional provision imposing a two-thirds supermajority requirement for citizen ballot initiatives related to wildlife management.  The Tenth Circuit rejected plaintiffs' argument that the supermajority requirement burdens their First Amendment rights "by making it more difficult to secure passage of a wildlife initiative" because "the supermajority requirement does not implicate the First Amendment at all."  *Id*. at 1099.  The three-fourths opt-out mechanism, on its face, "neither limit[s] or abridge[s] any party's ability to disseminate its views, nor does the statute affect how a party conducts its internal organizational affairs."  *Greenville*, 824 F. Supp. 2d at 668; *compare Eu*, 489 U.S. at 229-30 (finding that California's restrictions on the organization and composition of official governing bodies violated the parties' associational rights because the restrictions "limit[ed] a political party's discretion in how to organize itself, conduct its affairs, and select its leaders").  Accordingly, the Party has failed to show that Proposition 108 facially constitutes a severe burden on the associational rights of all major political parties.

Regarding its as-applied challenge, the Court finds that the Party has failed to meet its evidentiary burden of demonstrating that Proposition 108 imposes a severe burden on the Party's associational rights.  *See Nago*, 833 F.3d at 1125.  In *Jones*, the Supreme Court determined that the burden on the parties' associational rights was severe, in part, due to evidence that there was a "clear and present danger" that a party's nominee would be "determined by adherents of an opposing party."  *Jones*, 530 U.S. at 578.  For example, a survey showed that 37 percent of California Republicans planned to vote in the Democratic gubernatorial primary, while 20 percent of California

Democrats planned to vote in the Republican Senate primary. *Id*. The Supreme Court also discussed how the forced association in California's blanket primary system had the "likely outcome . . . of changing the parties' message." *Id*. at 581-82.

The Tenth Circuit has not addressed what type of evidence a political party must present to establish that a primary system imposes a severe burden on its constitutional rights. The Ninth Circuit requires a political party to provide "evidence showing a 'clear and present danger' that adherents of opposing parties [will] determine [its] nominees" or that the "open primary system causes [party] candidates to moderate their policy stances." *Nago*, 833 F.3d at 1125. District courts in the Ninth Circuit have found that primary systems severely burden a party's associational rights where expert reports identified "clear evidence of crossover voting." *Idaho Republican Party v. Ysursa*, 765 F. Supp. 2d 1266, 1273-74 (D. Idaho 2011); *see also Ravalli Cnty. Republican Cent. Comm. v. McCulloch*, 154 F. Supp. 3d 1063, 1070 (D. Mont. 2015), *aff'd*, 2016 WL 11859816 (9th Cir. Dec. 16, 2016) (noting that plaintiffs could not use evidence of crossover voting from other states to demonstrate a possibility of crossover voting in Montana).

At the hearing, the Party presented no evidence of crossover voting or any other evidence suggesting that unaffiliated voters or voters affiliated with rival parties might determine the Party's nominees. *See Nago*, 833 F.3d at 1125. Although it is undisputed that the number of active unaffiliated voters in Colorado is double the number of active Republican voters, *see* Ex. 24 at 1, ¶ 3, the Party presented no evidence regarding the number of unaffiliated voters who participated in certain primary elections since the enactment of Proposition 108. The Party offered no evidence that

unaffiliated voters changed the outcome of any specific primary races in 2018, 2020, or 2022.[15]  While voter secrecy laws safeguard the confidentiality of a voter's ballot selections, creating an obstacle to proving that unaffiliated voters have been instrumental in electing a candidate that Party members would not have elected in a closed primary, the Party's data subscription through SCORE provides it with the names of unaffiliated voters, their contact information, and which primary elections each unaffiliated voter participated in.  The Party could have conducted a poll of unaffiliated voters to determine whether the unaffiliated voters had candidate preferences that diverged from the candidate preferences of Party members.[16]  The Party acknowledged in its closing argument that one way to potentially determine whether unaffiliated voters influenced the outcome of a primary election would be to look at the winning candidate's policy positions on contested issues, such as abortion or immigration, compared to the Party's platform on those issues.  However, the Party presented no such analysis at the

