# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY,
an unincorporated nonprofit association, on behalf of itself and its members,

      Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

      Defendant.

---

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff Colorado Republican Party submits the following Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 and D.C.COLO.LCivR 56.1.

## **INTRODUCTION**

This suit challenges the constitutionality, both on its face and as applied, of Colorado's Proposition 108 (and its implementing statutes) ("Prop. 108"), a ballot initiative adopted in 2016 that requires a major political party to allow non-party members to vote in that party's primary election and thereby to help determine the party's nominee for the general election. Plaintiff COLORADO REPUBLICAN PARTY asserts, on behalf of itself and its members, that the law violates constitutionally-protected rights of speech, association, and equal protection of the laws. Plaintiff's governing State Central Committee has voted at the outset of the last two election cycles to challenge Prop. 108's constitutionality.

## STATEMENT OF UNDISPUTED FACTS

The Parties previously filed a Joint Statement of Undisputed Facts, which appears at Dkt. 33 (Exh. 1). In addition, Plaintiff submits that the following facts regarding Prop. 108 and its implementation are also undisputed (numbering continued from the prior Joint Statement):

14. The number of unaffiliated voters participating in Republican primary elections in Colorado has increased significantly in recent years, with approximately 100,000 in 2018, 130,000 in 2020, more than 231,000 in the 2022 Republican Primary Election, and more than 373,000 in the 2024 Presidential Primary.[1]

15. The official "Arguments for" Colorado's Prop. 108 stated: "Allowing unaffiliated voters to participate in primary elections may result in candidates who better represent all Coloradans," and "Opening the primary election may result in candidates who are more responsive to a broader range of interests."[2]

16. In each election cycle under Prop. 108, numerous unaffiliated voters have had their ballots disqualified because they returned both party ballots.[3]

17. In both 2021 and 2023, the Colorado Republican Party's State Central Committee overwhelmingly supported the option of a primary election limited only to Republican voters, an option not available under Prop. 108.  Rule 30(B)(6) Dep. 87:24-91:15 (Ex. 6).

18. Expert polling conducted by Plaintiff demonstrated "a marked and measurable difference between the voting behavior and opinions of registered Republicans who vote in Republican

---

[1] Khalaf Expert Report at 12, ¶ 29; SOS Data File CE68-20220708-1330 (2022); SOS CE68-20240313-2135 (2024).

[2] Legis. Council, Colo. Gen. Assembly, Rsch. Pub. No. 669-6, 2016 State Ballot Information Booklet 66 (Sept. 12, 2016) ("Blue Book"), https://tinyurl.com/2s3rsenb (last visited April 2, 2025).

[3] Def.'s Resp. to Interrog. No. 7, p. 8-9.

primaries and registered Unaffiliated voters who participate in those same elections."[4]

**PROCEDURAL HISTORY**

Plaintiff, the Colorado Republican Party ("COGOP"), filed this action on July 31, 2023, on behalf of itself and its members. It challenges the constitutionality of Prop. 108 and its implementing statutes, both facially and as applied. The complaint states five causes of action: 1) Requiring that unaffiliated voters be allowed to participate in the COGOP's primary elections violated COGOP's First Amendment Freedom of Association; 2) The undue burden and intrusion into internal party affairs caused by the supermajority vote requirement of Prop. 108's opt-out provision violates COGOP's Freedom of Association; 3) Requiring a candidate nominated with the votes of unaffiliated voters to be designated as the party's nominee at the general election is compelled speech that violates COGOP's Freedom of Speech; 4) The dilution of party members' votes by the inclusion of non-party members in the primary election violates the Equal Protection Clause; and 5) Treating Plaintiff—a major political party—differently than minor political parties in Colorado without good cause violates the Fourteenth Amendment's Equal Protection clause. Dkt. 1. Plaintiff moved for preliminary injunction on December 22, 2023. Dkt. 39. After briefing and a hearing that included both witness testimony and oral argument, the court denied the preliminary injunction motion on February 2, 2024. Dkt. 69 (Exh. 5). The parties subsequently engaged in discovery, and Plaintiff now submits this motion for partial summary judgement. Because the facial challenges arguably turn on a disputed issue of fact about the near impossibility of the Party's ability to opt out of the semi-open primary, Plaintiff here seeks summary judgment only on its as-applied challenges to Counts I, II, IV, and V, which it contends can be decided as a matter of law.

**ARGUMENT**

---

[4] Khalaf Rep. at 1, ¶ 3.

## I.   Standard of Review

Summary judgment is warranted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231–32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).

## II.  Prop. 108's Mandate to Allow Unaffiliated Voters to Participate in the Party's Selection of Its Nominee for Office Infringes the Party's Freedom of Association.

To prevail on its First Amendment Freedom of Association claim in the circumstances presented here, Plaintiff must prove: 1) that it is an expressive association;[5] 2) that the government's action, *i.e.*, the mandate in Prop. 108 that Plaintiff must allow voters who are not members of its association to participate in the primary election at which it chooses its party nominees, significantly burdens its associational rights; and 3) the government's interest is not sufficiently compelling, or the means it has employed are not narrowly tailored, to overcome the associational right. *Utah Republican Party v. Herbert*, 144 F. Supp. 3d 1263, 1271 (D. Utah 2015) (quoting *Eu*

---

[5] Plaintiff, as a political party, is undisputedly an expressive association; indeed, a quintessential political one. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997) ("The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas.").

*v. San Francisco Cnty Dem. Cent. Cmte.*, 489 U.S. 214, 222 (1989); *Washington State Grange v. Washington State Rep. Party*, 552 U.S. 442, 451 (2008)).

### A. Colorado's Prop. 108 substantially burdens Plaintiff's associational rights as a matter of law.

It is undisputed that Prop. 108 requires major political parties participating in Colorado's semi-open primary to allow unaffiliated voters to vote in their primary elections.

More than two decades ago, the Supreme Court made clear that forcing a political party and its members to allow unaffiliated voters—people who by definition are not part of the political association—to vote in the primary election that determines the nominee of that political party, violates the Freedom of Association of the party and its members protected by the First amendment and made applicable to the States by the Fourteenth Amendment. *California Democratic Party v. Jones*, 530 U.S. 567 (2000).

At issue in that case was California's "blanket primary," which provided that "[a]ll persons entitled to vote, *including those not affiliated with any political party*, shall have the right to vote ... for any candidate regardless of the candidate's political affiliation." *Id.* at 570 (quoting Cal. Elec. Code § 2001, emphasis added). The Court held that "[t]he First Amendment protects 'the freedom to join together in furtherance of common political beliefs,' … which 'necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.'" *Id.* at 574 (quoting *Tashjian v. Rep. Party of Conn.*, 479 U.S. 208, 214-15 (1986), and *Democratic Party of United States v. Wisc. ex rel. La Follette*, 450 U.S. 107, 122 (1981)). Indeed, the Court noted that "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee" because "[t]hat process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambass-dor to the general

electorate in winning it over to the party's views." *Jones*, 530 U.S. at 575 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 372 (1997) (Stevens, J., dissenting)).

California's blanket primary violated the freedom of association of the political parties and their members because it "force[d] political parties to associate with—to have their nominees, and hence their positions, determined by—those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival." *Jones*, 530 U.S. at 577. It was therefore "qualitatively different from a closed primary," for "[u]nder that system, even when it is made quite easy for a voter to change his party affiliation the day of the primary [as is also the case in Colorado], and thus, in some sense, to 'cross over,' at least he must formally *become a member of the party*; and once he does so, he is limited to voting for candidates of that party." *Id.* (emphasis in original).[6]

The Government here has previously contended, and this Court accepted at the preliminary injunction phase of this litigation, that *Jones* is distinguishable on two grounds. First, because Prop. 108 allows a party to opt out of the open primary and choose its nominees by a convention process closed to unaffiliated voters, the party is not "forced" to allow unaffiliated voters to participate in its selection of its nominees for the general election. And second, because, according to the government's expert, there is no evidence that unaffiliated voters have altered the

---

[6] In a footnote, Justice Scalia did suggest, in *dicta*, that a "blanket primary … may be constitutionally distinct from the open primary, … in which the voter is limited to one party's ballot," *id.* at 577 n.8 (emphasis added), but he did so in reliance on a dissenting opinion in *La Follette*, in which Justice Powell noted that "the act of voting in the Democratic primary fairly can be described as an act of affiliation with the Democratic Party." *Id.* at 577 n.8 (quoting *La Follette*, 450 U.S. at 130 n. 2 (Powell, J., dissenting)). That is not true of the Colorado law at issue here, for a provision of Proposition 108 expressly provides that "[a]n eligible unaffiliated elector … is entitled to vote in the primary election of a major political party without affiliating with that political party." CRS § 1-7-201(2.3); *see also* § 1-2-218.5(2) ("Any unaffiliated eligible elector may, but is not required to, declare a political party affiliation when the elector desires to vote at a primary election."). Justice Powell's inference is therefore not applicable here.

outcome of any primary election, the party's associational rights are not substantially burdened, if at all. Neither contention is a valid basis for distinguishing *Jones*, and this Court's prior determinations to the contrary, which relied on out-of-circuit decisions rather than a directly applicable in-circuit decision, should be revisited.[7]

### i. The opt-out option does not insulate Prop. 108's unaffiliated voter mandate in this as-applied challenge.

The parties dispute whether the supermajority vote requirement (three-fourths of the *total* central committee membership rather than merely three-fourths of those voting) necessary to opt out of the open primary and its compelled participation by unaffiliated voters is itself such a high hurdle that COGOP is effectively *forced* into a primary election in which it is required to accept the votes of unaffiliated voters, contrary to the Supreme Court's holding in *Jones.* But as the only other district court in this circuit to have addressed the issue has found, that dispute is *immaterial* to COGOP's as-applied constitutional challenge.[8]

At issue in *Utah Republican Party v. Herbert*, 144 F.Supp.3d 1263 (D. Utah 2015), was a challenge to the state's law permitting political parties to decided whether to participate in primary elections as a Registered Political Party ("RPP") or a Qualified Political Party ("QPP").

---

[7] "[F]indings of fact and conclusions of law made by a Court granting or denying a preliminary injunction are generally not entitled to law of the case status, as they are 'not binding at trial on the merits.'" *DTC Energy Grp., Inc. v. Hirschfeld*, 17-CV-01718-PAB-KLM, 2020 WL 1333090, at *4 (D. Colo. Mar. 23, 2020) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Fish v. Schwab*, 957 F.3d 1105, 1140 (10th Cir. 2020) ("As *Camenisch* indicates, the normal rule is that '[r]ulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case…'" (quoting 18B Wright et al., Federal Practice and Procedure § 4478.5)).

[8] Plaintiff concedes that, if the opt-out provision is itself not unduly burdensome such that it is a truly viable choice, then its facial challenge to the open primary law under Count I of the Complaint would likely fail. Whether it is so burdensome as to effectively force Plaintiff into the open primary is a disputed issue of fact, not appropriate for resolution at summary judgement. But for the reasons set out below, that disputed issue of fact is not material to its as-applied challenge in Count I.

Political parties choosing the latter designation were required to allow unaffiliated voters to par-

ticipate in their primary elections. The Utah Republican Party ("URP") and the Constitution Party

of Utah ("CPU") challenged the unaffiliated voter mandate as a violation of their First Amendment

freedom of association. The State moved for summary judgement, contending that the Parties were

not "forced" to allow participation of unaffiliated voters in their primary elections because they

"easily could have chosen to become RPPs and avoid the forced association with unaffiliated vot-

ers." *Id.* at 1271. "The State is incorrect," the court concluded, explaining after a thorough review

of relevant Supreme Court precedent that the RPP choice afforded to political parties insulated

Utah's law from a facial challenge but not an as-applied challenge. Once a party made the choice

to proceed as a Qualified Political Party, the unaffiliated voter provision imposed "a severe burden

because it forces QPPs to flood their primary elections with thousands of unaffiliated voters." *Id*.

at 1280. "Accordingly," the court held, "the Unaffiliated Voter Provision must be struck down

unless it is 'narrowly drawn to advance a State interest of compelling importance.'" *Id.* (quoting

*Burdick v. Takushi,* 504 U.S. 428, 434 (1992)). Then, after rejecting each of the State's asserted

interests (including the same "increase voter participation" interest

advanced by Colorado here) as not "compelling," the Court denied the State's Motion for Sum-

mary Judgement and granted the Constitution Party's Motion for Partial Summary Judge on the

unaffiliated voter issue. It also granted summary judgment to non-movant Utah Republican Party

pursuant to Fed. R. Civ. P. 56(f). *Id.* at 1265 and n.10.[9]

     *Utah Republican Party* is directly on point, and its thorough review of controlling

---

[9] The decision was not appealed; the State Legislature instead deleted the requirement that Quali-
fied Political Parties allow unaffiliated voters to participate in their primaries. 2016 Utah Laws Ch.
16 (H.B. 48), § 3 (deleting Utah Code § 20A–9–101(12)(a), which defined "Qualified Political
Party" as, inter alia, a registered political party that "permits voters who are unaffiliated with any
political party to vote for the registered political party's candidates in a primary election").

Supreme Court precedent is compelling and extremely persuasive. It should be followed here. Once the Colorado Republican Party has declined to opt out of the open primary (whether by choice or because of the extremely high hurdle the statute requires in order to opt out), the requirement that it allow unaffiliated voters to participate in its primary election imposes a "severe" burden on its First Amendment associational rights, triggering strict scrutiny in its as-applied challenge as a matter of law. Just as in *Utah Republican Party*, therefore, the unaffiliated voter mandate imposed by Prop. 108 here "must be struck down unless it is 'narrowly drawn to advance a State interest of compelling importance.'" *Utah Republican Party*, 144 F.Supp.3d at 1280 (quoting *Burdick*, 504 U.S. at 434).

ii.   **Whether unaffiliated voters have or will affect primary election results is also immaterial to COGOP's as-applied challenge.**

The *Utah Republican Party* decision also dispensed with the State's claim that the burden on associational rights was not supported by the evidence because the political parties "have not shown that unaffiliated voters will choose to vote in the Republican or Constitution Parties' primaries and, if so, in what numbers" and therefore "have not presented 'concrete evidence' to demonstrate what impact, if any, unaffiliated voters will have on the outcome of the Parties' primaries," and have also "failed to show that 'the presence of unaffiliated voters in their primaries will change the Parties' message and dilute Party ideology.'" *Id.* at 1271. Relying on the Fourth Circuit's decision in *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006), the court found the State's claim to be "incorrect." *Id.* at 1271. "[E]ven though an election has not been held under SB54, and it is uncertain *exactly* how SB54 would affect the upcoming election, it is clear that the Unaffiliated Voter Provision 'causes the plaintiffs [URP and CPU] to associate with [unaffiliated voters] during the candidate-selection process,' which is an 'unquestionabl[e] ... constitutional injury.'" *Id.* at 1272 (quoting *Miller*, 462 F.3d at 316, 318).

Citing a case out of the Ninth Circuit, this Court denied COGOP's motion for preliminary injunction in this case in part because "the Party presented no evidence of crossover voting or any other evidence suggesting that unaffiliated voters or voters affiliated with rival parties might determine the Party's nominees"; "no evidence that unaffiliated voters changed the outcome of any specific primary races"; and "no evidence suggesting that Colorado's semi-open primary system causes candidates to moderate or change their policy stances on specific issues." Dkt. 69 at 20-22 (citing, *e.g.*, *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1123, 1125 (9th Cir. 2016)). Because the Court suggested as an evidentiary remedy that "[t]he Party could have conducted a poll of unaffiliated voters to determine whether the unaffiliated voters had candidate preferences that diverged from the candidate preferences of Party members," Dkt. 69 at 21, COGOP conducted just such a poll and, not surprisingly, it demonstrated that "there is a marked and measurable difference between the voting behavior and opinions of registered Republicans who vote in Republican primaries and registered Unaffiliated voters who participate in those same elections." Khalaf Rep. at 1, ¶ 3 (Exh. 2).

The survey conducted by Khalaf demonstrates significant, outcome-relevant differences in candidate preferences. In the 2024 Presidential Primary, Donald Trump received 76.1% support from Republican respondents but only 47.9% from unaffiliateds—a 28.2-point gap. Nikki Haley received 14.1% support from Republicans but 36.0% from unaffiliateds—a 21.9-point gap the other direction. Khalaf Rep. at 7-8, ¶¶ 21-22. In the 2022 Secretary of State race, conservative candidate Tina Peters received support from 16.2% of Republicans and just 10.3% of unaffiliateds. *Id.* at 6, ¶¶ 16-17. These differences far exceed the ±5.77% survey margin of error and are statistically significant.[10]

---

[10] Khalaf's findings merit particular weight given his firm's credentials. Data Orbital is rated by FiveThirtyEight as the 8th best pollster in the country and the highest-rated small polling firm.

These divergent preferences reflect deeper ideological divides. 71.1% of Republican re-
spondents identified as conservative (42.7% as "strong conservative"), while only 40.2% of unaf-
filiateds identified as conservative (18.7% "strong conservative"). 43.4% of unaffiliateds self-iden-
tified as moderate. *Id*. at 11, ¶ 28. Notably, these different ideological identifications correspond
with different voting behaviors even when controlling for ideology. As Khalaf testified, "Repub-
lican moderates do not vote like Unaffiliated moderates." Khalaf Dep. 91:1-14 (Exh. 3).

These findings confirm that unaffiliated voters not only vote in large and growing numbers
but also vote differently from COGOP members—posing a "clear and present danger" that unaf-
filiateds may determine the Party's nominee. *Jones*, 530 U.S. at 578; *Utah Republican Party*, 144
F. Supp. 3d at 1277. Even Defendant was forced to concede that, in at least some Republican
primaries, the number of unaffiliated voters participating in the Republican primary exceeded the
margin of victory. See Def.'s Resp. to RFA No. 5 (Exh. 4).

The expert report prepared by COGOP's pollster also filled an evidentiary gap identified
by this Court in its order denying the preliminary injunction, namely, that "the Party presented no
evidence regarding the number of unaffiliated voters who participated in certain primary elections
since the enactment of Prop. 108." Dkt. 69 at 20. As the report documents, "there has been a
remarkable shift towards Unaffiliated voters participating in Republican primary elections in re-
cent years, from roughly 100,000 in 2018 and 130,000 in 2020 to "more than 231,000 Unaffiliated
voters … in the 2022 Republican Primary Election." Khalaf Rep. at 12, ¶ 29. "By the 2024 Presi-
dential Primary, the number had increased to more than 373,000." *Id.* Because the numbers from
the 2022 and 2024 elections are based on "data from the Secretary of State's CE-068 file," it is

---

Khalaf Rep. at 3; Khalaf Dep. 115:8-11. The firm is also a member of the American Assoc. for
Public Opinion Research's Transparency Initiative, which requires disclosure of methodology to
ensure replicability according to scientific standards. Khalaf Dep. 113:22-114:14.

undisputed that unaffiliated voters have in fact participated in recent Republican primary elections in Colorado, and in significant enough numbers (about 35% of the Republican primary electorate in 2022 and about 43% in the 2024 presidential primary, with some counties seeing more unaffiliated than Republican voters, Khalaf Rep. at 12, ¶ 29, citing Colo. Sec'y of State, CE68-20220708-1330 & CE68-20240313-2135) to present not just a "prospect," but a "clear and present danger" that the Party's nominee will be determined by the unaffiliated voters. *Cf. Jones*, 530 U.S. at 578 (evidence of 37% and 20% cross-over voting created not just a "prospect," but a "clear and present danger" that the party's nominee would be determined by adherents of an opposing party); *Utah Republican Party*, 144 F.Supp.3d at 1277 (applying *Jones* to unaffiliated voters participating in a party primary).

In several counties, unaffiliated voters not only participated in large numbers—they outnumbered registered Republicans. In Denver County, for example, 27,977 unaffiliated voters cast ballots in the 2024 Republican presidential primary, compared to only 18,350 registered Republicans—a difference of more than 9,600 votes, or 52%. Khalaf Rep. at 12, ¶ 29. This same phenomenon occurred in Boulder County (22,234 unaffiliateds to 15,870 Republicans) and Jefferson County (29,941 to 23,433). *Id*. at 12, ¶ 30. In each of these counties, it was not the Party's members but unaffiliated voters who made up the majority of the Republican primary electorate—and who therefore controlled its outcome. This is the foreseeable and intended consequence of a statutory scheme that compels the Republican Party to open its most critical internal function to individuals who have affirmatively declined to join it.

And while the State may dispute the expert conclusion that "there is a marked and measurable difference between the voting behavior and opinions of registered Republicans who vote in Republican primaries and registered Unaffiliated voters who participate in those same elections," any such dispute would not be material under the *Utah Republican Party* case and the Supreme

Court and other precedent on which it relied. For "even though … it is uncertain *exactly* how [the inclusion of unaffiliated voters] would affect the upcoming election, it is clear that the Unaffiliated Voter Provision 'causes the plaintiffs … to associate with [unaffiliated voters] during the candidate-selection process,' which is an "unquestionabl[e] ... constitutional injury.'" *Utah Republican Party*, 144 F.Supp.3d at 1272 (quoting *Miller*, 462 F.3d at 316, 318). Indeed, in *Jones*, the Supreme Court expressly held that "[i]t is unnecessary to cumulate evidence" that policy positions were altered as a result of the blanket primary, "since after all, the whole *purpose* of Proposition 198 was to favor nominees with 'moderate' positions."[11] The same is true here. The official "Arguments for" Colorado's Prop. 108 demonstrates that the same purpose as was identified in *Jones* is at work here: "Allowing unaffiliated voters to participate in primary elections may result in candidates who better represent all Coloradans," and "Opening the primary election may result in candidates who are more responsive to a broader range of interests." Und. Fact 15.

The Utah court also relied, *inter alia*, on the Supreme Court's decision in *La Follette* to reach its conclusion. As the Supreme Court stated in that case, "[o]n several occasions this Court

---

[11] In its opinion denying Plaintiff's Motion for Preliminary Injunction, this Court relied on the Ninth Circuit's decision in *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119 (CA9 2016) for the proposition that a political party must provide "evidence showing a 'clear and present danger' that adherents of opposing parties [will] determine [its] nominees" or that the "open primary system causes [party] candidates to moderate their policy stances." *Nago*, 833 F.3d at 1125. But *Nago* distinguished *Jones* on this point, noting that in the California election system at issue in *Jones*, voters "listed their political affiliation," whereas "Hawaii, on the other hand, does not provide for partisan registration." *Id.* at 1125 (citing *Jones*, 530 U.S. at 570). The Democrat Party's contention that non-Democrats were participating in Democrat primaries was therefore merely an inference that was "not sufficient to show that Hawaii's open primary system severely burdens the Party's associational rights" by allowing non-party members to participate in its primary election, because "the 185,000 people voting in Hawaii's Democratic primaries who are not formal Party members may nevertheless personally identify as Democrats." *Id.* Because Colorado's voter records indicate a voter's party affiliation or unaffiliated status, the evidence that was lacking in *Nago* is present here. Indeed, it is undisputed that unaffiliated voters participate in Republican primaries in Colorado and therefore present a "clear and present danger" that they will determine the party's nominees. *Jones*, 530 U.S. at 578.

has recognized that the inclusion of persons unaffiliated with a political party may seriously distort

its collective decisions—thus impairing the party's essential functions—and that political parties

may accordingly protect themselves from intrusion by those with adverse political principles." *La*

*Follette,* 450 U.S. at 112. Significantly, the Court also held that "a State, or a court, may not con-

stitutionally substitute its own judgment for that of the Party" with respect to what is necessary to

protect the Party from such intrusions. *Id.*, 450 U.S. at 123-24. In other words, if, as here, a political

party believes that the inclusion of unaffiliated voters in its primary election may impact its pri-

mary elections, either by the choice of candidate or the moderation of views,[12] it may protect itself

from the intrusion of unaffiliated voters even if the State has a different view about the impact

unaffiliated voters may have on the party's collective decisions. The extent of the impact, if indeed

any at all, is therefore *immaterial* to the constitutional right of the political party to make that

judgment on its own. This Court should therefore find that the unaffiliated voter mandate is a

severe burden on Plaintiff's associational rights as a matter of law.

**B.  None of Colorado's asserted interests are "compelling" or "narrowly tailored"**

The State has previously asserted four interests in support of Prop. 108's unaffiliated voter

participation mandate: (1) "facilitating increased voter participation;" (2) "promoting fairness;"

(3) "ensuring administrative efficiency;" and (4) "preserving the integrity of the nominating pro-

cess." Dkt. 51 at 7. In its preliminary injunction ruling, this Court only addressed the first, finding

that it was an "important regulatory interest" that "justifies the minimal burden imposed on the

Party's associational rights." Dkt. 69 at 25. Because it applied only rational basis review rather

than the strict scrutiny required by the above analysis for severe burdens on associational rights,

the Court did not assess whether the State's interest in facilitating increased voter participation

---

[12] *See, e.g.*, Rule 30(b)(6) Dep. Witness, p. 157-58 (Exh. 6).

was compelling, or whether the unaffiliated voter mandate was narrowly tailored to achieve that interest. As Plaintiff has previously noted, controlling Supreme Court precedent holds that it is not, and neither are any of the other interests the State has asserted.

Defendant admitted in discovery that Prop. 108 was enacted to "encourage candidates who are responsive to the viewpoints of more Coloradans." Def.'s Resp. to Req. for Admis. No. 1. That is not only constitutionally insufficient, it is precisely the same interest the Supreme Court held unconstitutional in *Jones*. There, the State of California defended its blanket primary by arguing that it would produce nominees "closer to the median policy positions of their districts" and compel parties to nominate candidates with "broader appeal." *Id*. at 582. The Court forcefully rejected that rationale, holding that such a purpose amounts to "a stark repudiation of freedom of political as-sociation." *Id*. It condemned California's Proposition 198 because its "intended outcome" was to alter party nominees and positions in order to appeal to non-members of the party—exactly what Prop. 108 attempts by "encouraging responsiveness" to a broader electorate at the nomination stage.

Additionally, the State's interest in "facilitating greater voter participation" is quite similar to the "third" interest asserted by the State of California in *Jones*, namely, ensuring that disenfran-chised persons – meaning, those "unable to participate" in a party's closed primary – enjoy the right to an effective vote. *Jones,* 530 U.S. at 583. The Court described that interest as "nothing more than reformulation of an asserted state interest we have already rejected—recharacterizing nonparty members' keen desire to participate in selection of the party's nominee as 'disenfran-chisement' if that desire is not fulfilled." *Id*.

The high Court rejected that interest in strong terms as well: "We have said ... that a 'non-member's desire to participate in the party's affairs is overborne by the countervailing and legiti-mate right of the party to determine its own membership qualifications.'" *Id*. (quoting *Tashjian*,

479 U.S. at 215-16 n.6). The Court added that the "voter's desire to participate does not become more weighty simply because the State supports it." *Id*. at 583-84. And it offered a remedy to the voter who feels himself "disenfranchised": "simply join the party." "That may put him to a hard choice," the Court noted, "but it is not a state-sponsored restriction upon his freedom of association, whereas compelling party members to accept his selection of their nominee is a state-imposed restriction upon theirs." *Id*. at 584.

The Utah District Court considered the same asserted interest in *Utah Republican Party*, where the State argued that increased voter participation is "a good thing … because '[g]reater voter participation is a hallmark of a vibrant democracy.'" *Utah Republican Party*, 144 F.Supp.3d at 1280. That interest "was raised and rejected in *Jones* and *Miller*, the court noted, adding that "The U.S. Supreme Court in *Jones* instructed that increasing voter participation is 'just a variation on the same theme' of broadening the range of choices *favored by the majority* … [which is] hardly a compelling state interest, if indeed it is even a legitimate one. *Id*. (quoting *Jones*, 530 U.S. at 584 (emphasis in original)). And the *Miller* court likewise "noted that '[w]hile allowing the broadest possible group of voters to participate in a primary may be desirable, this interest cannot overcome the severe burden placed upon a political party when it is forced to associate with those who may not share its views." *Id*. at 1281 (quoting *Miller*, 503 F.3d at 371). In short, the Utah District Court is right. Controlling Supreme Court precedent in *Jones*, and the Fourth Circuit's decision in *Miller*, compel the conclusion that increasing voter participation "is not a compelling state interest."

The Secretary's second asserted interest is in "promoting fairness," which appears to be "fair candidate winnowing," Dkt. 51 at 7, and "an administratively sound way to winnow the fields of candidates who identify with shared political views," *id*. at 9. Such an interest is also explicitly foreclosed by *Jones*. There, the interest was described as "producing elected officials who better represent the electorate and expanding candidate debate beyond the scope of partisan concerns,"

which the Court said were "simply circumlocution for producing nominees and nominee positions other than those the parties would choose if left to their own devices." *Jones*, 530 U.S. at 582. These interests "reduce to nothing more than a stark repudiation of freedom of association: Parties should not be free to select their own nominees because those nominees, and the positions taken by those nominees, will not be congenial to the majority." *Id*. The Court refused to countenance such an "inadmissible" interest. "[W]innow[ing] the field of candidates" to those "who identify with shared political views" is just another way of advocating for the same "stark repudiation of freedom of association" foreclosed by *Jones*.

The remaining two interests previously asserted by the Secretary are "ensuring administrative efficiency" and "preserving the integrity of the nominating process." As with the asserted interest in "promoting fairness" addressed above, the Secretary has been a bit vague as to the substance of these interests, or whether they are even separate interests. "Ensuring administrative efficiency" is later paired with "stability," Dkt. 51 at 9, and also with the need to prevent regular "vacillation" and "undue voter confusion," which all seem to be connected in some way to "preserving the integrity of the nominating process." Plaintiff therefore treats all these formulations as merely different descriptions of the same interest in preserving election integrity.

"Stability," prevention of regular "vacillation" among nomination methods, and prevention of "undue voter confusion" are all offered as interests supporting Prop. 108's extraordinarily high, "three-fourths-of-the-total-membership" threshold for the Party to opt out of the open primary. The problem with the Secretary's reliance on these interests as support for the opt-out provision is that they are only furthered if the opt-out is not achieved, completely undermining the Secretary's claim that the open primary default is merely a choice made by the Party.

Colo. Rev. Stat. § 1-4-702(1) makes this problem clear. Any vote to opt out of the open primary is only good for the election cycle in which the vote occurs. Colo. Rev. Stat. § 1-4-702(1)

(providing that the opt-out vote "shall occur no later than October 1 of the year preceding the year in which an assembly or convention nominating process is to be used."). Should a three-fourths vote actually be achieved in any given election cycle, the nominating process would revert back to the open primary default for the next election cycle unless another three-fourth's vote could be obtained at the outset of that election cycle. The high threshold necessary to "ensure[] that a party must have a strong commitment to opting out" of the open primary in one election cycle, as the Secretary sees it, therefore serves as high barrier to stability for the succeeding election cycle, creating the very vacillation and voter confusion the Secretary bemoans.

The Secretary's asserted interest in increased voter participation would also be severely undermined were a political party ever to achieve the supermajority vote requirement necessary to opt out of the open primary. The opt-out provision provides that a party opting out of the open primary may only nominate candidates for the general election ballot "by assembly or convention." Colo. Rev. Stat. § 1-4-702(1). Such an alternative would risk *excluding* from the process most of the nearly 1 million voters registered with the party – all but the relatively few (3,000 to 4,000 or so) who are chosen as delegates to the statewide assembly or convention.

In sum, the Supreme Court has already rejected the State's principal asserted interests as not compelling – increasing voter participation and winnowing the field of candidates to those whose views are shared by more of the electorate. The State's two other asserted interests – "ensuring administrative efficiency" and "preserving the integrity of the nominating process" – can hardly be viewed as "compelling" in comparison. But even if some argument could be advanced that either of those constituted a compelling governmental interest, the unaffiliated voter mandate is not narrowly tailored to further any such interest, if it furthers the interest at all.

The State does not even try to connect those dots, and no connection is self-evident. In fact,

the system implemented by Prop. 108 adds several *inefficiencies* to the primary nomination pro-

cess. First, from 2018 until 2023, election officials were required to track unaffiliated voters who

provide notice of a primary party preference to ensure that the unaffiliated voters is mailed only

the preferred party's ballot. 8 Colo. Code Regs. § 1505-1:2.16 (eff. 2017 to 2023). No such effort

was required under the prior closed primary system. Second, for the overwhelming number of

unaffiliated voters who did not submit a party preference notification (and for all unaffiliated vot-

ers since the party preference regulation was repealed), election officials must mail at least two

ballots (and perhaps more, depending on whether any minor political party has permitted unaffil-

iated voters to vote in its election), one for each of the parties participating in the election, doubling

the printing costs and likely increasing the mailing costs and voter confusion. That is the opposite

of "administrative efficiency." Third, county clerks must confirm that unaffiliated voters return

only one of the party ballots they had been sent, since the law requires that only one party's ballot

can be voted. Colo. Rev. Stat. § 1-7.5-107(6).  That significant effort simply did not exist under

the prior, closed primary system. These all create greater inefficiencies in the conduct of primary

elections, and Plaintiff is hard pressed to identify *any* administrative action that makes the process

more efficient rather than less.

  The State has also not attempted to connect the dots as to how the unaffiliated voter man-

date preserves the integrity of the nomination process at all, must less how it is narrowly tailored

to further that interest. As with the asserted administrative efficiency interest, just the opposite

seems to be the case. As the Secretary has admitted, in each election cycle numerous unaffiliated

voters have their ballots disqualified because they returned both of the two party ballots they re-

ceived rather than only one. Def.'s Resp. to Interrog. No. 7, p. 8-9 (reporting that 6,947 ballots

were rejected in 2018, 9,655 in 2020, and 8,336 in 2022 because unaffiliated voters returned both

major party ballots).  The confusion created by the mailing of multiple ballots undermines rather

than advances the integrity of the nomination process.

In sum, none of the interests advanced by the State are compelling, and even if any argument could be made to the contrary, the unaffiliated voter mandate is not narrowly tailored to advance those interests, if it even advances those interests at all. Moreover, in *Jones*, the Supreme Court held that the blanket primary was not narrowly tailored to further the interests asserted there, because all of the interests could be protected without interference with the free association rights of political parties by resort to a *nonpartisan* blanket primary. *Jones*, 530 U.S. at 585–86. California adopted a *nonpartisan* blanket primary in response to the *Jones* decision, but Colorado embraced an unconstitutional semi-open primary instead.

The unaffiliated voter mandate is unconstitutional as a matter of law, and this Court should grant Plaintiff's Motion for Summary Judgement as to Count I.

## III. The Opt-Out Provision of Prop. 108 Is Unconstitutional In Its Own Right.

Prop. 108's "opt-out" provision, CRS § 1-4-702, not only does not save the unaffiliated voter mandate from unconstitutionality for the reasons articulated in *Utah Republican Party* and discussed in Section II above, it is constitutionally problematic in its own right for at least two reasons. First, it allows a major political party to opt out of the semi-open primary *only* if, before every election cycle, a supermajority of three-fourths of the total membership of the party's governing state central committee votes to opt out of the semi-open primary election in which the Party must allow unaffiliated voters to participate. That threshold is extraordinary, rarely if ever applied in other parliamentary contexts because it is nearly impossible to meet for any contested question, *see, e.g.*, Robert's Rules of Order ¶68 ("In prescribing the vote necessary for the adoption of an amendment, the expression 'a vote of two-thirds of the members' should never be used in ordinary societies, especially in large organizations with quorums smaller than a majority of the membership, as in such societies it is seldom that two-thirds of the members – that is, two-thirds

of the entire membership – is ever present at a meeting."). It is also a severe and unconstitutional "intrusion into the internal structure or affairs" of Plaintiff, *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984), for it allows a small minority of members (if that) to thwart an opt-out vote even if such were supported by an overwhelming majority but less than a three-fourths supermajority of Plaintiff's governing body, the State Central Committee.

The Supreme Court's decision in *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989), is instructive here. Although this Court cited that decision in its Order denying the preliminary injunction, it apparently read the case is establishing a restricted list of ways in which State would unconstitutionally intrude into the internal affairs of a private organization. That is not what the *Eu* Court did, but even if the *Eu* recitation of examples was exclusive, two of them – how a party conducts its affairs and how it selects its leaders – are directly applicable to the opt-out supermajority vote requirement imposed by State law.

At issue in *Eu* were provisions of the California election code that dictated the organizational structure and composition of political parties' governing bodies, imposed limits on the term of office for state central committee chairs, and mandated that the chair rotate between residents of northern and southern California. "These laws directly implicate the associational rights of political parties and their members," the Court held. *Eu*, 489 U.S. at 229. There is nothing in the opinion that even hints that the particular provisions at issue in the case were the only ways in which government might unconstitutionally interfere with the internal operations of political parties. On the contrary, the reasoning of the opinion is broad. "[A] political party's 'determination … of the structure which best allows it to pursue its political goals, is protected by the Constitution.'" *Id.* (quoting *Tashjian*, 479 U.S. at 224). The word "structure" is easily broad enough to encompass things like supermajority vote requirements such as is imposed by the opt-out provision. Indeed, this Court has described the supermajority vote requirement as a "structural bar-rier"

(albeit not, in its view an impossible one). Dkt. 69 at 23. Moreover, the next sentence in *Eu* is even more relevant here: "Freedom of association also encompasses a political party's decisions about the identity of, *and the process for electing*, its leaders." *Id.* (citing *La Follette*, 450 U.S. 107, emphasis added). Prop. 108's supermajority requirement for an opt-out vote directly impacts the "process" by which a political party decides to choose its leaders, and it alters the party's governing rules on how such decisions are normally made, by majority vote. Whether the "three-fourths of total membership" requirement is impossible, nearly impossible, or merely a thumb on the scale, it is indisputably a heavy thumb, one which limits the party's "discretion in how to … conduct its affairs" on a critically important decision about how to select its nominees for office. *Eu*, 489 U.S. at 230.

The heavy thumb placed on the scales of that decision also effectively results in the State substituting its judgment for that of the party on such a critically important decision. As *Eu* held, "a State cannot substitute its judgment for that of the party as to the desirability of a particular internal party structure." *Id.* at 233 (citing *Tashjian*, 479 U.S. at 224).

In its Order denying Plaintiff's Motion for Preliminary Injunction, this Court also noted that numerous provisions in constitutions impose supermajority requirements of various kinds, such as impeachments, veto overrides, and appropriations bills. Dkt. 69 at 24 n.18 (citing *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1100 (10th Cir. 2006)). But each of those require-ments, as well as the supermajority requirement for passage of certain kinds of ballot initiatives at issue in the *Walker* case, involved supermajority requirements for how government operates, not, as here, a supermajority requirement imposed *by government* on how a private entity such as a political party can operate. *Walker* is therefore inapposite, and Plaintiff respectfully requests that the Court revisit its reliance on it.

Finally, even were the "three-fourths of total membership" threshold to be met, the opt-out

Plaintiff's Motion for Summary Judgment - 22

provision allows nomination *only* by assembly caucus or convention (conducted with only the party's resources); it prohibits a party from choosing a primary election (conducted with access to county and state resources) limited only to Republican voters—the one choice that Plaintiff's State Central Committee unanimously or nearly unanimously supported in both 2021 and 2023. Undisputed Facts ¶¶ 7, 11. It therefore creates an unenviable and unconstitutional Hobson's choice—forego a primary election where the nominee is chosen only by voters affiliated with the party, or accept an unconstitutional condition mandating that it allow unaffiliated voters to influence—perhaps decisively—the choice of nominee in its primary election. Some choice. Both alternatives – the semi-open primary where the Party is compelled to accept participation by unaffiliated voters and the "opt-out" alternatives of nomination by assembly caucus or convention rather than a primary election open to all Republican voters – violate the associational rights of Plaintiff and its members. As the Supreme Court has recognized, "Freedom of association … encompasses a political party's decisions about the identity of, and the process for electing, its leaders." *Eu*, 489 U.S. at 229.

Given this closely analogous precedent from the Supreme Court, Plaintiff's contention here should succeed as a matter of law. And as with the core Freedom of Association claim set out above in Part II, there are no compelling governmental interests that the opt-out provision is narrowly tailored to further. Indeed, by forcing the party to the Hobson's choice of allowing unaffiliated voters to help determine the party's nominees or no primary election at all, the opt-out provision actually runs counter to one of the principal governmental interests asserted by proponents of the initiative – encouraging more people to get involved in the electoral process. Def.'s Resp. to RFA No. 1.

**IV. Allowing Unaffiliated Voters to Vote in a Party's Primary Election Dilutes the Votes of Voters Affiliated with the Party in Violation of the Commands of the Fourteenth Amendment's Equal Protection Clause.**

The Right to the Equal Protection of the Laws protected by the Fourteenth Amendment to the United States Constitution prohibits States from diluting the weight to be accorded to a person's vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). In its Motion for Preliminary Injunction, Plaintiff drew an analogy with ballot stuffing. In its Order denying the preliminary injunction, this Court equated "ballot-box stuffing" with the practice of inserting "false ballots" into a ballot box, and then held that Prop. 108 is not akin to ballot-box stuffing because there is no evidence that unaffiliated voters are casting "false ballots." Dkt. 69 at 29. With all due respect, the Court simply misunderstood the point of Plaintiff's analogy. It is simply a mathematical truism that if unaffiliated voters are allowed to participate in a political party's primary election, then the votes of the party's own members are diluted from the weight they would have had if only party members had been allowed to vote. If there are 100 party members voting in a closed primary election, for example, each vote is worth 1/100th. If 100 unaffiliated voters are also permitted to vote in that primary election, each member's vote would be worth only 1/200th – diluted by half. There can be no dispute, therefore, that the votes are diluted, just as there was no dispute that the votes of members of Congress were diluted in *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994). The issue in both cases is whether they are *unconstitutionally* diluted because the additional votes are not constitutionally permissible. A city's annexation of territory with additional residents would dilute the votes of the pre-existing residents, but it would not be an unlawful dilution because the annexation itself was lawful. *Michel* simply held that the granting of voting power to non-member territorial delegates in the Committee of the Whole House was not unconstitutional, and therefore (implicitly) the vote dilution at issue in the case was not impermissible. Here, whether unconstitutional dilution occurs depends on whether the forced inclusion of unaffiliated voters in Plaintiff's primary is itself unconstitutional. If it is, then not only the Freedom of Association Claim in Count I, but the Vote Dilution Claim in Count IV, should succeed as a matter of law. Count IV asserts nothing

more.[13]

**CONCLUSION**

This Court should GRANT Plaintiff's Motion for Partial Summary Judge as to Counts I, and II, and derivatively as to Counts IV and V. Defendant's officers, agents, employees and all other persons acting in active concert with her, should be permanently enjoined from enforcing Prop. 108 and Colo. Rev. State Sections 1-2-218.5(2), 1-4-101(2)(b), 1-4-104, 1-4-702, and 1-7-201(2.3), in whole or in part, against Plaintiff, and affording to major political parties the same right that is available to minor political parties under CRS § 1-4-1304(1.5)(c) to notify the Secretary of State by the designated day before each primary election whether they wish to prohibit unaffiliated electors from voting in their primary elections.

Respectfully Submitted this 8th day of April, 2025.

/s/ Alexander Haberbush
Alexander Haberbush
CONSTITUTIONAL COUNSEL GROUP
444 W Ocean Boulevard, Suite 1403
Long Beach, CA 90802
Telephone: (562) 435-9062
FAX: (562) 600-7570
E-mail: ahaberbush@ccg1776.com

Randy B. Corporon
LAW OFFICES OF RANDY B. CORPORON P.C.
5445 DTC Parkway, Suite 825
Greenwood Village, CO 80111
Telephone: (303) 749-0062
FAX: (720) 836-4201
E-mail: rbc@corporonlaw.com

*Attorneys for Plaintiff*

---

[13] The same issue impacts the Court's analysis of Count V. In its Order denying the preliminary injunction, the Court noted that "[w]hen 'all voters' are 'given an opportunity to vote… [there is] no burden on a fundamental right to vote.'" Dkt. 69 at 31 (quoting *Save Palisade FruitLands*, 279 F.3d at 1213.). But if the "all voters" includes voters whose inclusion in the Party's primary election is not constitutionally permissible, then there is a burden on Party member's fundamental right to vote, and strict scrutiny, rather than rational basis review, would apply. The viability of Plaintiff's Count V Equal Protection claim therefore turns on the viability of its Count IV Vote Dilution claim, which, as noted above, turns on the viability of its Count I Freedom of Association claim.