**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY,
an unincorporated nonprofit association, on behalf of itself and its members,

  Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

  Defendant.

---

**REPLY IN SUPPORT OF THE SECRETARY'S MOTION FOR SUMMARY
JUDGMENT**

---

  Defendant Jena Griswold, in her official capacity as Colorado Secretary of State ("the Secretary"), by and through counsel, submits the following reply in support of her motion for summary judgment [Doc. 102].

  The record in this case is undisputed: the Party has not presented evidence that Proposition 108 presents a clear and present danger of impacting the identity of its nominees, its candidates' messages, or its platform. The opt-out provides an alternative to the semi-open primary that the Party may select by achieving a vote threshold that it routinely reaches when voting on other matters. And the Party has no evidence at all regarding Proposition 108's impact on other major political parties, as needed to support its facial claim. The Party has admitted that all key facts are undisputed, and the legal tests it urges this Court to adopt are unsupported by applicable authority. Summary judgment should be granted for the Secretary.

## RESPONSE TO STATEMENT OF DISPUTED FACTS

1.  Denied on the basis that the question of "whether the opt-out provision of Proposition 108 presents a feasible alternative" is a characterization and opinion, rather than a fact. The parties do not dispute the underlying facts regarding this issue. *See* Pl.'s Opp. [Doc. 107] at 2 (admitting to all but one of the Secretary's Statements of Undisputed Material Facts ("SUMF")).

## RESPONSE TO STATEMENT OF ADDITIONAL UNDISPUTED FACTS

1.  Denied as unsupported by the citation to the record.

2.  Denied. *See* Ex. S – 5.23.25 Rudy Decl. ("Ex. S").

3.  Admit.

4.  Admit that primary turnout as a percentage of total registered voters was 30.39% in 2018. Admit that primary turnout as a percentage of active registered voters was 35.12% in 2018 and 31.96% in 2022. Deny that the reported turnout number for 2024 is correct. *See* Ex. S ¶ 9.

## ARGUMENT

I.  **The Party has not produced evidence that Proposition 108 severely burdens its associational rights.**

   A.  **The inclusion of unaffiliated voters in the Party's primaries is insufficient, standing alone, to establish a severe burden.**

   Instead of identifying evidence that Proposition 108 severely burdens its associational rights, the Party argues it need not provide any. It urges this Court to hold, as a matter of law, that requiring a party to include non-party members in its primary is unconstitutional. *E.g.*, Pl.'s Opp. at 8. But as this Court recognized in its opinion denying the Party's preliminary injunction motion, that approach is unsupported by *California Democratic Party v. Jones*, 530 U.S. 567 (2000), as well as the substantial weight of authority thereafter.

In *Jones*, the Supreme Court reviewed a litany of evidence that, taken together, showed "the prospect of having a party's nominee determined by adherents of an opposing party . . . [was] a clear and present danger" in California's blanket primary. 530 U.S. at 578. This included (a) survey evidence of the percent of voters who were members of one party but planned to vote in the race of an opposing party; (b) studies of actual rates of crossover voting from other states with blanket primaries; (c) survey evidence showing that non-party members often had significantly different policy views than party members; (d) expert testimony, accepted by the Court, concluding that the blanket primary made it "inevitable" that candidates would be chosen who were not preferred by even a plurality of party members; and (e) expert testimony that policy positions of members of Congress from blanket primary states are more moderate. *Id.* at 578-81. Thus, *Jones* based its finding of severe burden on a wide range of empirical evidence and expert testimony about the likely and actual effects of blanket primaries, not on the mere fact that the blanket primary allowed non-party members to vote in party races.

The Party's Opposition focuses on select language in *Jones* describing the risks of blanket primaries as "obvious" and "inevitable." Pl.'s Opp. at 4. But in each instance, these observations were supported by record evidence, not just conjecture. The Court's reference to the "obvious proposition" that non-party members "often have policy views that diverge" from those of party members was supported by survey data. *Jones*, 530 U.S. at 578. That candidates "inevitab[ly]" would be nominated who were not preferred by party members was a matter of expert opinion. *Id.* at 579. Similarly, the finding that the blanket primary had the "likely outcome . . . of changing the parties' message," *id*. at 581-82, was not based solely on the goals motivating the law's adoption; it was supported by an expert report concluding that members of

Congress from blanket primary states have more moderate policy positions. *Id.* at 580. All told, *Jones* does not support the Party's claim that "the forced inclusion of large numbers of unaffiliated voters in its primary is alone sufficient to establish a severe burden." Pl.'s Opp. at 6.

Courts interpreting *Jones* have widely concluded that the extent to which a party's associational rights are burdened is a question of fact requiring evidentiary support. While the Party tries to spin *Democratic Party of Hawaii v. Nago* to its benefit, *Nago* could not have been clearer: "the extent of the burden that a primary system imposes on associational rights is a factual question on which the plaintiff bears the burden of proof." 833 F.3d 1119, 1122 (9th Cir. 2016). In that case, the plaintiff failed to carry its burden because the only evidence it presented was a "lone statistic" that was "ambiguous at best," and it had not presented evidence that the primary system "cause[d] [the party's] candidates to moderate their policy stances." *Id.* at 1125. Other courts have similarly required evidentiary support establishing the severity of any burden imposed by a primary system. *See Idaho Republican Party v. Ysursa*, 660 F. Supp. 2d 1195, 1200 (D. Idaho 2009) ("*Ysursa I*") (declining to grant summary judgment because "the Court ha[d] not been provided with the same type of expert testimony, surveys or statistics" as in *Jones*); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 665 (D.S.C. 2011) (explaining the court could not "come to the same conclusion as the Supreme Court did in *Jones*" without "empirical evidence" regarding the "effects of cross-over voting").

None of the Party's cited cases are persuasive authority to the contrary. In *Miller v. Brown*, 503 F.3d 360 (4th Cir. 2007), no litigant disputed that requiring a political party to participate in an open primary constituted a severe burden, so the Fourth Circuit did not rule on that question. *Id.* at 368-70. In *Utah Republican Party v. Herbert*, 144 F. Supp. 3d 1263 (D. Utah

2015), the court cited no evidence and no legal authority in concluding that requiring a small
political party to include unaffiliated voters in its primaries would alter "the way [it] conveys its
message." *Id.* at 1279-80. Nor did the court cite any caselaw to support its conclusion that merely
including large numbers of unaffiliated voters in a party's primary constituted a severe burden.
*Id.*[1] *Herbert*'s analysis departs substantially from *Jones* and should not be followed.

      Nor does *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981),
support the contention that a party establishes a "severe burden" simply by showing that non-
party members participate in its primaries. First, because *La Follette* predates the *Anderson-
Burdick* test, it did not address whether the state law at issue severely burdened the party's
associational rights under that framework. Second, while *Jones* drew on the "principles" set forth
in *La Follette*, it did not rely on *La Follette* for the proposition that including non-party members
in a party's primary is itself sufficient to establish a severe burden. If it had, the Court's
extensive discussion of surveys and expert testimony would have been unnecessary. Such a
reading of *Jones* would also be in tension with footnote 8 of the Court's opinion, which—citing
the dissent in *La Follette*—reserved the question of whether an open primary is constitutionally
distinct from a blanket one. 530 U.S. at 577 n.8. Finally, to the extent the Party interprets *La
Follette* as creating a general rule that "a State . . . may not constitutionally substitute its own
judgment for that of the Party" in determining who may participate in a Party's primary, *see* Pl.'s
Opp. at 8 (quoting *La Follette*, 450 U.S. at 123-24), that reading is foreclosed by the Supreme
Court's later ruling in *Clingman v. Beaver*, which held that a state law prohibiting political

---

[1] The Tenth Circuit's opinion in *Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018),
did not rule on the constitutionality of the unaffiliated voter rule at issue in *Herbert*. *See id.* at
1074 (noting that the district court's ruling on that law was "not before [the Court] on appeal").

parties from including members of opposing parties in their primaries imposed only a slight

burden on the parties' associational rights and was constitutional. 544 U.S. 581 (2005).

In the alternative, the Party argues that even if it must show evidence of a severe burden

beyond the mere fact of unaffiliated voter participation, it need not show "unaffiliated voters

have actually had an outcome determinative effect," Pl.'s Opp. at 9. To be sure, the type and

amount of evidence needed to establish a severe burden may vary based on the details of a

primary's format and a particular state's circumstances. Thus, in *Idaho Republican Party v.

Ysursa*, 765 F. Supp. 2d 1266 (2011) ("*Ysursa II*"), the court was heavily influenced by evidence

that Idaho was "the most one-party state and least electorally competitive state in the United

States," such that adherents of opposing parties "ha[d] to" cross over to vote in the dominant

party's primaries "to have any meaningful influence in elections." *Id.* at 1273. Combined with

expert testimony that closing Idaho's primaries would likely produce less moderate candidates,

the court found a severe burden on the dominant party's associational rights. *Id.* at 1275. And in

*Jones*, the Supreme Court took care to distinguish California's blanket primary, in which voters

of any affiliation could vote for candidates of any affiliation in any race, from open primaries, in

which voters are limited to one party's slate of candidates. 530 U.S. at 577 n.8. Here, the critical

flaw in the Party's case is not that they lack evidence that Proposition 108 has had any single

type of outcome-determinative effect. Rather, as discussed below, the cumulative evidence

cannot carry the Party's burden of showing that "the prospect of having [its] nominee determined

by adherents of an opposing party . . . is a clear and present danger," *id.* at 578, or that

Proposition 108 "has the likely outcome . . . of changing the [Party's] message," *id.* at 581-82.

Thus, the Party cannot meet the evidentiary thresholds set by *Jones* and its progeny.

**B.  The Party's scant evidence does not amount to a showing of "severe burden."**

The Party has presented precious little to sustain its burden of showing a severe imposition on its associational rights. The Party admits that (1) it cannot identify any nonpresidential primary election in Colorado in which the participation of unaffiliated voters changed the outcome; (2) it cannot identify any nonpresidential primary election in Colorado in which the candidate favored by the plurality or majority of unaffiliated voters differed from the candidate favored by the plurality or majority of registered Party voters; (3) there is no conclusive evidence demonstrating that open primary formats result in winning candidates with more moderate ideologies (contrary to the evidence accepted in *Jones*); and (4) there is no systematic evidence in political science literature that changes in primary rules have produced different candidate messages or messages that are less traditionally associated with candidates' political party. Pl.'s Opp. at 2 (admitting to SUMF). Indeed, since the preliminary injunction hearing, after which this Court found "the Party ha[d] presented no evidence that Colorado's semi-open primary system causes candidates to change their policy positions or that unaffiliated voters might have an outcome determinative effect on the Party's nominees," Doc. 69 at 22, the Party has introduced little new evidence of its asserted burden.

First, although Mr. Khalaf opined that there is "a marked and measurable difference between the voting behavior and opinions of" Party and unaffiliated voters, Doc. 102-12 at 1, his survey shows that the plurality of Party voters and plurality of unaffiliated voters uniformly preferred the same candidates in all surveyed races. *Id*. at 5-8; Doc. 102-11 at 8-10; *see also* Ex.

T –Sides Decl.[2] That the two groups had different favorability ratings for President Donald Trump and Congresswoman Lauren Boebert—while still preferring the same candidates in Party primaries—cannot establish a severe burden, as it does not show a "clear and present danger" of the Party's nominees being determined by unaffiliated voters.

Mr. Khalaf's survey also undermines the Party's assertion that its evidence about the number of unaffiliated voters participating in its primaries is similar to the evidence of crossover voting in *Jones* that evinced a "clear and present danger" of non-party members determining a party's candidates. 530 U.S. at 578. *Jones* highlighted evidence that meaningful percents of voters registered with one party planned to vote in the primary race of an *opposing* party. *Id*. As evident from the fact that unaffiliated and Republican voters ultimately preferred the same candidates in Mr. Khalaf's survey, the inferences that may be drawn from party *opponents* voting in substantial numbers in a party's primary are simply not comparable to a context in which only unaffiliated voters participate.

Finally, the Party points to Mr. Bjorklund's assertions that "candidate campaigns in Republican Primary elections have targeted the Unaffiliated voter in order to sway them toward candidates that don't traditionally appeal to Republican voters" and "as more candidates vie for the Unaffiliated voter participation, the message is watered down away from Republican voters and toward Unaffiliated voters." Pl.'s Opp. at 12. Mr. Bjorklund's claims—which his report did

---

[2] Out of an abundance of caution, the Secretary attaches a sworn declaration from John Sides attesting to the contents of his expert reports. *Compare Sanchez v. Hartley*, 299 F. Supp. 3d 1166,1181 n.11 (D. Colo. 2017) (expert declarations need not be sworn following the 2010 amendments to the Federal Rules of Civil Procedure) *with Peak ex rel. Peak v. Cent. Tank Coatings, Inc.*, 606 F. App'x 891, 895 (10th Cir. 2015) (unpublished) ("[U]nsworn expert reports are not competent evidence on summary judgment.").

not support with any data, methodology, examples, or analysis of individual candidate campaigns or messages—are not "[s]imilar expert evidence," Pl.'s Opp. at 12, to that relied on in *Jones*, where the Court cited expert analysis of the policy positions of members of Congress elected from blanket primary states. 530 U.S. at 580. And Plaintiff's defense of Mr. Bjorklund's conclusions as based on "personal experience" lacks merit. Pl.'s Opp. at 12 n.6. The deposition excerpt cited by the Party, which concerns Mr. Bjorklund's training in "voter lists," does not show his opinions about "candidate campaigns" or the Party's "message" are based on sufficient facts or data or are the product of reliable principles or methods. Doc. 107-6 at 45:4-11; *see* Fed. R. Evid. 702(b), (c). Therefore, his conclusory opinions cannot create a dispute of material fact. *Compare* Pl.'s Opp. at 12 *with* Doc 102-16 at 4; *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 977 (10th Cir. 2018) (unsupported and conclusory statements in purported expert report "are insufficient to defeat summary judgment"); *Ysursa I*, 660 F. Supp. 2d at 1201 (rejecting as conclusory a party chairman's assertion that candidates were modifying their policy positions and messages, and instead requiring "[s]urveys, expert testimony, statistics and/or testimony from the candidates themselves").

In sum, the Party falls far short of showing a severe burden on its associational rights. The Secretary is entitled to judgment on the Party's as-applied freedom of association claim.

## II.    The opt-out is relevant to the Party's as-applied associational challenge.

Next, the Party contends its ability to opt out of the semi-open primary is irrelevant to whether Proposition 108, as-applied, severely burdens its associational rights. Pl.'s Opp. at 13. This argument flouts the requirement that courts "analyze [election regulations] in sum rather than in isolation." *See Cox*, 892 F.3d at 1088 (citing *Arutunoff v. Okla. State Election Bd.*, 687

F.2d 1375, 1379 (10th Cir. 1982) ("[E]ach case must be resolved on its own facts after due consideration is given to the practical effect of the election laws of a given state, viewed in their totality.")). Neither *Herbert* nor *Miller* persuasively supports the Party's contrary argument.

As discussed in the Secretary's Response to the Party's partial motion for summary judgment, Doc. 108 at 7-8, *Miller* concluded that a political party was severely burdened by a nomination system that allowed individual incumbent legislators, not parties themselves, to opt into open primaries. *See* 503 F.3d at 362-63. *Miller* thus rejected the state's contention that an incumbent legislator's choice could stand in for the party's, but nothing in the opinion suggests a choice made by the party itself would be irrelevant to an as-applied associational challenge. *See id.* at 369 (rejecting state's argument that "there is nothing unconstitutional about designating [individual incumbent] as the particular person to choose the nomination method on behalf of the party"). *Herbert* overlooks *Miller*'s distinction between a legislator's choice and the party's, and its as-applied analysis is flawed and unpersuasive for that reason. *See* 144 F. Supp. 3d at 1279 (summarizing the state law at issue in *Miller* as "allow[ing] *a political party* to 'select from various methods' to nominate a candidate" (emphasis added)). Consistent with the Tenth Circuit's ruling in *Cox*, the existence of "constitutionally sufficient" alternatives to the semi-open primary (i.e., nomination by convention or assembly) "necessarily reduce[s]" any burden imposed by Proposition 108 on the Party in an as-applied analysis.[3] *See Cox*, 892 F.3d at 1086, 1088 (holding state law is "not unconstitutional . . . as applied to the [Utah Republican Party]").

---

[3] The Opposition suggests that the Secretary "concedes . . . that absent a realistic opt-out option, [Proposition 108] would impose a severe burden on the Party's associational rights." Pl.'s Opp. at 14. That is incorrect. The Party has failed to adduce evidence establishing that any portion of Proposition 108 severely burdens its associational rights. *See supra* § I.

Undisputed record evidence demonstrates not that the Party lacks alternatives, but rather that robust debate among the Party's leaders and members has led it not to exercise them. *See* SUMF ¶¶ 15-23. The Party asserts there is a dispute of material fact as to how difficult opting out is, foreclosing summary judgment. *See* Pl.'s Opp. at Statement of Disputed Facts ¶ 1; *see also id.* at 14, 15, 17 (suggesting that dispute over whether opting out is "feasible," "realistic," "nearly impossible," "very difficult," or merely "difficult" precludes summary judgment). But this argument mistakes a semantic disagreement for a genuine dispute of material fact. *See, e.g., Werahera v. Regents of the Univ. of Colo.,* No. 21-cv-02776-NYW, 2022 WL 15517043, at *5 n.6 (D. Colo. Oct. 27, 2022) (finding "dispute to be one of semantics, not of material fact").

The undisputed material facts are as follows: To opt out of semi-open primaries, the Party must achieve a vote of three-quarters of the Party's state central committee's (the "Committee") total membership. Votes surpassing three-quarters' support of the Committee's members occur "often," and some votes are unanimous. SUMF ¶ 19. The Party does not know how often its Committee has voted unanimously or near-unanimously because it has not maintained consistent records of its votes. SUMF ¶ 21. Of the three times the Committee voted on whether to opt out, that vote exceeded a simple majority only once, at a meeting in 2023. SUMF ¶¶ 17, 18. At that same meeting—attended by 96% or more of the Committee's total voting membership—six votes achieved support of more than two-thirds, three-quarters, or 90% of the Committee. SUMF ¶ 20; Doc. 102-4 at 79:21-25, 85:1-21; 86:1-87:9; Ex. U – Supplemental Plaintiff 30(b)(6) Deposition, at 80:16-20.[4]

---

[4] The Party does not know by how much these votes surpassed a two-thirds, three-quarters, or 90% threshold because it did not tally them. Doc. 102-4 at 84:21-85:25.

The Party does not and cannot dispute that the necessary three-quarters vote of its Committee is something the Party can, and frequently does, achieve. What has prevented the Party from opting out in prior elections, therefore, is not an inability to meet the opt-out conditions established by state law. Rather, what has prevented the Party from opting out is a policy disagreement among its members. SUMF ¶ 23 (listing reasons why members of the Committee oppose opting out).

III.    **The Party's facial associational challenge must fail because the Party can choose to opt out of the semi-open primary.**

The Secretary is entitled to summary judgment on the Party's facial claim because the Party has failed to demonstrate or even argue that Proposition 108 lacks a "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citation and internal quotations omitted).

The Party does not apply the correct standard to its facial challenge. *See* Pl.'s Opp. at 13-17, & n.7 (asserting facial challenge "turns on disputed issues of fact" concerning the "viability of the opt-out choice"). A facial challenge considers a statute's "application to all conceivable parties, while an as-applied challenge tests the application of that [statute] to the facts of a plaintiff's concrete case." *Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023) (citations and internal quotations omitted). The latter requires "a developed factual record and the application of a statute to a specific person." *Id.* (citation and internal quotations omitted). The former constitutes "a challenge to the terms of the statute" as written. *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1248 (10th Cir. 2023) (citation and internal quotations omitted). Thus, "a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Wash. State Grange*, 552 U.S. at 449 (citation and internal quotations omitted).

The Party's Opposition has this backwards. Instead of arguing Proposition 108 lacks a "plainly legitimate sweep," the Party points to facts specific to itself—its three votes falling short of the three-quarters opt-out threshold in 2019, 2021, and 2023, and to the assessment of its witnesses that opting out is difficult—to suggest that doing so is not a "realistic option." Pl.'s Opp. at 14-16. But even if that amounted to a material fact supported by the record (and, as discussed above, it does not), Proposition 108's application to the Party specifically has limited bearing on the law's application, as written, to "all conceivable parties." *Harmon*, 61 F.4th at 789. In *Miller,* by contrast, the Fourth Circuit found that the availability to political parties of alternative "options for restricting their candidate selection process to individuals of their choosing" saved the law from facial challenge. 503 F.3d at 368. Just so here.

The record is silent on the ability of other "conceivable parties"—other major political parties in Colorado subject to Proposition 108—to exercise their option to opt out. The Party has admitted to having no information about Colorado's Democratic Party as it pertains to Proposition 108 other than the Party's belief that "they do not avail themselves to voting on this issue of the opt-out" and "they've simply accepted that it's within their best interests to continue participating in the open primary system." Doc. 102-4 at 168:9-18. That admission defeats the Party's facial claim. Without any evidence that Proposition 108 is unconstitutional with respect to other parties, the Party cannot carry the burden applicable to its facial challenge.

IV.    **Any minimal burden is justified by the State's interests in increasing voter participation and ensuring stability in elections.**

To attack the State's interests,[5] the Party first argues that those interests "presume that the supermajority vote[] necessary to opt out of the semi-open primary will never be achieved." Pl.'s Opp. at 15-16. It next argues that undisputed evidence on how Proposition 108 advances those interests is "less significant than it appears." *Id*. at 18-19. Neither argument calls into question the importance of the State's asserted interests, which justify any minimal burden on the Party.

First, the structure of a semi-open primary by default, while permitting convention or assembly by opt-out, is a feature, not a bug, of Proposition 108. The three-quarters threshold may favor semi-open primaries over nomination by convention or assembly and therefore result in more year-to-year predictability in the conduct of political parties' nominating contests and increased voter participation. When major political parties decisively vote to opt out of those primaries, however, those interests—which *Cox* called "the very backbone of our constitutional scheme"—give way. 892 F.3d at 1084. But by encouraging, rather than mandating, major political parties to participate in state-funded semi-open primaries, Colorado strikes a necessary balance. *Id*. That balancing act may not provide the outcome the Party prefers in every instance, and it may not promote stability and increased voter participation as much as a mandatory scheme would, but it is precisely what *Anderson-Burdick* recognizes states must undertake. *See Greenville*, 824 F. Supp. 2d at 672 ("In enacting elections laws, States must engage in a tough balancing act . . . that must result in providing all with the rights to which they are entitled.").

---

[5] It is irrelevant that the Secretary has not sought summary judgment on the basis that Proposition 108 satisfies strict scrutiny. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.").

Second, Mr. Bjorklund's declaration does not diminish the evidence demonstrating that
Proposition 108 encourages increased voter participation. SUMF ¶¶ 34-36. When measured as a
percent of all registered voters, turnout in every election since 2016 has surpassed pre-
Proposition 108 turnout by more than 5%, and in most years by more than 10%. Doc. 107-3 ¶ 7;
Ex. S ¶ 9 (by approximately 12% in 2018, 22% in 2020, 10% in 2022, and 5% in 2024). And as
Professor Sides' undisputed analysis demonstrates, those increases bore out on a national scale,
boosting Colorado's voter participation relative to other states. SUMF ¶ 35. Those figures
represent additional hundreds of thousands of Coloradans participating in primary elections, a
clear endorsement of the state's effort to increase voter participation. Courts need not "require
elaborate, empirical verification of the weightiness of the State's asserted justifications," but the
undisputed record in this case supplies exactly that. *See Timmons v. Twin City Area New Party*,
520 U.S. 351, 364 (1997).

Finally, *Jones* does not hold, as the Party suggests, that increased voter participation is
not a "compelling interest." Pl.'s Opp. at 18. *Jones* held increased voter participation was not a
compelling interest "*in the circumstances of [that] case*." 530 U.S. at 584 (emphasis in original).
It reached this conclusion because, in defense of California's blanket primary, the state asserted
that "increase[ed] voter participation" would result from the law's "moderating" effect, i.e.
"more choices favored by the majority will produce more voters." *Id.* at 584-85. Colorado makes
no such assertion, and the undisputed record evidence suggests that Proposition 108 is not
achieving increased voter participation by producing moderate candidates, but by affording
unaffiliated voters an opportunity to take part in primary elections in the first place. SUMF ¶ 30.

**V.       The Secretary is entitled to summary judgment on Claims III, IV, and V.**

For the reasons set forth in the Secretary's Motion, the Secretary is entitled to summary

judgment on the Party's compelled speech, vote dilution, and equal protection claims. Doc. 102

at 19-25. The Opposition identifies no evidence that could carry the Party's burden on those

claims. Pl.'s Opp. at 19-20; *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986) (where

nonmoving party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial,"

summary judgment is required). In its Opposition, the Party indicated for the first time that it

intends to move to dismiss Claims III, IV, and V. The Secretary will oppose a motion that seeks

dismissal without prejudice of those claims.

## CONCLUSION

Summary judgment should be granted for the Secretary on all claims in the Complaint.

Respectfully submitted this 23rd day of May, 2025.

PHILIP J. WEISER
Attorney General

*/s/ Kyle M. Holter*
LEEANN MORRILL, No. 38742*
First Assistant Attorney General
KYLE M. HOLTER, No. 52196*
Assistant Attorney General
TALIA KRAEMER, No. 57619*
Assistant Solicitor General
Public Officials Unit | State Services Section
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: 720.508.6159; 720.508.6150; 720.508.6544
leeann.morrill@coag.gov; kyle.holter@coag.gov;
    talia.kraemer@coag.gov
*Attorneys for Defendant*
*Counsel of Record