IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY,
an unincorporated nonprofit association, on behalf of itself and its members,

    Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

    Defendant.

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

### ARGUMENT[1]

I.   *Herbert* and *Miller* Support Plaintiff's Contention that the Existence of the Opt-Out Provision Does Not Alleviate the Substantial Burden on Plaintiff's Freedom of Association In Its As-Applied Challenge.

As Plaintiff contended in its opening brief, the decision by the District Court for the District of Utah in *Utah Republican Party v. Herbert*, 144 F.Supp.3d 1263 (D. Utah 2015), is directly on point, and resolves the as-applied challenge in Plaintiff's favor as a matter of law. The District

---

[1] We use the following abbreviations herein:

    Resp.: The Secretary's Response to Plaintiff's Motion for Partial Summary Judgment

    JSUF:  Joint Statement of Undisputed Facts, Dkt.#33

    PSUF: Plaintiff's Statement of Undisputed Facts (from Mot. for Partial Summ. Judgmnt.)

    DSUF: Defendant's Statement of Undisputed Facts

    PI Tr.: Preliminary Injunction hearing transcript

    MSJ: Secretary's Motion for Summary Judgment

    MPSJ: Plaintiff's Motion for Partial Summary Judgment

Plaintiff's Reply In Support of Motion for Partial Summary Judgment - 1

Court held that for an as-applied challenge, a government mandate that a political party allow unaffiliated voters to participate in its primary election creates a substantial burden on its First Amendment rights even if the party could have chosen a different primary election procedure that did not have such a mandate. *Id*. at 1278-80.

In her opposition brief, the Secretary admits that *Herbert* so held. Resp. at 7. Because *Herbert*'s holding is based on a thorough review of controlling Supreme Court precedent, that should be the end of the matter with respect to Plaintiff's as-applied challenge to Colorado's unaffiliated voter mandate. The mandate is subject to strict scrutiny, and absent a narrowly-tailored compelling interest, unconstitutional.

The Secretary instead claims that the position adopted by the *Herbert* court is "nonsensical," "not … persuasive," and "flawed." *Id.* at 6-7. Her attack on *Herbert* is two-fold. First, she argues that the *Herbert* court "ignored the other paths available to parties," in contravention of the Tenth Circuit's holding in *Utah Republican Party v. Cox,* 892 F.3d 1066 (10th Cir. 2018), that "the effects of election laws must be analyzed 'in sum rather than in isolation.'" *Id.* at 7 (quoting *Cox*, 892 F.3d at 1088). The Secretary's claim that *Herbert* "ignored" the statutory alternatives is clearly not true, as the court explicitly considered the entire statute, upholding it against a facial challenge because of the availability of an alternative option that did not require participation by unaffiliated voters. But the court then held that, as applied, the unaffiliated voter mandate imposed a substantial burden on the Party's associational rights and was therefore unconstitutional whenever the Party elected to proceed as a Qualified Political Party, thereby triggering the mandate. *Herbert*, 144 F.Supp.3d at 1279-80.

*Cox* is not to the contrary. That case involved candidate access to a primary election ballot that, because of *Herbert*, was limited to registered Republicans. The Tenth Circuit merely held

that providing a path to the ballot by collection of signatures in addition to selection by a convention of party leaders did not infringe the associational rights of "the *party*, which consists of the roughly 600,000 registered Republicans in Utah." *Id*. at 1081-82.  Moreover, the Tenth Circuit specifically recognized that the Utah Republican Party, "like all political parties, has 'a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences.'"  *Id*. at 1081 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)).  And, in so doing, it acknowledged, with apparent agreement, the Herbert court's holding that the unaffiliated voter mandate was unconstitutional.  *Id*. at 1081; *see also id*. at 1079, 1083.[2]

Second, the Secretary claims that *Herbert* misinterpreted the Fourth Circuit's decision in *Miller v. Brown*, 503 F.3d 360 (4th Cir. 2007).  Resp. at 7.  But it is the Secretary, not the *Herbert* court, who misinterprets the import of *Miller*.  Under the Virginia law at issue in *Miller*, a single member of a political party who was an incumbent legislator could choose the method by which candidates for the legislator's seat would be nominated in the next election, including an open primary open to all registered voters as well as a party-funded convention or caucus open only to party members.  When a particular Republican incumbent chose the open primary, the local Republican party committee challenged the unaffiliated voter mandate that came with it as a substantial burden on its associational rights, and it prevailed.  The Secretary claims that the holding was

---

[2] The Secretary also relies on the Supreme Court's decision in *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986).  Resp. at 6.  But her reliance on that case, which held that the State could not prohibit a political party from opening its primary election to unaffiliated voters if it so chose, is based on the false premise that by failing to achieve the extraordinary three-fourths-of-total-membership requirement mandated by Colorado law to opt out of the open primary, the Colorado Republican Party here has "freely chosen to remain" in a primary open to unaffiliated voters. The undisputed record simply does not support such a premise, as even after failing to achieve the 3/4 vote necessary to opt out, the Party Central Committee has overwhelmingly voted to challenge the open primary as an unconstitutional infringement on its First Amendment freedom of association.  JSUF, ¶¶ 7, 11.

based on the fact that the individual legislator was not a stand-in for the party. *Id.* at 8. True enough. But, the same is also true here, at least whenever a majority of the party's governing body votes to opt out but a minority as small as 25% plus 1 votes against the opt out, as was indisputably the case in 2023. JSUF ¶ 7. In either case, the *party* – which is to say, a majority of its governing body – did not choose to participate in an open primary with unaffiliated voters. The difference between the one party member who forced the open primary at issue in *Miller*, and the small minority voting against the opt-out who forced the open primary in 2023 here, is one of degree, not of kind.[3] The Utah District Court in *Herbert* was right to rely on *Miller*, and its persuasive reasoning should be followed here.

II. **The Secretary's Claim that the Party has Produced No Evidence Demonstrating A "Clear and Present Danger" Such as Was Discussed in *Jones* Is Belied by the Record.**

The Secretary claims that the Party has produced "*none* of the extensive empirical evidence *Jones* relied on in striking down California's blanket primary." Resp. at 10. As was discussed at length in the Party's opposition to the Secretary's own Motion for Summary Judgment, that is simply not true. A short recap here should put that erroneous claim to rest.

| **Evidence Discussed in *Jones*** | **Evidence Proffered by the Party Here** |
|---|---|
| California's law was "[p]romoted largely as a | "Allowing unaffiliated voters to participate in |

---

[3] The *Miller* Court also addressed Virginia's alternative contention that the Party Committee was not bound by the incumbent state Senator's selection because it could "use internal party rules to compel [the Senator] to select the Committee's preferred method of nomination." *Miller*, 503 F.3d at 370. The Secretary has made a similar argument here, contending that the Party could alter its rules, even to the point of choosing its Central Committee members, in order to obtain the supermajority requirement to opt out of the open primary. Resp. at 18. The *Miller* Court soundly rejected Virginia's argument, holding that "even if it were theoretically possible for the Committee to dictate the selection process in this manner, we do not think the Committee should be required to take such drastic affirmative steps against an incumbent officeholder … in order to preserve its right of free association." *Miller*, 503 F.3d at 370. This Court should likewise reject the Secretary's similar argument here.

Plaintiff's Reply in Support of Motion for Partial Summary Judgment - 4

| | |
|---|---|
| measure that would 'weaken' party 'hard-liners' and ease the way for 'moderate problem-Solvers.'" 530 U.S. at 570 (citing "ballot pamphlet distributed to voters."). | primary elections may result in candidates who better represent all Coloradans," and "Opening the primary election may result in candidates who are more responsive to a broader range of interests."  PSUF 15 (citing State Ballot Information Booklet).[4] |
| "The record also supports the obvious proposition that these substantial numbers of voters who help select the nominees of parties they have chosen not to join often have policy views that diverge from those of the party faithful. The 1997 survey of California voters revealed significantly different policy preferences between party members and primary voters who 'crossed over' from another party." 530 U.S. at 578-79 (citing Addendum to Mervin Field Report). | There is "a marked and measurable difference between voting behavior and opinions of registered Republicans who vote in Republican primaries and registered Unaffiliated voters who participate in those same elections." PSUF 18 (citing Ex. L, Khalaf Rep. at 1 ¶ 3); Colorado Polling Institute, *Survey of Likely 2024 General Election Voters* (Nov. 2023) (identifying statistically significant differences between Republican and Unaffiliated Voters on a wide range of issues) (PI Hearing Ex. 11). |
| "As respondents' own expert concluded: 'The policy positions of Members of Congress elected from blanket primary states are ... more | "Proposition 108 was intended to weaken the link between party members and their nominees. The official *2016 State Ballot Information Booklet* included two arguments for |

---

[4] The Secretary has tried to distance herself from the purpose of the open primary initiative that was set out in the State Ballot Information Booklet (the "Bluebook"), Resp. at 16-17, but for the reasons described in Part III below, her effort to do so is not supported by Colorado Supreme Court precedent.

| | |
|---|---|
| moderate, both in an absolute sense and relative to the other party, and so are more reflective of the preferences of the mass of voters at the center of the ideological spectrum.'" 530 U.S. at 580 (quoting expert report of Elisabeth R. Gerber). | Proposition 108, the second being that it 'may result' in different kinds of candidates winning party nominations. It is my opinion that Colorado's semi-open primary does create exactly this risk, placing a burden on the associational rights of the major political parties." See Ex. 13, England Expert Rep. at 4-5. |
| "Even when the person favored by a majority of the party members prevails, he will have prevailed by taking somewhat different positions—and, should he be elected, will continue to take somewhat different positions in order to be renominated." 530 U.S. at 579-80 (citing expert report of Elisabeth R. Gerber). | Since 2016 (when Proposition 108 was adopted), "candidate campaigns in Republican Primary elections have targeted the Unaffiliated voter in order to sway them toward candidates that don't traditionally appeal to Republican voters." "[A]s more candidates vie for the Unaffiliated voter participation, the message is watered down away from Republican voters and toward Unaffiliated voters." Bjorklund Expert Rep., Def's MSJ, Ex. P, p. 4. |

It should also be noted here that the Supreme Court in *Jones* stated that "[i]t is unnecessary to cumulate evidence of this phenomenon, since, after all, the whole *purpose* of Proposition 198 was to favor nominees with 'moderate' positions." 530 U.S. at 580.

*Jones* described it as "obvious" that "substantial numbers of voters who help select the nominees of parties they have chosen not to join often have policy views that diverge from those of the party faithful." 530 U.S. at 578; *see also id.* at 584 ("it is obvious that the net effect of this

scheme—indeed, its avowed purpose—is to *reduce* the scope of choice, by assuring a range of candidates who are more 'centrist'"). It is for that reason that the Court held California's blanket primary law to be unconstitutional: "Proposition 198 forces petitioners to adulterate their candidate-selection process—the 'basic function of a political party'—by opening it up to persons wholly unaffiliated with the party." *Id.* at 581 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973)). And it is for that reason, as Plaintiff noted in its brief in opposition to the Secretary's Motion for Summary Judgement, that several other courts have held that a party's associational rights are severely burdened simply by the existence of an unaffiliated voter mandate. *See, e.g.*, *Idaho Republican Party v. Ysursa*, 765 F. Supp. 2d 1266, 1273, 1276 (D. Idaho 2011) (*Ysursa II*) (holding that because the State's own expert acknowledge that "voters do *likely* cross over" to vote in Republican primaries, "the current primary system in Idaho imposes a severe burden on the Idaho Republican Party's First Amendment rights"); *Herbert*, 144 F.Supp.3d at 1280 ("the forced association" of unaffiliated voters "severely burdens the [Republican Party] because it nearly doubles the number of voters in a [Republican] primary election. Those are voters who evidently do not share the [Republican Party's] views enough to become members of the [Republican Party]."); *Utah Republican Party v. Cox*, 892 F.3d 1066, 1073, 1081 (10th Cir. 2018) ("The URP, like all political parties, has 'a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences.'…That is why the district court [in *Herbert*] declared the Unaffiliated Voter Provision, which forced the URP to allow nonmembers to help select its candidates, unconstitutional in the First Lawsuit." (quoting *Eu v. San Francisco Cnty. Dem. Central Comm.*, 489 U.S. 214, 224 (1989))); *Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) (The mere fact that Virginia law, as applied, "forced the Committee to use a nomination process that prevented it from excluding voters with whom it did not wish to associate" was sufficient to establish a severe burden); *Democratic Party of U. S. v. Wisconsin ex*

*rel. La Follette*, 450 U.S. 107, 122 (1981) ("On several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions—and that political parties may accordingly protect themselves 'from intrusion by those with adverse political principles.'").

As these cases make clear, it was the "obvious" and "likely" risk, the "clear and present danger," that unaffiliated voters could and likely would have an effect on a Party's candidate nomination process that constituted the "severe burden" on a Party's associational rights. The Secretary's claim that *Idaho Republican Party v. Ysursa*, 660 F. Supp. 2d 1195, 1201 (D. Idaho 2009) (*Ysursa I*) "*suggest[ed]*" that "[s]urveys, expert testimony, statistics and/or testimony from the candidates" would be necessary to show that party candidates "have modified and will continue to modify their . . . positions," Resp. at 9 (emphasis added), is contradicted by that court's subsequent decision in the same case—a decision that the Secretary fails to cite. There, as noted above, it was evidence of cross-over voting alone – evidence that was lacking at the Summary Judgement stage when *Ysursa I* was decided – that was sufficient for the court to find a "severe burden" on the Party's associational rights. *Ysursa II*, 765 F.Supp.2d at 1273, 1276.

*Democratic Party of Hawaii v. Nago*, 833 F.3d 1119 (9th Cir. 2016), also relied on by the Secretary, involved only a facial challenge, not an as-applied challenge. Moreover, it was the lack of *any* evidence of *cross-over voting* (attributed to the fact that, unlike Colorado, Hawaii did not have partisan voter registration), not the lack of evidence of the effect of such cross-over voting, that doomed the Democrat Party's claim in that case. According to the Court, the Party essentially asked the Court "to infer" cross-over voting, which it held was "not sufficient." *Id*. at 1124-25.[5]

---

[5] Neither does an unaffiliated voter's act of voting in a Republican primary indicate an affiliation with the party, as the Secretary asserts, doubling down on her reliance on Justice Powell's *dissenting* opinion in *Democratic Party of U. S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 130 n.2 (1981). As Plaintiff has previously explained, Colorado law (unlike the Wisconsin law at issue in

That leaves only the decision of the District Court for the District of South Carolina in *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 665 (D.S.C. 2011), which required evidence of actual *effects*, not just the likelihood of such effects, from cross-over voting. Given the number of cases cited above to the contrary, it is *Greenville* that is the outlier here, not *Herbert*. *Jones* spoke repeatedly of the "prospects" that unaffiliated voters could affect the outcome; it did not require proof of such outcome. *Herbert*'s holding is therefore perfectly compatible with *Jones*, not contradicted by it, as the Secretary claims.[6]

The Secretary also contends that what she describes as the "minimal differences"[7] in voting behavior between Republican and unaffiliated voters identified in the Khalaf expert survey "fall well short of the bar set by *Jones*. Resp. at 11. Not so. In fact, the Supreme Court *rejected* the Ninth Circuit's determination that the burden on political parties was not "severe" based on "testimony that the prospect of malicious crossover voting, or raiding, is slight, and that even though the numbers of 'benevolent' crossover voters were significant, they would be determinative in only

---

*La Follette*) specifically allows an unaffiliated voter to vote in a partisan primary without affiliating with that party. *See* CRS § 1-7-201(2.3) ("An eligible unaffiliated elector … is entitled to vote in the primary election of a major political party without affiliating with that political party").

[6] Neither did *Jones* "*carefully* distinguish[] California's blanket primary from open primary systems," as the Secretary further claims. Resp. at 10 (emphasis added). The passage to which she refers is clear *dicta*, in a footnote, and merely suggested, based on a prior dissenting opinion, that there might be a difference in states where the mere act of voting in a primary constituted affiliation with the political party. As Plaintiff has pointed out previously, that is not the case under Colorado law. *See* P's Mot. for Summ. Judgement at 6, n. 6; *see also supra* note 5.

[7] The Secretary would like to ignore the "dramatically different result" that the survey identified between unaffiliated and Republican voters in the 2024 presidential primary, asserting that the data "is irrelevant" because presidential primaries are not governed by Proposition 108 and are not being challenged in this litigation. That misses the point, of course. The survey was designed to assess whether there are significant differences between unaffiliated and Republican voters, and the "dramatic" difference reflected in the 2024 presidential primary results, where "[m]emories were fresher" and "the high-profile national attention of the race sustained the attention and interest of voters much more than the primaries for statewide office," demonstrates beyond cavil that there are significant differences.

a small number of races." 530 U.S. at 579 (quoting 169 F.3d at 656-57).  As the Court noted, "a single election in which the party nominee is selected by nonparty members could be enough to destroy the party."  *Id*. (describing the likely disintegration of the new Republican Party if a pro-slavery candidate had been nominated instead of Abraham Lincoln).[8]

### III. The Governmental Interest Approved by the Voters Is Arguably Not Even Legitimate, and the Additional Interests Asserted by the Secretary Are Not Compelling.

Although the Secretary has tried to distance herself from the purpose of the open primary initiative that was set out in the State Ballot Information Booklet (the "Bluebook"), even to the point of explicitly disavowing it, Resp. at 16-17, the Colorado Supreme Court has expressly held that a "court may ascertain the intent of the voters by considering other relevant matters such as … the biennial 'Bluebook,' which is the analysis of ballot proposals prepared by the legislature." *In re Interrogatories on House Bill 99–1325*, 979 P.2d 549, 554 (Colo.1999); *see also, e.g.*, *In re Colorado Indep. Cong. Redistricting Comm'n*, 2021 CO 73, ¶ 34, 497 P.3d 493, 504 (Colo. 2021) (describing the "three key purposes" intended to be served by a ballot initiative by reference to the Bluebook); *Davidson v. Sandstrom*, 83 P.3d 648, 653 (Colo. 2004); *Chronos Builders, LLC v. Dep't of Labor & Employment, Div. of Family & Med. Leave Ins.*, 2022 CO 29, ¶ 5, 512 P.3d 101, 102 (Colo. 2022) (ascertaining the purpose of an initiative from the description contained in the

---

[8] The Secretary also criticizes Khalaf's expert analysis because of 1) discrepancies between the polling data and actual election data; and 2) a significant number of survey respondents who refused to answer.  Resp. at 11.  She claims that "[h]ad even a slightly larger fraction of voters responded to these questions, or reported voting for a candidate that participated in the race, the allegedly 'outcome-relevant' differences the Party claims exist between Party members and unaffiliated voters could easily disappear." *Id*.  Her claim is pure speculation, and contradicted by Khalaf's own expert opinion describing that it is "common" that individuals being surveyed about down-ticket races "would not remember who they voted for," but that the "assumption, which is common practice in survey research," is that such amnesia would be "randomized" and therefore "statistically distributed across any of the weighted demographics."  So, the common usage in the survey industry of such questions is to compare differences between groups even if the responses don't match actual election results.  Khalaf. Depo. at 86-87. [Ex. J].

Bluebook); *In re Interrogatories on Senate Bill 21-247 Submitted by Colorado Gen. Assembly*, 2021 CO 37, ¶ 13, 488 P.3d 1008, 1013 (Colo. 2021) (relying on both the "Arguments For" and "Arguments Against" contained in the Bluebook to describe what the adopted amendments "were designed to" accomplish); *Americans for Prosperity v. State*, 2025 COA 46, ¶ 28, 2025 WL 1257173 (Colo. App. May 1, 2025) (noting that the description of an initiative contained in the Bluebook "puts to rest any uncertainty about its interpretation."). The Colorado Supreme Court has also looked to the Bluebook to identify the governmental interest sought to be achieved by an initiative. *Dallman v. Ritter*, 225 P.3d 610, 623 (Colo. 2010).

The Bluebook clearly demonstrates that Proposition 108 was designed to produce candidates "who better represent all Coloradans," and "who are more responsive to a broader range of interests." PSUF 15 (citing State Ballot Information Booklet). It is not surprising that the Secretary is running away from the purpose actually presented to voters, as it was resoundingly rejected by *Jones*, which held that "assuring a range of candidates who are more 'centrist' … is hardly a compelling state interest, if indeed it is even a legitimate one." *Jones*, 530 U.S. at 584.

Yet in the very next sentence, *Jones* also rejected the asserted interest in increased voter participation. "The interest in increasing voter participation is just a variation on the same theme (more choices favored by the majority will produce more voters), and suffers from the same defect," the Court held. *Id.* at 584-85.

Even accepting that the Secretary's asserted interest in increasing voter participation is, contrary to the interest adopted by voters as reflected in the Bluebook, simply a claim about raw numbers rather than one tied to the viewpoints of the candidates selected in the nomination process, *see* Resp. at 14-15, her assertion suffers from another fundamental flaw. She acts as though the only way unaffiliated voters can participate in a primary election is for the State to force political parties to permit them to do so. But that is simply not the case, and the argument is also squarely

Plaintiff's Reply in Support of Motion for Partial Summary Judgment - 11

rejected by *Jones*. Colorado law permits *anyone* – unaffiliated voters and party-registered voters alike – to register as a member of a political party right up to the close of polls on the day of the primary election and thereby vote in that party's primary election. CRS § 1-2-201(3)(b)(V). The same was true with respect to the California law held unconstitutional in *Jones*. Here's what the Supreme Court had to say: "The voter who feels himself disenfranchised should simply join the party. That may put him to a hard choice, but it is not a state-imposed restriction upon *his* freedom of association, whereas compelling party members to accept his selection of their nominee *is* a state-imposed restriction upon theirs." *Jones*, 530 U.S. at 584. Thus, even if increasing voter participation is an important or even a compelling interest, *Jones* holds that it is not sufficient to outweigh a political party's freedom of association. The Secretary's attempt, Resp. at 15, to distinguish *Jones*' statement that voters may simply join the party in order to participate in the party's primary election is unavailing. Whether the issue is permitting non-affiliated voters to participate in a safe-district primary election to have an effective vote, as was the argument in *Jones*, or simply to participate in a primary election at all in order to increase participation, the point is the same. All the unaffiliated voter need do is register with the Party in order to participate in the Party's primary election.

The Secretary also asserts that "stability" is a compelling interest which supports the unaffiliated voter mandate. As an initial matter, it should be noted that such an interest is furthered *only if* the Party is never able to achieve the three-fourths supermajority requirement to opt out of the open primary. For if a Party were ever able to reach that threshold and opt out of the open primary, the open primary default would apply only for the following election because the opt-out provision operates as a button, not a switch. That problem lends further support to the Party's

claim that the opt-out provision was deliberately designed to be extremely difficult to achieve.[9]

Moreover, the Secretary does not explain how forcing a political party to open its primary election to unwelcome unaffiliated voters is any more stable a system than the prior, closed-primary system. Indeed, if anything, given the discretion that the nearly 2 million unaffiliated voters have under Proposition 108 to vote in the Democrat primary, the Republican primary, a potential third-party primary, or no primary at all, the uncertainty created for political candidates regarding who the likely voters will be creates confusion and chaos, not stability. *Cf. Storer v. Brown*, 415 U.S. 724, 730 (1974) (recognizing that regulations of elections are necessary to promote "order, rather than chaos").

*Storer*, relied on by the Secretary, is inapposite to the asserted interest in stability at issue here. That case involved a restriction on access to the general election ballot by "independent" candidates who had recently been affiliated with a political party. The stability that the Court in that case found to be a "compelling" interest bears no relation to any stability that the Secretary asserts here.

### IV. The Three-Fourth's Supermajority Vote Requirement Imposed by Proposition 108's Opt-Out Provisions Is a Significant Intrusion Into The Party's Operations

The Secretary's counter to the Party's contention that the extraordinarily-high three-fourths-of-total-membership vote requirement imposed by Proposition 108 is a significant intrusion into its operations is two-fold. First, she claims that the fact that the Party "often" approves other proposals by more than a three-quarters vote, and sometimes even unanimously, indicates that the high threshold to opt out of the open primary is not "nearly impossible to meet." Resp. at

---

[9] The Secretary's cavalier suggestion that a political party "may privately fund a primary election open only to party members" is contradicted by her own witness, former Republican Party Chairman Richard Wadhams, who testified at the Preliminary Injunction hearing that he did not believe it was even possible for the Party to conduct its own primary election. Ex. 8, PI Tr. at 377:21-378:6. The lack of real-time access to voter rolls in order to ensure voter eligibility and prevent double voting may even make such an effort illegal.

17.  That private associations are able to achieve consensus or near-consensus on many non-controversial items – the Republican Party adopting a resolution opposing tax increases, for example, or voting to celebrate Abraham Lincoln's birthday – hardly disproves the Party's contention that, on a contested question such as the opt-out vote, such a high threshold is nearly impossible to achieve. In fact, it was designed that way, and as the Secretary admits, the high threshold has *never* been achieved by either major political party. PI Tr. at 201:24-202:3 and 228:25; DSUF ¶ 14.

Second, and more fundamentally, she asserts that the high threshold is not an unconstitutional interference with the Party's *internal* operations in deciding "how to organize itself, conduct its affairs, and select its leaders," but only a permissible "indirect consequence of laws necessary to the successful completion of a party's *external* responsibilities in ensuring the order and fairness of elections." Resp. at 17 (quoting *Eu v. S. F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 230-32 (1989), emphasis added).  The Secretary simply misconstrues *Eu*, on at least two points.

First, *Eu* held a state's interference with decisions about how a party selects its leaders to be unconstitutional.  Although the "leaders" at issue in *Eu* were party chairmen, there is nothing in *Eu* that limits its ruling to such leaders.  Quite the opposite.  *Eu* cited *LaFollette* for that proposition, a case which involved the election of delegates to the national Democratic convention at a primary election.  *See also*, *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008) (describing a party's nominee as the "candidate bearing the party's standard in the general election.").  As the Supreme Court noted in *Jones*, "In no area is the political association's right to exclude more important than in its candidate-selection process.  That process often determines the party's positions on significant public policy issues, and *it is the nominee who is the party's ambassador* charged with winning the general electorate over to its views.  The First Amendment reserves a special place, and accords a special protection, for that process." 530 U.S. at 568 (emphasis added).  The case the *Jones* Court cited in support of that proposition was *Eu* – the very

Plaintiff's Reply in Support of Motion for Partial Summary Judgment - 14

language dealing with the selection of party leaders that the Secretary here tries to restrict to party chairman rather than party nominees more broadly.  And it is the same language that the Tenth Circuit cited in *Cox* when it specifically recognized that the Utah Republican Party, "like all political parties, has 'a right to identify the people who constitute the association, *and to select a standard bearer* who best represents the party's ideologies and preferences.'" *Id*. at 1081 (emphasis added, quoting *Eu*, 489 U.S. at 224).

Second, forcing the Party to make such a momentous decision as to whether or not to opt out of a primary election overrun with voters unaffiliated with the Party by a supermajority vote requirement is a serious intrusion into how the Party conducts its affairs.  The general rule about how a private association such as a political party conducts its affairs is by majority rule.  *See, e.g.*, Henry M. Robert III *et al.*, Robert's Rules of Order Newly Revised, 12th ed. (PublicAffairs, 2020), § 44:1, pp. 400-401 ("The basic requirement for adoption of a motion or action by a deliberative assembly, except where a rule provides otherwise, is a majority vote"); Rev. Model Nonprofit Corp. Act § 7.23(a) (1987) ("Unless this Act, the articles, or the bylaws require a greater vote or voting by class, if a quorum is present, the affirmative vote of the votes represented and voting (which affirmative votes also constitute a majority of the required quorum) is the act of the members."); Model Bus. Corp. Act § 7.25(c) (2002) ("If a quorum exists, action on a matter (other than the election of directors) by a voting group is approved if the votes cast within the voting group favoring the action exceed the votes cast opposing the action, unless the articles of incorporation or this Act require a greater number of affirmative votes."); Cal. Corp. Code § 16401(j) ("A difference arising as to a matter in the ordinary course of business of a partnership may be decided by a majority of the partners."); Colo. Rev. Stat. § 7-58-514(1)(B) ("Action on any matter is approved only upon the affirmative vote of at least a majority … unless more than a majority is required or permitted by [law] or the articles or bylaws"); Colo. Rev. Stat. § 23-21-511 ("Any

action of the [University of Colorado Hospital Authority] board of directors shall require the affirmative vote of a majority of the total membership of the board."). This general rule is reflected in the Party's bylaws, which provides for actions to be taken by majority vote except in a few instances, such as bylaws changes and removal of officers. *Compare* Ex. O, Art. VI § B.1 (officers elected by majority vote); Art. VII § H (actions may be taken without a special meeting by written consent of a majority of the members); *with id.* Art. V § C (3/5 vote for removal of officers); Art. XX § A (2/3 vote for bylaws amendments); *see also* Ex. 14, PI Hearing Ex. 4, p. 27 ("Unless otherwise specified in … Colorado law, the bylaws …, the applicable parliamentary authority, or these Rules, a majority of members present, and voting shall be required to decide any question.").

This is no semantic disagreement. The requirement of a supermajority vote means that a minority faction, rather than a majority, can determine (and has determined) whether or not the Party will opt out of the open primary and its unaffiliated voter mandate. That means the decision not to opt out is not one made *by the party* but by a minority as small as 25% plus 1 of the Party's governing body. That is the concern that triggered the holding of unconstitutionality in *Miller*, and it is similar to the intrusions into the internal operating procedures held unconstitutional in *Eu*.

## CONCLUSION

The Party's Motion for Partial Summary Judgement in its as-applied challenges in Counts I and II should be granted.

Respectfully Submitted,

/s/ Alexander Haberbush  
Alexander Haberbush  
CONSTITUTIONAL COUNSEL GROUP  
444 W Ocean Boulevard, Suite 1403  
Long Beach, CA 90802  
Telephone: (562) 435-9062  
E-mail: ahaberbush@ccg1776.com

Randy B. Corporon  
LAW OFFICES OF RANDY B. CORPORON P.C.  
5445 DTC Parkway, Suite 825  
Greenwood Village, CO 80111  
Telephone: (303) 749-0062  
E-mail: rbc@corporonlaw.com

*Attorneys for Plaintiff*