IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY, an unincorporated nonprofit association, on behalf
of itself and its members,

     Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

     Defendant.

---

**ORDER**

---

     This matter comes before the Court on defendant Jena Griswold's Motion for
Summary Judgment [Docket No. 102] and plaintiff Colorado Republican Party's Motion
for Partial Summary Judgment [Docket No. 105]. Defendant Jena Griswold (the
"Secretary") and plaintiff Colorado Republican Party (the "Party") filed responses.
Docket Nos. 107, 108. The Secretary and the Party filed replies in support of their
respective motions for summary judgment. Docket Nos. 113, 114. The Court has
jurisdiction pursuant to 28 U.S.C. § 1331.

## I. PROCEDURAL BACKGROUND

     On July 31, 2023, the Party filed this case, challenging the constitutionality of
Colorado's semi-open primary system. Docket No. 1. On December 22, 2023, the
Party filed a motion for a preliminary injunction, asking that the Court enjoin the
Secretary from enforcing the semi-open primary system. Docket No. 39 at 15. The
Court held a two-day evidentiary hearing on the preliminary injunction motion on

January 23-24, 2024.  Docket Nos. 67-68.  The Court denied the preliminary injunction motion on February 2, 2024.  Docket No. 69.  The Secretary filed her motion for summary judgment on April 4, 2025, and the Party filed its motion for partial summary judgment on April 8, 2025.  Docket Nos. 102, 105.

## II.    FACTS[1]

In 2016, Colorado voters approved Proposition 108, a ballot initiative allowing for a semi-open primary system, which permits voters not affiliated with a political party to vote in major parties' nonpresidential primary elections.[2]  Docket No. 102 at 2, ¶ 1. Unaffiliated voters receive a mailing containing the primary ballots of all major political parties, but the voter "may cast the ballot of only one major political party."  *Id.*, ¶ 4 (quoting Colo. Rev. Stat. § 1-4-101(2)(b)).  Voters affiliated with a political party may only vote in their party's primary.  *Id.*, ¶ 5.  The State of Colorado and the counties pay for all expenses incurred in administering semi-open primary elections.  *Id.*, ¶ 3.

Proposition 108 requires major political parties to nominate candidates for the general election through a semi-open primary system, unless they opt out pursuant to statute.  *Id.*, ¶ 2.  The Colorado Republican Party and Colorado Democratic Party are major political parties as defined by Colorado law.  *Id.* at 3, ¶ 13.  Major political parties may opt out of the semi-open primary system and elect to use an assembly or convention nominating process if "three-fourths of the total membership of the party's

---

[1] The following facts are undisputed unless otherwise noted.

[2] A "major political party" is defined as "any political party that at the last preceding gubernatorial election was represented on the official ballot either by political party candidates or by individual nominees and whose candidate at the last preceding gubernatorial election received at least ten percent of the total gubernatorial votes cast." Colo. Rev. Stat. § 1-1-104(22).

state central committee" votes to "use the assembly or convention nomination process." *Id.*, ¶ 6 (quoting Colo. Rev. Stat. § 1-4-702(1)).

Minor political parties[3] may "prohibit unaffiliated electors from voting in the party's primary election so long as the prohibition is in accordance with the party's constitution, bylaws, or other applicable rules."  *Id.*, ¶ 7 (quoting Colo. Rev. Stat. § 1-4-1304(1.5)(c)). Since the passage of Proposition 108, only one minor political party has held a primary election, in one election cycle.  *Id.*, ¶ 8.  Minor parties typically use the assembly nomination process.  *Id.*, ¶ 9.  Minor parties often do not field candidates for every open seat in a given election.  *Id*., ¶ 10.  Minor party candidates rarely win seats in the general election.  *Id.*, ¶ 11.  In circumstances where unaffiliated voters would be permitted to vote in minor party primaries, the costs involved would include the following: the costs of making minor party ballots available to unaffiliated voters; the administrative effort required to train county clerks and educate the electorate about minor party primaries; and increased risk of voter confusion.  *Id.*, ¶ 12.

The 2016 State Ballot Information Booklet released by the Legislative Council of the Colorado General Assembly, in a section entitled "Arguments For" Proposition 108, stated that "Allowing unaffiliated voters to participate in primary elections may result in candidates who better represent all Coloradans," and "Opening the primary election may result in candidates who are more responsive to a broader range of interests." Docket No. 105 at 2, ¶ 15.

---

[3] A "minor political party" is defined as "a political party other than a major political party that satisfies one of the conditions set forth in section 1-4-1303(1) or has submitted a sufficient petition in accordance with section 1-4-1302."  Colo. Rev. Stat. § 1-1-104(23).

Since the passage of Proposition 108, no major political party has opted out of the semi-open primary system. *Id.* at 4, ¶ 14. On September 21, 2019, the Party's state central committee (the "Committee") voted on a motion to opt out of Colorado's 2020 semi-open primary. *Id.*, ¶ 15. The motion failed to achieve the three-fourths opt-out threshold. *Id.* On September 18, 2021, the Committee voted on a motion to opt out of Colorado's 2022 semi-open primary, and that motion failed. *Id.*, ¶ 16. There were 171.6 votes, or 32.9% of the Committee's total membership, in favor of the motion and 241.3 votes, or 46.3% of the total membership, against the motion. *Id*. On September 30, 2023, the Committee voted on whether to opt out of the 2024 semi-open primary, which again failed to achieve the three-fourths opt-out threshold. *Id.*, ¶ 17. There were 259 votes in favor of the motion and 143.5 votes against. *Id.* The Party estimates that, as of September 30, 2023, the Committee's total membership was approximately 420, meaning that less than two-thirds of the Committee's total membership voted in favor of opting out of the semi-open primary. *Id.*, ¶ 18. The Committee has successfully voted on other issues with more than three-fourths of the Committee's members voting in favor, with some votes being unanimous. *Id.*, ¶ 19. The Committee's members have expressed a range of views about Proposition 108, with some members of the Committee objecting to opting out. *Id*. at 5, ¶ 22. Members of the Committee who are opposed to opting out believe, among others reasons, that adopting a convention or assembly nomination method would result in too few voters participating in the nomination process, opting out would make the Party an "insider party," opting out would run contrary to Republican values, and opting out would reduce Republicans' chances of success in the general elections and in swing districts. *Id.*, ¶ 23. Members

4

of the Party have described the three-fourths requirement as being "nearly impossible to achieve" or "very difficult."  Docket No. 107 at 2, ¶ 1.

"Party raiding," where a voter participates in a party's primary with malicious intent, is rare.  Docket No. 102 at 5, ¶ 24.  Since the passage of Proposition 108, plaintiff's expert Trent England is not aware of any evidence of successful party raiding. *Id.* at 6, ¶ 25.  The Party cannot identify any nonpresidential primary election in Colorado where the outcome was changed by the participation of unaffiliated voters. *Id.*, ¶ 26.  The Party also cannot identify any nonpresidential primary election in Colorado where the candidate favored by the plurality or majority of unaffiliated voters differed from the candidate favored by the plurality or majority of registered Party voters. *Id.*, ¶ 27.  Mr. England is unaware of any empirical research showing that, since the passage of Proposition 108, more moderate or different kinds of candidates have won their respective party's nomination.  *Id.*, ¶ 28.  There is no conclusive evidence demonstrating that open primary formats result in winning candidates with more moderate ideologies.  *Id.*, ¶ 30.  The witnesses at the preliminary injunction hearing who had been Republican Party candidates conceded that they did not moderate or alter their policy positions to appeal to unaffiliated voters.  *Id.* at 6-7, ¶ 31.  The fact that the number of unaffiliated voters participating in an election was greater than the margin of victory in a given election does not show that the unaffiliated voters' participation resulted in the selection of a different candidate than would have been selected in a closed primary.  *Id.* at 7, ¶ 32.  The largest study concerning primary rules and candidates' platforms found that changing the openness of primary rules did not result in systematic changes in platforms.  *Id.*, ¶ 33.  Political science literature does not

5

provide systematic evidence that changes in primary rules have produced different candidate messages or messages that are less traditionally associated with candidates' political party.  *Id.*

Voter turnout is higher in open primary systems.  *Id.*, ¶ 34.  Before the passage of Proposition 108, primary turnout in Colorado was only a few percentage points above the national average.  *Id.*, ¶ 35.  After Proposition 108, turnout increased to eight points above the national average.  *Id.*  In Colorado's 2020 primaries, turnout exceeded the turnout in Colorado's 2016 primaries by 24%.  *Id.*, ¶ 36.

As of November 1, 2023, there were 929,561 active Republican voters, 1,053,385 active Democratic voters, and 1,871,868 active unaffiliated voters in the State of Colorado.  *Id.*, ¶ 37.  As of April 1, 2025, there were 942,120 active Republican voters, 1,041,589 active Democratic voters, and 1,990,552 active unaffiliated voters. *Id.*, ¶ 38.  Since Proposition 108 took effect in 2018, the percentage of unaffiliated voters participating in Republican primary elections has increased.  Docket No. 107 at 3, ¶ 3.  In 2018, approximately 100,000 unaffiliated voters participated in Republican primary elections, 130,000 unaffiliated voters participated in 2020, and more than 231,000 unaffiliated voters participated in 2022.  Docket No. 105 at 2, ¶ 14.  In 2018, unaffiliated voters cast 20.1% of the total votes cast in Republican primaries statewide. Docket No. 107 at 3, ¶ 3.  In 2020, that percentage increased to 23.3%, and in 2022, the percentage increased to 37.1% statewide.  *Id.*  In some counties, in 2022 and 2024, the number of unaffiliated voters came close to or in some cases exceeded the number of Republican voters voting in Republican primaries.  Docket No. 105 at 12; Docket No. 102-12 at 12, ¶ 29.  In Denver County, for example, 27,977 unaffiliated voters cast

6

ballots in the 2024 Republican presidential primary, compared to 18,350 Republicans. Docket No. 105 at 12; Docket No. 102-12 at 12, ¶ 29.[4]

The Party's expert, George Khalaf, conducted a survey after the preliminary injunction hearing that shows large differences in how Republican and unaffiliated voters view themselves ideologically.  Docket No. 105 at 2-3, ¶ 18; Docket No. 105-3 at 11, ¶ 28.[5]  The survey shows that "these two groups of voters do not share a common identity or set of political values or ideologies."  Docket No. 105-3 at 11, ¶ 28.

The Party also remains free to limit and expand the Republican Party's state central committee's total membership after satisfying the statutory minimums for committee memberships required by Colorado law.  Docket No. 102 at 8, ¶ 39.  The Party also remains free to control when, where, and how central committee meetings are held, how members are notified of meetings, the quorum required to call meetings to order, and the method of committee votes.  *Id.*, ¶ 41.  The Party remains free to endorse any candidate platform, to criticize or support candidates' positions, and to encourage voters to support particular candidates.  *Id.*, ¶ 42.

## III.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the

---

[4] The Secretary does not contest that, in some counties, like Boulder County, Jefferson County, and Denver County, the number of unaffiliated voters voting in Republican primaries exceeded the number of Republicans.  *See* Docket No. 105 at 12.

[5] The Secretary argues that Mr. Khalaf's survey data is "too unreliable to provide insight into differences in behavior between registered Party members and unaffiliated voters."  Docket No. 108 at 3-4, ¶ 18.  While the Secretary challenges Mr. Khalaf's findings regarding unaffiliated voting behaviors, she does not challenge Mr. Khalaf's finding that Republican voters and unaffiliated voters have different ideologies.

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  A movant who bears the burden at trial must submit evidence to establish the essential elements of its claim.  *Harper v. Mancos Sch. Dist. RE-6*, 837 F. Supp. 2d 1211, 1217 (D. Colo. 2011).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.

When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* Cross-motions for summary judgment must be viewed separately, and the denial of one does not necessitate the granting of the other. *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (citations omitted).

## IV.  ANALYSIS

The Party asserts two claims: (1) Proposition 108 violates the Party's right to freedom of association under the First Amendment; and (2) Proposition 108's opt-out provision violates the Party's right to freedom of association under the First Amendment. *See* Docket No. 1 at 10-15. The Secretary moves for summary judgment on both of the Party's claims, and the Party moves for partial summary judgment on its as-applied challenges to Proposition 108 as to Counts 1 and 2.[6]  Docket No. 102 at 1; Docket No. 105 at 3.

### A.  The Party's Motion for Partial Summary

The Party seeks summary judgment on its as-applied challenge under Counts One and Two. *See* Docket No. 105 at 3. An as-applied challenge "tests the application of that restriction to the facts of a plaintiff's concrete case." *Harmon v. City of Norman, Okla*, 61 F.4th 779, 789 (10th Cir. 2023) (citation omitted). To succeed on an as-

---

[6] The complaint also includes a First Amendment freedom of speech claim, a Fourteenth Amendment vote dilution claim, and a Fourteenth Amendment equal protection claim. Docket No. 1 at 15-20. After filing its motion for partial summary judgment, the Party represented that it will dismiss Counts Three, Four, and Five. *See* Docket No. 107 at 19, 20-21. Accordingly, the Court will dismiss these claims and only address Counts One and Two.

applied challenge, the plaintiff must provide "a developed factual record and the application of a statute to a specific [plaintiff]." *Id*. (citation omitted).

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). The Supreme Court has recognized that "the freedom to join together in furtherance of common political beliefs . . . necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only. That is to say, a corollary of the right to associate is the right not to associate." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (citations and quotations omitted). "In no area is the political association's right to exclude more important than in the process of selecting its nominee. That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." *Id.* at 575. Accordingly, Supreme Court cases "vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.'" *Id*. (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm*., 489 U.S. 214, 224 (1989)).[7]

---

[7] A political party also has a First Amendment right to include who it wants to participate in its primaries. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) (invalidating state law that prohibited unaffiliated voters from participating in primary elections where the Republican Party wanted such voters to participate).

"On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."  *Timmons*, 520 U.S. at 358.  "The Constitution grants states the right to prescribe '[t]he Times, Places and Manner of Holding Elections for Senators and Representatives,' Art I, § 4, cl. 1, and the Supreme Court has held that states enjoy similar authority to regulate their own elections."  *Utah Republican Party v. Cox*, 892 F.3d 1066, 1076 (10th Cir. 2018) (citing *Tashjian*, 479 U.S. at 217).  "States have a major role to play in structuring and monitoring the election process, including primaries."  *Jones*, 530 U.S. at 572.  These regulations "will invariably impose some burden upon individual voters and political parties."  *Utah Republican Party*, 892 F.3d at 1077.

Amidst this "confluence of interests," courts analyze electoral regulations using the *Anderson–Burdick* balancing test.  *Id*.  Under *Anderson–Burdick*,

> a court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Id*. (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).  Election regulations that impose "severe burdens" on a party's associational or free speech rights are subject to strict scrutiny, and a court will only uphold the regulation if it is "narrowly tailored to serve a compelling state interest."  *Id*. (quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008); *Timmons*, 520 U.S. at 358.

11

"[T]he severity of the burden that a primary system imposes on associational rights is a factual, not a legal, question," on "which the Party bears the burden of proof." *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1123, 1125 (9th Cir. 2016). The Supreme Court has previously addressed the constitutionality of: (i) a closed primary system, which restricted primary participation to registered voters of each party, *Tashjian*, 479 U.S. 208; (ii) a blanket primary system, where the primary ballot listed every candidate regardless of party affiliation and allowed the voters to choose freely among the candidates, *Jones*, 530 U.S. 567; (iii) a non-partisan, blanket primary system, where the top two winners advanced to the general election, *Wash. State Grange*, 552 U.S. 442; and (iv) a semi-closed primary system, which allowed a political party to open its primary to unaffiliated voters, but not registered voters of other parties. *Clingman*, 544 U.S. 581.

### 1. *Whether Proposition 108 Imposes a Severe Burden on the Party's Associational Rights*

The undisputed facts regarding primary elections in Colorado since the implementation of Proposition 108 show no harmful effects to the Party. The Party cannot identify any nonpresidential primary election in Colorado where the outcome was changed by the participation of unaffiliated voters or where the candidate favored by the plurality or the majority of unaffiliated voters differed from the candidate favored by the plurality or the majority of Party voters. The Party's expert, Trent England, is unaware of any empirical research showing that, since the passage of Proposition 108, more moderate or different kinds of candidates have won their respective party's nomination. In light of this evidence, the Secretary claims that the Party fails to show that Proposition 108 imposes a severe burden on the Party's association rights.

The Party argues that it does not need to provide proof that unaffiliated voters have affected the outcome of Republican primaries.  Docket No. 105 at 9.  Rather, the Party contends that it must show the danger of unaffiliated voters doing so in order to demonstrate a severe burden to its First Amendment rights of association.  *Id.* at 9-14. The Secretary disagrees, arguing that the Party must adduce empirical evidence showing that unaffiliated voters have affected the outcome of Republican primaries to demonstrate a severe burden.  *See* Docket No. 108 at 9.  The Secretary contends that the Party's failure to do so means that it cannot prevail on its as-applied challenge under Counts One and Two.  *See id.*

In holding that California's blanket primary system was unconstitutional, *Jones* relied on a survey showing that 37 percent of California Republicans planned to vote in the Democratic gubernatorial primary, while 20 percent of California Democrats planned to vote in the Republican senate primary.  *Jones,* 530 U.S. at 578.  *Jones* also relied on a survey of California voters that "revealed significantly different policy preferences between party members and primary voters who 'crossed over' from another party."  *Id.* In response to the lower court's reliance on testimony that the prospect of party raiding was slight and would be determinative in "only a small number of races," *Jones* responded that "a single election in which the party nominee is selected by nonparty members could be enough to destroy the party."  *Id.* at 579.  *Jones* held that California's blanket primary system not only had the effect of altering the identity of the nominee, but that, "[e]ven when the person favored by a majority of the party members prevails, he will have prevailed by taking somewhat different positions – and, should he be elected, will continue to take somewhat different positions in order to be *re*nominated."

13

*Id*. at 579–80.  *Jones* held that it is an "obvious proposition that these substantial numbers of voters who help select the nominees of parties they have chosen not to join often have policy views that diverge from those of the party faithful."  *Id.* at 578.  Thus, *Jones* held that the evidence of crossover voting demonstrated a severe burden on plaintiff's First Amendment rights of association because there was "a clear and present danger" that the party's nominee would be "determined by adherents of an opposing party."  *Id.*

Since the preliminary injunction hearing, the Party has submitted undisputed evidence analogous to that relied upon in *Jones*, namely, the degree to which non-party members vote in Republican primaries and differences in policy views between Party members and unaffiliated voters.  Moreover, such evidence, while not showing any adverse effects on elections that have taken place since 2018, nevertheless shows a clear and present danger of party nominees being determined by non-party members.  This danger is greatly increased by the large numbers of unaffiliated voters in Colorado. In 2025, over half of the active voters in Colorado were unaffiliated voters.  The Republican Party and the Democratic Party each have approximately 25% of the active voters.  As a result, if the primaries of the major parties are open to unaffiliated voters, there is the possibility of large numbers of unaffiliated voters participating.  And, not only has that been the case, but the degree of participation has been growing dramatically. In 2018, 100,000 unaffiliated voters participated in Republican primaries; in 2020, 130,000 unaffiliated voters; and in 2022, 231,000 unaffiliated voters.  Given the large numbers of unaffiliated voters, the effects in some counties' primaries have far exceeded what *Jones* considered.  In some counties, more unaffiliated voters have

14

voted than Republicans voters in the Republican primaries.  For instance, in the Denver County primary in 2024, 18,350 Republicans voted as compared to 27,977 unaffiliated voters.  Docket No. 105-3 at 12, ¶ 29.  *Jones* held that "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee."  *Jones*, 520 U.S. at 575.  When more non-party members vote in a primary election than party members, that right has been severely compromised.

The Secretary asserts that there is no evidence that unaffiliated voters have changed the outcome of Republican primaries, either by selecting different candidates than those preferred by the majority of the Party or by nominating more moderate candidates.  *See* Docket No. 102 at 6-7, ¶¶ 26-33.  However, the Party has produced evidence that unaffiliated voters have different policy views than those of Republican voters.  A survey done by Mr. Khalaf shows that "these two groups of voters do not share a common identity or set of political values or ideologies."  Docket No. 105 at 11; Docket No. 105-3 at 11, ¶ 28.  This is the kind of evidence – which "reveal[s] significantly different policy preferences between party members and primary voters who 'crossed over' from another party" – that *Jones* relied upon.  *See Jones*, 530 U.S. at 578.  Moreover, even without the survey data, the Party has shown a severe burden on its First Amendment association right.  By allowing unaffiliated voters to participate in major party primaries, Proposition 108 "forces political parties to associate with – to have their nominees, and hence their positions, determined by – those who, at best, have refused to affiliate with the party."  *Id.* at 577.  The fact that the votes of Republican voters and unaffiliated voters have not yet demonstrably diverged does not mean the absence of a clear danger of them doing so in the future and does not mean

15

that in counties where more unaffiliated voters than Republican voters participate in primaries that the outcome of the elections are not controlled by non-party members. Thus, despite the undisputed evidence of no known electoral harm in previous primaries, the Party has shown that Proposition 108's requirement that primaries be open to unaffiliated voters constitutes a severe burden.

The Court turns to the Party's argument that the three-fourths opt-out provision is "constitutionally problematic in its own right." Docket No. 105 at 20. The Party argues that this "threshold is extraordinary, rarely if ever applied to other parliamentary contexts because it is nearly impossible to meet for any contested question." *Id*. Major political parties may opt out of the semi-open primary system and instead conduct an assembly or convention to nominate candidates if "three-fourths of the total membership of the party's state central committee" votes to opt out. Colo. Rev. Stat. § 1-4-702(1). Since the passage of Proposition 108, no major political party has opted out of the semi-open primary system. The Republican central committee on several occasions entertained motions to opt out, but each time the motion failed to achieve a three-quarter vote. In fact, the votes in favor of opting out have never exceeded two-thirds. While members of the central committee have a diversity of views regarding whether it is in the interests of the Party to opt out, some members of the Party have described the three-fourths requirement as "very difficult" or "nearly impossible" to achieve. Docket No. 107 at 17.

The background and origin of the three-fourths opt-out provision is unclear. What is clear is that it constitutes an unusual and difficult barrier for the central committee to overcome, more akin to a hurdle to amend a foundational governing document, such as the United States Constitution, than a traditional means of regulating

16

political parties.  It is true that the central committee here has approved motions by a three-fourths or even unanimous vote.  But there is no evidence that such motions have involved issues of any substance.  As a result, the theoretical possibility cannot overcome the obvious – the three-fourths opt-out provision erects an extraordinary barrier for a decision of this nature, namely, a political party choosing not to affiliate with non-party voters.[8]  Thus, the Court finds that, rather than the opt-out provision saving the constitutionality of Proposition 108 by giving the Party the right to avoid a semi-open primary, the opt-out provision creates a severe burden on the Party's association right by making it highly unlikely that an opt out motion will succeed.[9]

### 2.  State's Interests

As discussed above, under *Anderson–Burdick*,

> a court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

---

[8] The court in *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 668 (D.S.C. 2011), upheld a similar three-fourths opt-out provision, but did so on the grounds that it was analogous to a state requiring a candidate to obtain a certain percentage of signatures to gain access to the general election ballot.  That is not the ground on which the Secretary defends the provision and, in any event, the Court does not agree with the analogy.

[9] In the Court's order denying the Party's motion for a preliminary injunction, the Court cited *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006), as authority for the validity of the three-fourths opt-out provision.  *See* Docket No. 60-9 at 18-19.  In *Walker*, the Tenth Circuit denied a facial challenge to Utah's constitutional provision imposing a two-third supermajority requirement for citizen ballot initiatives related to wildlife management.  *See Walker*, 450 F.3d at 1085, 1105.  *Walker* held that "a constitutional provision imposing a supermajority requirement for enactment of initiatives on specific topics does not implicate the freedom of speech."  *Id.* at 1085.  Here, however, the three-fourths opt-put provision does not implicate the freedom of speech, but rather stands as a barrier to whether the Party has the ability to opt out of a semi-open primary.  Thus, *Walker* is distinguishable.

*Utah Republican Party*, 892 F.3d at 1077 (quoting *Burdick*, 504 U.S. at 434).  Given that

the Party has shown Proposition 108 imposes a severe burden on its First Amendment

right of association – by allowing unaffiliated voters to participate in the semi-open

primary and by failing to provide a realistic mechanism for opting out – the Secretary

must provide a compelling reason for both the semi-open primary and the opt-out

provision.  The Secretary argues that the State has two compelling interests served by

Proposition 108: increasing voter participation and promoting the stability of elections.

*See* Docket No. 108 at 13-17.

First, the Secretary argues that Proposition 108 offers unaffiliated voters access

to the state's major party primaries and thereby allows them to participate in selecting

the candidates who will run for the state's public offices in the general election.  Docket

No. 102 at 17-18.  The Secretary points out that, since the implementation of

Proposition 108, the turnout for primary elections has increased significantly.  The

Supreme Court in *Jones* considered the state's argument that a blanket primary would

ensure that an otherwise disenfranchised person had the right to an effective vote.

*Jones*, 530 U.S. at 583.  The Court rejected the interest, noting that the Court had held

in other cases that a "nonmember's desire to participate in the party's affairs is

overborne by the countervailing and legitimate right of the party to determine its own

membership qualifications," *id.* (citing *Tashjian*, 479 U.S. at 215-216 n.6), and noting

that such voters, in order to participate in the primary, have the option of registering with

the party.  *Id.* at 583-84.   As the Fourth Circuit held in *Miller v. Brown*, 503 F.3d 360,

371 (2007), "[w]hile allowing the broadest possible group of voters to participate in a

primary may be desirable, this interest cannot overcome the severe burden placed upon

18

a political party when it is forced to associate with those who may not share its views."
Thus, the Court finds that the state's interest in increasing voter participation cannot
serve as a compelling interest.

In terms of the state's interest in stability, the Secretary focuses on the three-fourths opt-out requirement. She claims that the three-fourths requirement "favors semi-open primaries as the default for major parties' nominating contests," thus "creating stability." Docket No. 108 at 16. It is true that "a stable political system is, unquestionably, a compelling state interest." *See Eu*, 489 U.S. at 226. However, the stability that the Secretary claims as a compelling interest is not the type of stability that *Eu* discussed, such as bringing "some sort of order, rather than chaos" to the candidate selection system. *Id*. at 227 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Rather, the Secretary's argument suggests that the three-fourths requirement achieves stability by virtue of it being so difficult to overcome. The Court does not find this interest to be compelling. The State has offered no defense or explanation as to why Proposition 108 uses a three-fourths vote of the state committee as opposed to a majority vote, much less an explanation of why it requires a vote of all members, not just those present. Thus, the Secretary fails to justify "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (citation omitted). Although the Secretary argues that the Party is free to limit or expand the central committee's membership and to control where and when committee meetings are held, Docket No. 102 at 11, the Secretary does not explain how these things, if adopted, would appreciably lessen the burden imposed by the three-fourths provision.

19

The state cannot create a compelling stability interest out of a severe burden simply because the severe burden cannot be overcome by the Party.

### 3. Remedy

The Party says its motion for partial summary judgment is limited to its as-applied challenge.  *See* Docket No. 105 at 3.  However, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."  *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 331 (2010).  As discussed above, the Court found that the three-fourths opt-out provision is a severe burden on the Party.  If the Court were to find that the three-fourths provision is only unconstitutional as applied to the Party, it would be ignoring the fact that the three-fourths provision, on its face, constitutes a severe burden regardless of the party.  Thus, the Court finds that providing relief on the basis of a facial challenge is proper in this case.

The Court finds that Colo. Rev. Stat. § 1-4-702(1), which requires "at least three-fourths of the total membership of the party's state central committee votes to use the assembly or convention nomination process" in order to opt-out of the semi-open primary, constitutes a severe burden on the major parties' right to association and is therefore unconstitutional.

However, the Court finds that, if a major party has a reasonable ability to opt out of the semi-open primary, the associational burden of Proposition 108 would not exist. As the Fourth Circuit noted in *Miller*, "Virginia allows political parties to nominate candidates not only by state-run primary but also by other methods controlled and

funded by the party. And, by merely choosing any of these other options, a party is free to limit its candidate selection process to voters who share its political views. Thus, the 'forced association' that the Supreme Court has condemned, *Jones*, 530 U.S. at 581, simply is not present here." *Miller*, 503 F.3d at 367. The Court finds that the Party is entitled to summary judgment, but only to the extent of the Court declaring the three-fourths opt-out provision unconstitutional.

### B. The Secretary's Motion for Summary Judgment

The Secretary moves for summary judgment on both of the Party's claims. *See* Docket No. 102 at 25. The Secretary's motion is premised on the argument that Proposition 108 is facially constitutional due to the three-fourths opt-out provision. *See id.* at 9-12. For the reasons discussed above, the Court finds that the three-fourths provision not only fails to render Proposition 108 constitutional, but itself imposes a severe burden that infringes on major political parties' First Amendment rights of association. Accordingly, the Court will deny the Secretary's motion for summary judgment.

## V.    CONCLUSION

Therefore, it is

**ORDERED** that defendant Jena Griswold's Motion for Summary Judgment [Docket No. 102] is **DENIED**. It is further

**ORDERED** that plaintiff Colorado Republican Party's Motion for Partial Summary Judgment [Docket No. 105] is **GRANTED in part**. It is further

**ORDERED** that Colo. Rev. Stat. § 1-4-702(1), requiring that "at least three-fourths of the total membership of the party's state central committee votes to use the

21

assembly or convention nomination process" before a major party can opt for an

assembly or convention nomination process is unconstitutional.

DATED March 31, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge