## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY,
an unincorporated nonprofit association, on behalf of itself and its members,

     Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

     Defendant.

---

**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE, FOR RECONSIDERATION OF THE MARCH 31, 2026 ORDER FOR THE 2026 PRIMARY ONLY**

---

Plaintiff Colorado Republican Party ("the Party"), by and through undersigned counsel, respectfully moves this Court on an emergency basis for a temporary restraining order and/or preliminary injunction (or, alternatively, modification of the March 31, 2026 Order) directing Defendant Jena Griswold ("Secretary Griswold"), in her official capacity as Colorado Secretary of State, to exclude unaffiliated voters from participating in the Republican primary portion of the June 30, 2026 Colorado Primary Election. Pursuant to D.C.COLO.LCivR 7.1(a), the undersigned conferred with opposing counsel this morning, and was advised that Secretary Griswold opposes this motion. Declaration of Alexander Haberbush ¶ 12 (attached hereto as Exhibit 1). In support thereof, the Party states as follows:

Plaintiff's Emergency Motion for TRO or PI - 1

I.    INTRODUCTION

On March 31, 2026, this Court held that "the Party has shown that Proposition 108's requirement that primaries be open to unaffiliated voters constitutes a severe burden" on its constitutional right to freedom of association. Order at 16 (Dkt.#130). As such, the Proposition 108 unaffiliated voter mandate was subject to strict scrutiny, and this Court also held that neither of the governmental proffered interests—increased voter participation and stability—was sufficient to overcome the severe burden on the Party's associational rights. Order at 18-19. The Court then held that "if a major party has a reasonable ability to opt out of the semi-open primary, the associational burden of Proposition 108 would not exist." Order at 20.[1] The "reasonable ability to opt out" exists here, according to the Court, because the supermajority vote requirement to opt out is itself unconstitutional and, therefore, now no longer in effect. "Colo. Rev. Stat. § 1-4-702(1), which requires 'at least three-fourths of the total membership of the party's state central committee votes to use the assembly or convention process' in order to opt out of the semi-open primary, constitutes a severe burden on the major parties' right of association and is therefore unconstitutional." Order at 21. Accordingly, the Court granted the Party's Motion for Summary Judgment with respect to its claim that the 3/4 supermajority vote requirement to opt out was

---

[1] The Party disagrees with this holding and will be filing a separate motion under Fed. R. Civ. P. 54(b) for reconsideration of that issue. The holding contradicts the holding by the District Court for the District of Utah in *Utah Republican Party v. Herbert*, 144 F.Supp.3d 1263 (D. Utah 2015), which is not addressed in the March 31 Order. As the Party argued in its Summary Judgement briefs, the Utah law at issue in that case also provided political parties with the opportunity to avoid an unaffiliated voter mandate by choosing another method for accessing the general election ballot. That option insulated the Utah law from a facial challenge, but once the Party made the choice to proceed under the method mandating unaffiliated voter participation, the unaffiliated voter provision, *as applied*, imposed "a severe burden because it forces [parties choosing that method] to flood their primary elections with thousands of unaffiliated voters." *Id.* at 1280. Because Utah's interests, including the interest in "increase[d] voter participation" proffered by Secretary Griswold here, were not compelling, the Court granted summary judgment to the political parties in that case.

unconstitutional. But it denied Summary Judgement to the Party with response to the unaffiliated voter participation mandate itself,[2] apparently because, absent the unconstitutional *supermajority* opt-out vote requirement, the party has a "reasonable" opportunity to opt out such that "the associational burden of Proposition 108 would not exist." Order at 20. In other words, absent the supermajority opt-out vote requirement, "the 'forced association' that the Supreme Court has condemned … simply is not present here." Order at 21 (quoting *California Democratic Party v. Jones*, 530 U.S. 567, 581 (2000)).

For the 2026 election cycle, however, no such "reasonable ability" ever existed, and the ability to opt out of the 2026 semi-open primary cannot now be retroactively resurrected. The 75% supermajority threshold that this Court has now declared unconstitutional was the only statutory mechanism available to the Party in September–October 2025, and under the statute, the Party was required to conduct its opt-out vote by October 1, 2025. C.R.S. § 1-4-702(1). Because that now-unconstitutional barrier prevented any realistic opt-out, the semi-open primary for 2026 imposes precisely the severe associational burden the Court identified. The State's asserted interests were expressly rejected as non-compelling. Order at 18–20. Accordingly, application of the semi-open primary to the 2026 Republican primary unconstitutionally compels the Party to associate with unaffiliated voters in violation of the First Amendment under the very reasoning of this Court's Order. Emergency relief limited to the 2026 cycle is therefore necessary to prevent irreparable constitutional injury before ballots are mailed to voters wishing to vote in the June 30, 2026, primary election.

---

[2] The Court also denied Secretary Griswold's Motion for Summary Judgment.

Plaintiff's Emergency Motion for TRO or PI - 3

## II.      FACTUAL BACKGROUND

At its meeting on September 27, 2025, the Republican Party's State Central Committee met and voted on whether to opt out of the 2026 semi-open primary. Declaration of Eric Grossman ¶ 2 (attached hereto as Exhibit 2). The vote was 226 in favor of opting out to 196 against, short of the 3/4 of total membership threshold required by C.R.S. § 1-4-702(1). *Id.* Although some party members contended that an earlier resolution by the Republican State Assembly, adopted at the Assembly's convention the prior Spring, required the State Central Committee to opt out of the 2026 semi-open primary, Brita Horn, the Chairman of the Republican Party at the time, ruled that the opt-out vote had failed to achieve the 3/4 supermajority requirement of C.R.S. § 1-4-702(1) and that the Party had therefore not opted out of that election. *Id.*

Colorado law requires that any vote to opt out of the semi-open primary occur "no later than October 1 of the year preceding the year in which an assembly or convention nominating process [instead of the semi-open primary] is to be used." C.R.S. § 1-4-702(1). Accordingly, it is now too late for the Party to conduct a new opt-out vote without the 3/4 supermajority requirement that this Court has held to be unconstitutional.[3]

---

[3] Even if this Court could waive the October 1, 2025 deadline under the present circumstances, it is simply not possible to now resurrect an opt-out vote and have the party's nominees chosen by assembly or convention at this point. The assemblies have already met and chosen the candidates who will appear on the primary election ballot, and the final state assembly/convention met on April 11, 2026. See Official Call, available at https://www.parkcogop.com/images/121450/2026_State_Assembly_Official_Call.pdf. By law, that assembly could meet no later than April 18, 2026. CRS § 1-4-601(1)(a). For many offices, the assemblies or convention have chosen more than one such candidate to appear on the primary election ballot, and should those assemblies now be treated as candidate-selection assemblies pursuant to an opt out, there was no determination as to which of the several approved candidates should be the party's nominee in the general election.

### III.    LEGAL ARGUMENT

#### a.  The Court's Reasoning in its March 31 Order Compels the Conclusion That Proposition 108 Is Unconstitutional as Applied to the 2026 Primary.

This Court has already found that Proposition 108's semi-open primary "constitutes a severe burden" on the Party's associational rights. Order at 15. The Court further held that the opt-out provision, rather than curing that burden, itself created the severe burden because it made opting out "highly unlikely." *Id*. at 16–17. The conditional language in the Order is unambiguous: the associational burden "would not exist" *only if* the Party possesses "a reasonable ability to opt out." *Id*. at 20.

For the 2026 cycle, that condition was never satisfied. The 75% threshold—now declared facially unconstitutional—was in full force when the Party's State Central Committee acted in September 2025 and when the statutory deadline expired on October 1, 2025. The Party therefore never had a "reasonable ability" to opt out. Under the Court's own logic, the severe burden identified in the Order exists for the 2026 primary.

The Secretary's proffered governmental interests (voter participation and election stability) were expressly rejected as compelling justifications. *Id*. at 18–20. No other interest was advanced that could survive strict scrutiny. Consequently, compelling the Party to conduct a semi-open primary in June 2026—without any reasonable opt-out mechanism available at the time—violates the First Amendment.

#### b.  The Relief Sought Here Is Narrow, Equitable, and Limited to 2026 Only.

The Party does not seek with this emergency motion to invalidate Proposition 108 writ large or for future cycles. The requested relief is strictly as-applied and time-limited to the 2026 primary election. This Court has authority to issue such an injunction pursuant to Fed. R. Civ. P. 65. Alternatively, if the Court determines that its March 31 Order precludes such relief, the Court

retains authority to modify or clarify its judgment to prevent ongoing constitutional violations flowing directly from the ruling. See Fed. R. Civ. P. 54(b). This is such a case.

### c.    The Four Factors for Emergency Relief Strongly Favor the Party.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001). All four elements are met here.

#### i.    Likelihood of success on the merits.

For the reasons set out above, the Party is likely to succeed on the merits. Indeed, this Court has already ruled in its March 31 Order that: 1) Proposition 108's unaffiliated voter participation mandate imposes a severe burden on the Party's constitutionally-protected associational rights absent a reasonable opportunity to opt out; 2) the government interests proffered by the Secretary are not compelling and therefore are insufficient to overcome the severe burden on the Party's associational rights; and 3) that burden is only removed because this Court determined that the 3/4 supermajority vote requirement to opt out of the semi-open primary was unconstitutional. But the 3/4 supermajority vote requirement was in effect when the Party attempted to opt out of the 2026 semi-open primary and, given the statutory October 1, 2025, deadline to opt out, the ability to opt out under a constitutionally permissible vote cannot now be resurrected. Therefore, the Party is being forced to participate in the upcoming June 30, 2026, primary election that includes unaffiliated voters without having had a reasonable opportunity to opt out of that forced association.

In a constitutional case, the likelihood of success on the merits will often be the determinative factor. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). This is because: (a) "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016); (b) the government's interests in enforcing a likely unconstitutional law do not outweigh Plaintiff's interest in having its constitutional rights protected; and (c) it is always in the public interest to prevent violation of constitutional rights. *Hobby Lobby*, 723 F.3d at 1145. As the Tenth Circuit has previously recognized, "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012).

Even if the Court were to separately consider the other three factors, however, the result would be the same because all of the factors favor Plaintiff.

### ii.    Irreparable harm.

It is well-settled that a showing of the infringement of a constitutional right requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019).

### iii.    Balance of Harms

As for the balance of harms prong, the State's interest in enforcing an unconstitutional law does not outweigh Plaintiff's interest in having its constitutional rights protected. *Awad*, 670 F.3d at 1131.

This Court has already determined that, absent a reasonable opportunity to opt out of the semi-open primary, Proposition 108's unaffiliated voter participation mandate imposes a severe

burden on the Party's associational rights. And it has already determined that the Secretary's proffered governmental interests are insufficient to outweigh that burden.

The Secretary may argue, as she has previously, that she cannot change the elections system in time to prevent unaffiliated voters from participating in the Party's June 30, 2026, election. But state law already allows a minor political party to notify the Secretary of State that it is prohibiting unaffiliated electors from voting in its primary as late as April 16, 2026. C.R.S. § 1-4-1304(1.5)(c). No harm would arise were major political parties such as Plaintiff here allowed to avail themselves of the same right that statutorily exists for minor parties to exclude unaffiliated voters from their primary elections. The few days difference between the April 16 deadline for minor parties contained in C.R.S. § 1-4-1304(1.5)(c) and the filing of this motion should, under the circumstances described more fully below, not be a barrier to the relief requested here. No alteration of ballots is required; no alteration of the candidates who will appear on the ballot is required. The only difference, should this motion be granted to avoid the unconstitutional violation that has already been found to exist, is that ballots will not be mailed to unaffiliated voters. Pursuant to the Uniformed and Overseas Citizens Absentee Voting Act of federal law, absentee ballots must be transmitted to military and overseas citizens "at least 45 days before an election for federal office," which is May 16 for the upcoming primary election. 52 U.S.C.A. § 20302(a)(8)(A) ("UOCAVA"). That requirement is replicated in Colorado law and extended to state elections. C.R.S. §§ 1-8.3-103(1)(b); 1-8.3-110(1). The real deadline for simply *not* mailing such ballots is therefore May 16, 2026. And as this Court has already recognized, unaffiliated voters who wish to vote in the Republican primary election "may change their affiliation up until election day." Order Denying Mot. for Preliminary Injunction, Dkt.# 69, at 9; *Colorado Republican Party v. Griswold*, 715 F. Supp. 3d 1339, 1349 (D. Colo. 2024).

The Secretary may contend, as she has previously, that it is not possible to re-program the state's SCORE voter rolls system to exclude unaffiliated voters on such short notice. We have three responses to any such argument. First, Secretary Griswold is legally obligated to be able to make such a change for any minor party who notified the Secretary by April 16 of its desire to exclude unaffiliated voters from its primary election. C.R.S. § 1-4-1304(1.5)(c). Second, as this Court will recall, the Party's data expert segregated unaffiliated voters from party voters in real time on the witness stand during the preliminary injunction hearing held on January 23, 2024. PI Hearing, Testimony of Thomas Bjorklund (Jan. 23, 2024). Third, the Secretary's own witness at the preliminary injunction hearing testified that, under the existing procedures, the SCORE voter system already "determines which ballot style each voter is eligible to receive based on," *inter alia*, "party affiliation. Dkt. #69, at 6; *CRP*, 715 F. Supp. 3d at 1347. As this Court recognized, that means, for example, that:

> a Republican voter in Arapahoe County would receive a Republican primary ballot, containing any state-wide races, county-specific races for Arapahoe County, and ballot initiatives. Meanwhile, an unaffiliated voter in Arapahoe County would receive a major party packet, containing both the Republican and Democrat primary ballots for the voter's district.

*Id.* In other words, the segregation of unaffiliated from party-registered voters is already operative in the SCORE system and part of the routine management of elections.

The only change that would now be required in order to prevent the violation of the Republican Party's constitutional rights in the upcoming election is that the unaffiliated voter packet would not include a Republican Party ballot. For some counties that have already pre-printed instructions for the unaffiliated voter packets despite being well aware of the existence of this litigation, those instructions may need to be modified and reprinted in order to explain why the unaffiliated voter packet only includes the Democratic Party ballot. Any such cost likely would be entirely offset by the reduction in postage fees resulting from not having to include

both major party ballots in the mailing and the significant reduction in ballot printing costs, but even if not, the fact that additional costs may be incurred is not a sufficiently compelling governmental interest to override the Party's constitutional right to freedom of association. *See, e.g.*, *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 218 (1986) ("the possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing appellees' First Amendment rights.").

### iv.    Public Interest

The unconstitutionality of Proposition 108 as applied to the June 2026 primary election is also dispositive on the "public interest" prong, as "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. Thus, "[w]hile the public has an interest in the will of the voters being carried out, … the public has a more profound and long-term interest in upholding an individual's constitutional rights." *Awad* , 670 F.3d at 1132. Granting the preliminary injunction would therefore serve the public interest.

### d.    Neither Laches nor the *Purcell* doctrine precludes granting a preliminary injunction.

Anticipating a likely affirmative defense by the Secretary, the Court will undoubtedly wish to consider whether the Party's emergency motion should be denied either on grounds of laches or the *Purcell* doctrine. In the Party's view, neither doctrine should preclude the granting of its motion for preliminary injunction.

### i.    *Laches* is not a bar under the circumstances presented here.

Laches is an affirmative defense. *Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 479 (10th Cir. 2023). It "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Equal Emp. Opportunity Comm'n v. Chris the Crazy Trader Inc.*, No. 21-CV-02666, 2025 WL 958486, at *9 (D. Colo.

Plaintiff's Emergency Motion for TRO or PI - 10

Mar. 31, 2025) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002)).

The party asserting laches as a defense has the burden of proving each element. *Safeway Stores*,

65 F.4th at 490. The Secretary cannot carry that burden on either element.

In a case nearly directly on point, the Supreme Court, via Justice Powell as Circuit Jus-

tice, granted a preliminary injunction ordering the Texas Secretary of State to place Senator Eu-

gene McCarthy on the general election ballot as a candidate for President in the 1976 presidential

general election. *McCarthy v. Briscoe*, 429 U.S. 1317, 1319 (1976). A year prior to the election,

the Texas legislature had altered state election law and repealed prior rules providing a mecha-

nism for independent candidates for President to demonstrate a sufficient level of support to be

granted access to the ballot. Senator McCarthy filed suit on July 30, 1976, in the Western District

of Texas, challenging the constitutionality of Texas's new law. On September 3, 1976—just two

months prior to the November 2, 1976, general election—the district court held that Texas's law

was unconstitutional but declined to provide any injunctive relief to Senator McCarthy, holding

that it was "too late for [it] to fashion meaningful relief without substantially disrupting the entire

Texas election scheme." *Id.* at 1319. Three weeks later, on September 23, the Fifth Circuit de-

nied Senator McCarthy's request for emergency injunctive relief, holding that "because the com-

plaint was so lately filed there is insufficient time for the Court to devise a petition requirement

for ascertaining whether McCarthy has substantial community support in Texas without disrupt-

ing the entire election process in that state." *Id.* at 1320. Senator McCarthy submitted an emer-

gency application the next day to Justice Powell, the Circuit Justice for the Fifth Circuit, and Jus-

tice Powell, noting agreement from a majority of the Court, granted the application on September

30—a mere 33 days before the election—ordering the Texas Secretary of State to include Sena-

tor McCarthy on the ballot. Justice Power rejected Texas's laches argument.

Plaintiff's Emergency Motion for TRO or PI - 11

The Party filed the instant suit more than three years ago. It sought a preliminary injunction in January 2024, five months before the June 2024 primary election, which was denied. It then sought Summary Judgement in May 2025 after extensive discovery. On March 31, 2026, this Court found that the supermajority-vote requirement to opt out of the semi-open primary was unconstitutional. But the Court also held that it would be a severe burden on the Party's associational rights, and therefore unconstitutional, if the Party did not have a reasonable opportunity (i.e., not burdened by the ¾ supermajority vote requirement) to opt out. As noted above, the Party had no such reasonable opportunity for the upcoming primary election.

This emergency motion for preliminary injunction is filed twenty days after this Court's ruling on unconstitutionality—1 day less than the time between the district court ruling in *McCarthy* and Senator McCarthy's emergency application to Justice Powell. Even more significantly, this motion is filed 71 days before the primary election. Senator McCarthy's emergency application to Justice Powell was filed only 39 days before the general election at issue in that case, and only 19 days before the window for applying for absentee ballots under Texas law at the time opened on October 13, pursuant to Article 2956 of the Texas Revised Civil Statutes of 1925.[4] Moreover, mailing of ballots to Texas military and overseas voters had likely already begun in 1976 under the Overseas Citizens Voting Rights Act of 1975, 89 Stat. 1142 (repealed and replaced by UOCAVA in 1986, 52 U.S.C. §§ 20301–20311).

Here, in contrast, transmittal of the list of candidates who will appear on the ballot has only just recently been completed and need not have been completed until April 22. *See* Secretary of State, 2026 Election Calendar[5] (describing April 22 as the "Last day for the state central

---

[4] Available at https://www.sll.texas.gov/library-resources/collections/historical-texas-statutes/bookreader/1925/#page/886/, pp. 815-16.

[5] Available at https://www.sos.state.co.us/pubs/elections/calendars/2026ElectionCalendar.pdf.

committee of each political party to file with the Secretary of State a compilation of the certificates of designation of each assembly that nominated candidates for any national or state office or for member of the general assembly, district attorney, or district office greater than a county office").[6] The deadline for mailing UOCAVA overseas ballots is not until May 16, C.R.S. § 1-8.3-110(1), and the first day that mail ballots may be mailed to voters (other than UOCAVA voters) is not until June 8, C.R.S. § 1-7.5-107(3)(a)(I).

To be sure, this instant motion is filed twenty days after the Court's ruling on unconstitutionality was issued on March 31. The delay is unfortunate, but excusable. The Party itself has repeatedly made clear, through resolutions of its governing body, that "a majority of the Republican Party's State Central Committee supports choosing Republican Party nominees by a primary election at which only registered voters who are members of the Republican Party are eligible to participate." Preliminary Injunction Hearing of January 23, 2024, Exs. 8 and 10. Despite that clear directive, the individual serving as Party Chairman at the time this Court's March 31 decision was issued, and who had already tendered her resignation effective April 17, 2026, after having twice received votes of no confidence, Grossman Decl. ¶¶ 3-4, instructed counsel *not* to file a motion for preliminary injunction that, if successful, would have secured the goals of the litigation sought by the Party itself. Haberbush Decl. ¶ 5.

An emergency meeting of the Party's Executive Committee, which under Article IX, Section B.4 of the Party's bylaws has authority to "[h]ear and determine party controversies" (subject to override by the State Central Committee), was called and held on April 9, but the Executive Committee declined to override the instruction of the Party Chair *not* to file a motion for

---

[6] The Republican Party held its state assembly this year on April 11, a week prior to the deadline under state law. *See* CRS § 1-4-601(1)(a). Its deadline for transmittal of the compilation of the certificates of designation was therefore April 15. CRS § 1-4-604(6)(a).

preliminary injunction with the vote outcome determined by the negative votes of all six of the Chairman-appointed members of the Committee. Grossman Decl. ¶ 5. The outgoing Party Chairman had already declined to call a meeting of the State Central Committee normally held the day prior to the Party's Assembly convention, *id.* ¶ 6, at which the State Central Committee could (and likely would) have overridden both the Chair and the Executive Committee, *id*. But on April 11, the Party's State Assembly met and overwhelmingly adopted a resolution censuring the 15 members (including the outgoing Chairman) of the 24-member Executive Committee who voted not to allow the filing of a motion for preliminary injunction, and to direct counsel "to immediately file an injunction to prevent unaffiliated [voters] from voting in [the Republican] primary." Grossman Decl. ¶ 7. It did so after overruling a ruling by the Parliamentarian, acting pursuant to authority delegated from the Chairman, that the resolution was out of order. *Id.* The State Assembly is the highest authority of the Party when it is meeting, superseding even the State Central Committee on grounds specified in Colorado law. C.R.S. § 1-3-106(2). It has full power "to pass upon and determine all controversies concerning the regularity of the organization of" the Party, and also to "make rules governing the method of passing upon and determining controversies as it deems best." All such determinations are to be deemed final. C.R.S. § 1-3-106(1).

Despite that unambiguous directive, the outgoing Party Chairman continued, through her appointed General Counsel, to instruct counsel of record in this case *not* to file a motion for preliminary injunction. Haberbush Decl. ¶¶ 7, 9-10. The General Counsel, who has now been terminated, Grossman Decl. ¶ 8, contended that the Assembly did not have authority to pass that resolution because, in his view, the issue was not a "controversy concerning the regularity of the

Plaintiff's Emergency Motion for TRO or PI - 14

organization."[7] Haberbush Decl. Ex. D. Although this was precisely the issue on which the Assembly had overruled the Chair's determination that the resolution directing the filing of the preliminary injunction motion was out of order, the Chairman nevertheless remained the CEO of the Party pursuant to the Party's bylaws and contended (through her General Counsel) that, as CEO, she had final authority to make specific litigation decisions. Haberbush Decl. ¶ 7 and Exs. C, D.

The Party contends that the now-former Chairman's interpretation of the bylaws and state law was incorrect, and that the directive issued by the Party while meeting in Assembly/Convention was controlling. The Party's position is supported by a recent decision of the Arapahoe County District Court, in which the Court held that it lacked jurisdiction to resolve a dispute between the Chair and State Central Committee, on the one hand, and the State Assembly/Convention, on the other, over the propriety of the latter taking a vote "regarding how the party's candidates will be elected or nominated," because such a dispute "*does* constitute the type of the dispute that is subject to C.R.S. § 1-3-106, as it is a controversy concerning the 'regularity of the organization of [the Republican] party." Order Dismissing All Claim, p. 6, *LeBlanc v. Colorado Republican State Central Committee*, No. 2025cv367 (Arapahoe Cnty Dist. Ct., Nov. 26, 2025)

---

[7] The communications between the former Party Chairman and General Counsel, on the one hand, and undersigned counsel of record in this case, on the other, are obviously attorney-client privileged communications. *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383 (1981) (holding that although the privilege is held by an entity itself, the privilege extends to officers of an entity who act on its behalf). However, the current acting Chairman/CEO of the Party has waived the privilege with respect to these particular communications, Haberbush Decl. ¶ 3 and Ex. A, given the necessity of disclosing them to the Court in order to demonstrate why laches is not a bar to the relief sought by this motion. As the Supreme Court has held, "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985).

(citing *People ex rel. Lowry v. Dist. Ct. of Second Jud. Dist.,* 74 P. 896, 898 (Colo. 1903), emphasis in original).

Nevertheless, despite the Assembly directive and the decision in *LeBlanc*, the outgoing Chairman, through her General Counsel, persisted in ordering counsel in this case *not* to file a motion for preliminary injunction. They did so by asserting that the Chair's position as CEO allowed her, under general principles of corporate governance, to make tactical litigation decisions. Haberbush Decl. ¶ 7, 9-10 and Ex. C. If the Party disagreed, as it clearly did here, case law suggests that the ordinary remedy is not for its members to manage the Party themselves, but "to install new management . . . ." *See Herald Co. v. Seawell*, 472 F.2d 1081, 1094 (10th Cir. 1972). With those conflicting directives from its client, and with the outgoing Chairman's resignation set to take effect in just a few days, counsel of record for the Party determined not to burden the Court with an internal dispute about the respective claims of authority to decide whether to file a motion for preliminary injunction until new leadership was at the helm. The authority question has now been resolved for purposes of this motion.

The outgoing Chairman's resignation took effect at the end of the day (midnight) on Friday, April 17. Grossman Decl. ¶ 4. Pursuant to Art. V, § D.2.a of the Party's bylaws, the Vice-Chairman of the Party must issue a call for a meeting of the State Central Committee to elect a new Chairman within 10 days, which meeting "shall be had within thirty days of the call."  In the interim, pursuant to Art. V, § B.2.a of the Party's bylaws, the Vice-Chairman "shall … [e]xercise the functions of the Chairman during" any temporary absence. In that capacity, the Vice-Chairman has now directed counsel of record in this case to file this emergency motion in accord with the April 11 directive of the State Assembly, Haberbush Decl. ¶ 11; Grossman Decl. ¶ 9, and we have done so on the very first court day since the Vice-Chairman began exercising the functions of the Chairman. The 20-day delay in filing this motion since this Court's March 31 order is

therefore not the result of the Party itself sitting on its rights, but rather of the obstructive direc-

tives of the former Party Chairman issued in defiance of the clearly-expressed will of the Party.

Laches should therefore not be a bar to the Court hearing and granting this emergency motion for

injunctive relief.

### ii.    The *Purcell* doctrine is likewise not a bar.

In *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court vacated a decision by the

Ninth Circuit enjoining a state election law—without explanation or justification—less than four

weeks before the election. *Id.* at 6. The Ninth Circuit's injunction was issued after the district

court had already rejected the request, not because it was sought too close to the election, but be-

cause plaintiffs were unlikely to succeed on the merits. *Purcell*, 549 U.S. at 3. The Supreme

Court's decision vacating the Ninth Circuit's last-minute injunction did not take issue with the

district court's consideration of the request for an injunction less than two months before the

election even though, under UOCAVA, the deadline for mailing absentee ballots to military per-

sonnel and overseas citizens was less than two weeks away.

The Supreme Court and lower courts have routinely noted how imminent was the elec-

tion at issue in *Purcell*, and either denied (or stayed) an injunction because the election was simi-

larly imminent or declined to apply that doctrine to requests for injunctive relief brought months

before an election.[8] Here, the election is still nearly two and a half months away. Election offi-

cials cannot begin mailing ballots (other than UOCAVA ballots) until June 8. And although the

---

[8] *Compare, e.g.*, *Husted v. Ohio State Conference of N.A.A.C.P.*, 135 S.Ct. 42 (2014) (staying an injunction affirmed on September 24 before an election for which early voting was to begin September 29); *with, e.g. Frank v. Walker*, 135 S.Ct. 7 (2014) (October 9th order lifting the September 12 stay by the Seventh Circuit of an April injunction issued by the district court blocking a photo id requirement for an election for which early voting was set to begin on October 20); *Holland v. Williams*, 457 F. Supp. 3d 979, 997 (D. Colo. 2018) ("In *Purcell*, it was a month before the election when an injunction was ordered. … Here, it is nearly five months before the 2018 elections.").

deadline for mailing UOCAVA ballots to military and overseas citizens is only four weeks away, that is still double the time available when the district court in *Purcell* considered the request for an injunction in that case.

In sum, although we are approaching the time when the *Purcell* doctrine might apply, the injunctive relief the Party now seeks is "not on the 'eve of an election'" as the courts have defined that phrase. *See, e.g.*, *Veasey v. Perry*, 769 F.3d 890, 894 (5th Cir. 2014)). The requested injunction is not barred by *Purcell*.

## IV.    CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, the Party respectfully requests that the Court:

(1) Grant this Emergency Motion;

(2) Issue a temporary restraining order and/or preliminary injunction barring the Secretary from including unaffiliated voters in the Republican primary ballot for the June 30, 2026 Colorado Primary Election; and

(3) Grant such other and further relief as the Court deems just and proper.


Dated: April 20, 2026

Respectfully Submitted,

/s/ *Alexander Haberbush*
Alexander Haberbush
CONSTITUTIONAL COUNSEL GROUP
444 W Ocean Boulevard, Suite 1403
Long Beach, CA 90802
Telephone: (562) 435-9062
E-mail: ahaberbush@ccg1776.com

/s/ *Randy B. Corporon*
Randy B. Corporon
LAW OFFICES OF RANDY B. CORPORON P.C.
5445 DTC Parkway, Suite 825
Greenwood Village, CO 80111
Telephone: (303) 749-0062
E-mail: rbc@corporonlaw.com


Plaintiff's Emergency Motion for TRO or PI - 18

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of April, 2026 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Alexander Haberbush*
Alexander Haberbush