---

[15] Several of the Party's witnesses speculated that unaffiliated voters could influence the outcome of a primary race.  For example, Chairman Williams testified that he believes "dark money groups wish to engage in these primary contests to sway the outcome for a candidate that may not be as committed to the Republican Party platform."  Similarly, Trent England, a fellow at the Oklahoma Council of Public Affairs, testified that, if unaffiliated voters are allowed to participate in the primary, there is the "possibility of having candidates who are actually opposed to the party platform" selected as the Party's candidate for the general election.  Mr. England stated that "there is a potential that you could have an organized effort of [unaffiliated voters] who could hijack the Republican primary."  However, Chairman Williams and Mr. England presented no evidence to suggest that the theoretical possibility has ever materialized in any election.  Accordingly, this testimony is insufficient to satisfy the Party's burden.

[16] The Party submitted third-party polling information, *see* Ex. 25, which shows that polls can be used to determine voter behavior and preferences.  In a state like Colorado, where voters are automatically registered as unaffiliated voters, a poll might provide relevant information regarding whether Party members have different ideological views or candidate preferences from unaffiliated voters who choose to participate in the Party's primary.

evidentiary hearing.  In contrast, the Secretary's witness, Professor Sides, testified that he was unaware of any conclusive empirical evidence showing that unaffiliated voters have changed the outcome of any primary election.  Additionally, academic literature demonstrates that the likelihood of party raiding is very rare.

Furthermore, at the evidentiary hearing, the Party presented no evidence suggesting that Colorado's semi-open primary system causes candidates to moderate or change their policy stances on specific issues.  *See Nago*, 833 F.3d at 1125; *Idaho Republican Party v. Ysursa*, 660 F. Supp. 2d 1195, 1201 (D. Idaho 2009) ("The Court cannot conclude, based on mere assertions, that Republican candidates have modified and will continue to modify their political messages, ideologies and positions because of [the] current open primary system.  Surveys, expert testimony, statistics and/or testimony from the candidates themselves is needed.").  The Party's witness, Mr. Lundberg, admitted that as a candidate, "I don't really craft my message according to who is out there as much as simply telling [voters] who I am."  Professor Sides testified that there is no evidence demonstrating any relationship between primary rules and the ideologies of winning candidates.  In short, because the Party has presented no evidence that Colorado's semi-open primary system causes candidates to change their policy positions or that unaffiliated voters might have an outcome determinative effect on the Party's nominees, the Party has failed to show that Proposition 108 imposes a severe burden on its associational rights.  *See Nago*, 833 F.3d at 1125.[17]

---

[17] The Party presented some evidence that candidates' marketing costs have increased under Proposition 108.  However, the Party failed to explain how these costs impose a severe burden on the Party's associational rights.  Complying with election regulations frequently imposes economic costs on parties and candidates.

However, even if the Party had demonstrated that the semi-open primary poses a severe burden on its associational rights, under Proposition 108, the Party still has the ability to opt out of the semi-open primary and use a closed assembly or convention nomination process open only to Party members.  Courts must "analyze ballot-access opportunities in sum rather than in isolation."  *Utah Republican Party*, 892 F.3d at 1088 ("due weight should be accorded to whether a challenged provision stands in isolation as the sole method for accessing the ballot, or whether candidates have alternative and constitutionally sufficient paths through which to qualify.  In the latter circumstance, the burden that any one particular route to ballot access that the law places on candidates, voters, and parties is necessarily reduced").  The Court finds that the Party has failed to show that the three-fourths opt-out threshold constitutes a severe burden on its associational rights.  The Party contends that the three-fourths requirement is "nearly impossible to meet."  Docket No. 39 at 7.  While it is undoubtedly true that there are constitutional limits on how high a state can raise the bar on a supermajority requirement in the voting context, the Court does not find that the three-fourths opt-out provision of Proposition 108 reaches that limit.  Evidence at the hearing, including the results of Committee votes and the testimony of Ms. Taheri and Mr. Wadhams, demonstrates that the Committee often surpasses a supermajority voting threshold on certain issues.  *See* Exs. 8, 10.  The Party's inability to opt out of the semi-open primary for the last three election cycles is not due to an impossible structural barrier, but rather arises from robust policy disagreement within the Party.  As the Tenth Circuit discussed in *Walker*, which also involved plaintiffs who sincerely felt frustrated by the burden of a supermajority provision, the difficulty of attaining a supermajority voting threshold does

not implicate the First Amendment: the "First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail." *Walker*, 450 F.3d at 1101.[18]  The Party has presented no legal authority suggesting that any court has invalidated a supermajority voting requirement in a freedom of association as-applied challenge.

Finally, the Court rejects the Party's argument that Proposition 108 is unconstitutional because it prohibits the Party from choosing a closed primary election funded by the State.  *See* Docket No. 39 at 8.  A political party does not have a constitutional right to nominate its candidates by a certain method.  *See Miller*, 503 F.3d at 368 ("a party has no constitutional right . . . to select its nominees by primary"); *Am. Party of Texas v. White*, 415 U.S. 767, 781 (1974) (noting that it "is too plain for argument" that the State "may insist that intraparty competition be settled before the general election by primary election or by party convention"); *Jones*, 530 U.S. at 572 ("a State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion"); *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 206 (2008) ("Selection by convention has never been thought unconstitutional, even when the delegates were not

---

[18] As noted in *Walker*, "[c]onstitutions and rules of procedure routinely make legislation, and thus advocacy, on certain subjects more difficult by requiring a supermajority vote to enact bills on certain subjects.  Those who propose, for example, to impeach an official, override a veto, expel a member of the legislature, or ratify a treaty might have to convince two-thirds of the members of one or both houses to vote accordingly.  State constitutions attach supermajority requirements to a bewildering array of specific categories of legislation, including appropriations bills, tax levies, bonding bills, debts, land use regulations, the salaries and discipline of state officials, district formation and redistricting, and judicial administration."  *Walker*, 450 F.3d at 1100-01.

selected by primary but by party caucuses"); *see also Utah Republican Party*, 892 F.3d at 1078-79.

The Party has failed to demonstrate that Proposition 108 imposes a severe burden on its associational rights and therefore strict scrutiny is inapplicable. *See Utah Republican Party*, 892 F.3d at 1077. When "regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Id*. (quoting *Clingman*, 544 U.S. at 586-87).

### b) State's Interests

The Secretary argues that Proposition 108's optional, semi-open primary system supports the State's interests in (1) "facilitating increased voter participation;" (2) "promoting fairness;" (3) "ensuring administrative efficiency;" and (4) "preserving the integrity of the nominating process." Docket No. 51 at 7.

Increasing voter participation in primary elections is an important State interest. *See Greenville*, 824 F. Supp. 2d at 671 ("States have an important interest in promoting voter participation in the electoral process"); *Utah Republican Party*, 892 F.3d at 1084 (increasing "voter participation" constitutes "the very backbone of our constitutional scheme"). Professor Sides' analysis demonstrated that, after the passage of Proposition 108, voter turnout in Colorado's 2018 and 2022 primary elections increased by nine points compared to voter turnout in the 2010 and 2014 primary elections. Proposition 108's higher voter turnout rate is consistent with academic studies showing that voter turnout rates are higher in states with more open primary systems. The Court finds that the Secretary's important regulatory interest of increasing voter participation justifies the minimal burden imposed on the Party's associational rights. *See*

*Greenville*, 824 F. Supp. 2d at 672 (finding that South Carolina's open primary law with an opt-out provision was adequately justified by the state's legitimate interest in encouraging voter participation in primary elections). As a result, the Party has not demonstrated that it is likely to succeed on the merits of its first and second claims.

### 2) *Third Claim – First Amendment Freedom of Speech*

The Party's third claim alleges that Proposition 108 infringes its rights to freedom of speech under the First Amendment. Docket No. 1 at 15-17. The Party argues that "[f]orcing a political party to lend its name to a nominee who may not reflect the views of a majority or even plurality of the party's members is compelled speech." Docket No. 39 at 10. The Secretary responds that Proposition 108 does not compel speech because it does not force political parties to proceed by a primary and Proposition 108 does not prevent the Party from disseminating its own views or endorsing certain candidates. Docket No. 51 at 11. Furthermore, the Secretary argues that the Party cites no case holding that a similar primary law constitutes compelled speech. *Id*. at 10.

The First Amendment protects an individual's "right to speak freely and the right to refrain from speaking at all." *Semple v. Griswold*, 934 F.3d 1134, 1143 (10th Cir. 2019) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "To state a compelled-speech claim, a plaintiff must establish three elements: (1) speech; (2) to which the speaker objects; that is (3) compelled by some governmental action." *Id*. In addition to freedom of association claims, the *Anderson–Burdick* balancing test also applies to free speech challenges to electoral regulations. *See Campbell v. Buckley*, 203 F.3d 738, 742 (10th Cir. 2000).

The Court finds that the Party has not shown that it is likely to succeed on the merits of its compelled speech claim because the Party has presented no evidence that it is forced to lend the Party's name to a candidate who does not reflect the views of the Party.  As discussed previously, the Party presented no evidence that unaffiliated voters changed the outcome of any primary races in 2018, 2020, or 2022.  The Party presented no evidence that, after the passage of Proposition 108, any nominee has held policy views that significantly differed from the Party's platform.  In contrast, Professor Sides testified that he was unaware of any conclusive empirical evidence showing that unaffiliated voters have changed the outcome of any primary election.  Even if the Party believes that there is a possibility that a winning candidate in its primary may not be the nominee preferred by Party members, the Party has a choice under Proposition 108's opt-out provision to use a closed assembly or convention nomination process limited to Party members.  The Party has failed to explain how its speech is compelled by governmental action when it has a statutory choice to proceed with a nomination process limited to Party members.  *See Semple*, 934 F.3d at 1143 ("As to the compulsion element, this court has held that the governmental measure must punish, or threaten to punish, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature.") (citation and quotations omitted)). The Party has not identified any case, and the Court found no case, holding that a semi-open primary system with an opt-out provision constitutes compelled speech.

Accordingly, any burden that Proposition 108 imposes on the Party's free speech rights is not severe.  The Court finds that the Secretary's important regulatory interest of increasing voter participation justifies the minimal burden imposed on the Party's free

speech rights, as discussed above.  As a result, the Party has not demonstrated that it is likely to succeed on the merits of its third claim.

### 3)  Fourth Claim – Vote Dilution

The Party's fourth claim asserts that Proposition 108 dilutes the votes of the Party's members under the Equal Protection Clause of the Fourteenth Amendment by allowing unaffiliated voters to vote in its primary.  Docket No. 1 at 17-18.  Specifically, the Party argues that Proposition 108 dilutes votes through "ballot-box stuffing."  Docket No. 39 at 10 (citing *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).  The Secretary argues that the Party has cited no case law holding that a registered party member's vote "is diluted by opening the party's primary to unaffiliated voters."  Docket No. 51 at 11.  The Secretary asserts that "'[b]allot-box stuffing'—or the practice of forging and returning false ballots to 'create a false and fictitious return respecting the votes lawfully cast'— bears no resemblance to the lawful counting of unaffiliated Coloradans' votes pursuant to Proposition 108."  *Id*. (quoting *United States v. Saylor*, 322 U.S. 385, 388 (1944)). Furthermore, the Secretary argues that the votes of the Party's members are not diluted because the Party has a choice to opt out of the semi-open primary.  *Id*.  In reply, the Party asserts that *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), is on point.  Docket No. 63 at 5.  The Party argues that the vote dilution in this case consists of "potentially 1.8 million unaffiliated voters able to swamp the 929,000 or so registered Republican voters."  *Id*.

The Fourteenth Amendment's Equal Protection Clause "prohibits states from restricting or diluting votes in violation of the 'one person, one vote' principle."  *Navajo Nation v. San Juan Cnty*., 929 F.3d 1270, 1282 (10th Cir. 2019) (quoting *City of*

*Herriman v. Bell*, 590 F.3d 1176, 1185 (10th Cir. 2010)).  "Under the one-person, one-vote principle, the right to vote 'is infringed when legislators are elected from districts of substantially unequal population.'"  *Id*. (quoting *Avery v. Midland Cnty., Tex*., 390 U.S. 474, 478 (1968)).

The Court finds that the Party has failed to demonstrate a likelihood of success on the merits of its vote dilution claim.  In *Reynolds*, the Supreme Court held that the right to vote cannot be "diluted by ballot-box stuffing."  *Reynolds*, 377 U.S. at 555 (citing *Saylor*, 322 U.S. at 385).  The Supreme Court in *Saylor* described ballot-box stuffing as the practice of inserting "false ballots" into the ballot box, "together with the other ballots lawfully cast, so as to create a false and fictitious return respecting the votes lawfully cast."  *Saylor*, 322 U.S. at 386.  The Court agrees with the Secretary that Proposition 108 is not akin to ballot-box stuffing.  There is no evidence that unaffiliated voters are casting "false ballots" under Proposition 108.  *See id*.  The "loss of political power through vote dilution is distinct from the mere inability to win a particular election." *Thornburg v. Gingles*, 478 U.S. 30, 57 (1986).  The Party has not identified any case, and the Court found none, holding that a semi-open primary system dilutes votes in violation of the "one person, one vote" principle.[19]  As a result, the Party has not demonstrated that it is likely to succeed on the merits of its fourth claim.

---

[19] The Court finds that the *Michel* case is not on point.  In *Michel*, several congressmen and individual voters challenged the constitutionality of a House of Representatives' rule granting delegates from Puerto Rico, Guam, the Virgin Islands, American Samoa, and the District of Columbia the right to vote in the Committee of the Whole.  *Michel*, 14 F.3d at 624-25.  The court found that the changes did not violate the constitutional requirement that the House "be composed of members."  *Id*. at 630-32. The Court therefore did not reach the vote dilution claims.

### 4) Fifth Claim – Equal Protection Claim between Minor and Major Parties

The Party's fifth claim asserts that Proposition 108 violates the Equal Protection Clause of the Fourteenth Amendment by treating major political parties and their members differently from minor political parties and their members.  Docket No. 1 at 19-21.  Specifically, the Party argues that "voters affiliated with major political parties such as Plaintiff are not permitted to participate in a primary election to choose their party's nominees without their votes being diluted by unaffiliated voters, but voters affiliated with minor political parties are permitted to do so.  That differential treatment infringes upon the fundamental voting rights of voters affiliated with major political parties."  Docket No. 39 at 11.  The Secretary argues that political parties, and voters affiliated with political parties, are not a "suspect class" under the Equal Protection Clause.  Docket No. 51 at 12.  The Secretary argues that Proposition 108's classification between major and minor political parties passes a rational basis test because there are obvious differences between the needs of major and minor parties.  *Id*.  In reply, the Party argues that strict scrutiny is the appropriate level of review.  Docket No. 63 at 5-6.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008).  "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny."

*Price-Cornelison*, 524 F.3d at 1109.  If the action "classifies people according to a quasi-suspect characteristic, such as gender or illegitimacy, then [the] court will apply intermediate scrutiny."  *Id*.  If the action "does not implicate either a fundamental right or a protected class, [the] court will apply a rational basis test."  *Id*. at 1110.

The Court will first consider what level of scrutiny is appropriate for this claim. Political parties are not "an inherently suspect class" under the Equal Protection Clause. *Greenville*, 824 F. Supp. 2d at 669; *see also Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 414 (W.D. Pa. 2020) (noting that inherently suspect classes include race, alienage, or national origin; "[p]olitical parties are not such a suspect class").  Although the "right to vote is a fundamental right," *see Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (citing *Reynolds*, 377 U.S. at 554), the Party does not allege that Proposition 108 infringes the ability of its members to vote in a semi-open primary election.  Proposition 108 allows both Party members and unaffiliated voters to participate in the Party's primary election.  *See* Colo. Rev. Stat. §§ 1-4-101(2)(a)-(b), 1-7-201(2.3).  When "all voters" are "given an opportunity to vote. . . [there is] no burden on a fundamental right to vote."  *Save Palisade FruitLands*, 279 F.3d at 1213.[20]  Furthermore, as discussed previously, the Party and its members have no constitutional right to nominate candidates by a certain method.  *See Miller*, 503 F.3d at 368.  Because Proposition 108's classification between major parties and

---

[20] The Court already found that the Party was unlikely to succeed on the merits of its vote dilution claim.  Therefore, the Party's suggestion that major and minor parties are treated differently due to the dilution of major party members' votes, *see* Docket No. 39 at 11, is unavailing.

minor political parties "does not implicate either a fundamental right or a protected class, [the] court will apply a rational basis test."  *See Price-Cornelison*, 524 F.3d at 1110.

Under the rational basis standard, "the classification need only bear a 'rational relation to some legitimate end to satisfy the Equal Protection Clause.'"  *Save Palisade FruitLands*, 279 F.3d at 1213 (quoting *Kinnell v. Graves*, 265 F.3d 1125, 1128 (10th Cir. 2001)).  In *White*, the Supreme Court found that states could, under the Equal Protection Clause, require smaller political parties to nominate candidates through a convention, while requiring major parties to nominate candidates through a primary election.  *White*, 415 U.S. at 781-82.  The Supreme Court acknowledged that

> there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other.  (A State is not) guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot.

*Id*. at 782 n.13 (citations and quotations omitted).  The Secretary argues that the State could rationally conclude that it has an interest in including unaffiliated voters in a major party's primary when the party does not opt out of the primary, but the State has less of an interest in including unaffiliated voters in a minor party's primary because minor parties "usually do not require the winnowing function of a primary between multiple candidates."  Docket No. 51 at 12.  The Secretary also asserts that Proposition 108 supports the State's interest in ensuring administrative efficiency.  *Id*. at 7.  Testimony at the evidentiary hearing revealed that, over the past four years, only one minor political party has participated in a primary election.  States have an important interest in protecting the "efficiency of their ballots and election processes."  *Timmons*, 520 U.S. at 364.  The Court finds that Proposition 108's classification between major and minor

political parties bears a rational relationship to the legitimate state interest of ensuring administrative efficiency.  *See id.; White*, 415 U.S. at 782 n.13; *Save Palisade FruitLands*, 279 F.3d at 1213.  Consequently, the Party has not demonstrated that it is likely to succeed on the merits of its fifth claim.

### B.  Other Preliminary Injunction Factors

Because the Party has failed to establish a likelihood of success on the merits, the Court declines to address the other preliminary injunction factors.  *See Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1140-41 (D. Colo. 2018) (denying preliminary injunction where movants failed to show a likelihood of success on the merits without considering the remaining preliminary injunction factors); *see also Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014) (unpublished) (noting that "a plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted").  The Court also declines to address the Secretary's arguments regarding the *Purcell* doctrine or laches.  *See* Docket No. 51 at 13-16.

## IV.    CONCLUSION

It is therefore

**ORDERED** that plaintiff's Motion for Preliminary Injunction [Docket No. 39] is **DENIED**.

DATED February 2, 2024.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge