## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY,
an unincorporated nonprofit association, on behalf of itself and its members,

      Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

      Defendant.

---

### THE SECRETARY'S RESPONSE TO PLAINTIFF'S EMERGENCY MOTION

After nearly three weeks of silence following this Court's order *declining* to grant injunctive relief, ECF No. 130 ("MSJ Order"), the Colorado Republican Party (the "Party") now seeks an "emergency" injunction, asking this Court to dramatically upend the administration of the June 2026 primary election, ECF No. 138 ("Motion" or "Mot."). The Motion should be summarily denied because it seeks overbroad relief that is incompatible with the MSJ Order; prohibited by Colorado law; and fatally disconnected from the narrow constitutional harm this Court found. It would also be massively burdensome to implement and inject a substantial risk of error and significant uncertainty in Colorado's upcoming primary election.

In the alternative, this Court should hold a prompt hearing and deny relief in advance of the May 1 statutory deadline to certify the content of the 2026 primary ballots. If this Court grants any injunctive relief related to the 2026 primary election, the Secretary respectfully requests a stay of that order so she can seek immediate appellate review. Fed. R. App. P. 8(a)(1).

**BACKGROUND**

This case's history is well-summarized in the MSJ Order. Of particular relevance here, Colorado law offers major political parties a choice: (1) nominate candidates through a semi-open, state-funded primary or (2) select those candidates through a closed, party-funded convention or assembly. C.R.S. § 1-4-702(1); *see* MSJ Order at 2-3. On March 31, this Court declared unconstitutional the "three-fourths" voting threshold required for parties to choose the latter option, but the Order specifically preserves the constitutionality of the binary choice established by Proposition 108. *Id.* at 20-22. The Order granted declaratory relief only. *Id.*

The Party's Motion asks this Court to issue an injunction creating a third option for the Party's nominating contests in 2026: a closed, state-funded primary election. *See* Mot. at 4, 15.

**LEGAL STANDARD**

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable injury absent the injunction, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Nellson v. Barnhart*, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020) (same standard for TRO). The plaintiff bears the burden of proving that each factor tips in its favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).[1]

---

[1] The Party's requested injunction is "disfavored" twice over: it (1) is a "mandatory" injunction that requires the Secretary to invent an extra-statutory primary process and (2) would dramatically upset the status quo. *Free the Nipple v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir. 2019).

## ARGUMENT

### I.      The Party misreads the MSJ Order and seeks a legally impermissible remedy.

The Party distorts the "likelihood of success" factor, arguing that this Court already addressed the question in its MSJ Order. Mot. 4-6. Yet the particular relief the Party seeks now is untethered to the merits of that decision. And because "[i]t is well settled an injunction must be narrowly tailored to remedy the harm shown," *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002), the Party's overbroad request for relief is fatal to its Motion.

The MSJ Order expressly *preserved* the binary choice that Colorado law requires major parties to make between (1) a semi-open primary or (2) a convention or assembly. MSJ Order at 20-21. It does not call into question whether the State may require parties to choose between these options, so long as the party has a reasonable opportunity to do so. *Id.* at 20-22. The Court therefore rejected the argument that the Party is constitutionally entitled to select a closed, state-funded primary. *See* ECF No. 105 at 25 (Party's request for MSJ relief). Instead, this Court found that the Party was "entitled to summary judgment, but *only* to the extent of the Court declaring the three-fourths opt-out provision unconstitutional," and it awarded limited declaratory relief only. MSJ Order at 20 (emphasis added). The Party's request for a closed primary would thus contradict the Order's holding that Colorado is *permitted* to require parties to choose between Proposition 108's two options. It is not "narrowly tailored" to the MSJ Order's findings.[2]

---

[2] The Party appears to recognize that its request is inconsistent with the MSJ Order, asking this Court to "modify or clarify" its MSJ Order in the alternative. Mot. at 4. The Party offers no argument or authority to support that reconsideration argument and has therefore forfeited it. *See Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1143 (10th Cir. 2023).

As a corollary, the Party's requested injunction would require the Secretary to ignore valid statutory provisions that the MSJ Order upheld. *See Woodruff v. Herrera*, 623 F.3d 1103, 1110 (10th Cir. 2010) (affirming remedial order invalidating voter-registration requirement for candidate but leaving "intact all requirements except the registration requirement"). To comply with C.R.S. § 1-4-702(1), the Secretary must allow major parties to nominate their candidates to the general election ballot through either (1) a semi-open primary election; or (2) nomination by caucus or assembly. Colorado law does not permit the Secretary to administer a closed primary for major parties, meaning the injunction that the Party seeks would prohibit the Secretary from performing her lawful duties, a result the Tenth Circuit heavily disfavors. *See Garrison*, 287 F.3d at 962; *Woodruff*, 623 F.3d at 1110-11.[3] Relatedly, granting the Party's request would require the Secretary to implement an untested, *ad hoc*, and extra-statutory election procedure on an expedited timeline. As discussed *infra* § II.A., that request poses a significant risk to election integrity as a factual matter. But as a legal matter, the Court should reject the Party's request for the Court to re-write Colorado's election code. *See Iancu v. Brunetti*, 588 U.S. 388, 398 (2019) (courts may invalidate an unconstitutional statute, but they cannot "fashion a new one").

The Party has not requested any relief tailored to the MSJ Order's *actual* merits decision, which found that the three-fourths voting threshold risked burdening the Party's ability to choose its preferred candidate-nomination method. MSJ Order at 20-21. For instance, the Party claims that its State Central Committee voted to "opt out" of the semi-open primary in September 2025 and was precluded from doing so by the three-fourths requirement. Mot. at 4. But nothing in the

---

[3] The injunction the Party seeks may also prohibit Colorado from complying with several other statutory provisions, including the May 1 deadline to certify ballot content and the May 16 federal deadline to mail military and overseas ballots. Declaration of Hilary Rudy ¶ 15 ("Ex. A").

Party's Motion indicates it has voted on whether to nominate candidates by assembly or convention, much less voted in favor of that decision. And under the statute, to properly opt *out* of a semi-open primary, the Party must opt *in* to a convention or assembly. C.R.S. § 1-4-601(1)(a).

Similarly, while the Party notes that it was "required to conduct its opt-out vote by October 1, 2025," Mot. at 3, it does not ask this Court to enjoin the Secretary's enforcement of that deadline. Nor does the Party seek to extend the April 18, 2026 statutory deadline for nominating candidates by assembly or convention (a deadline that passed 18 days *after* the MSJ Order). *See* C.R.S. § 1-4-601(1)(a). To be clear, implementing such relief would pose significant risks to election integrity and should not be considered. *See infra* at § II.A. But the fact that the Party has not requested such relief shows that the remedy it does seek is fatally overbroad. *See Garrison*, 287 F.3d at 962.

## II.     The *Purcell* principle precludes eleventh-hour injunctions that disrupt elections.

Enjoining the Republican primary now would also put at risk the integrity of Colorado's June 30, 2026, primary election. Under *Purcell*, federal courts generally should not change state election law right before an election. *Purcell v. Gonzales*, 549 U.S. 1, 5-6 (2006); *see Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020). That rule exists because "[b]allots and elections do not magically materialize. They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed." *Perry v. Judd*, 471 F. App'x 219, 226 (4th Cir. 2012). And once pre-election planning is complete, "thousands of state and local officials and volunteers must participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election." *Archer v. Griswold*, 638 F. Supp. 3d 1246, 1259 (D. Colo. 2022) (citation omitted). In addition, "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent

incentive to remain away from the polls." *Purcell*, 549 U.S. at 4-5. And "[a]s an election draws closer, that risk will increase[.]" *Id.* at 5.

*Purcell* counsels firmly against the Party's requested relief. Requiring the Secretary to implement a closed Republican primary—an alternative not contemplated by Colorado law—would require the State and its 64 counties, at the last minute, to scrap carefully planned election procedures; limit use of SCORE, the electronic system that forms the backbone of Colorado's elections; create new and untested processes for mailing ballots and administering elections that pose substantial risk of human error; and cause monumental voter confusion. The Court should not grant relief that would so dramatically disrupt the electoral process.

### A.  The Party's requested relief would upend Colorado's June 30, 2026, primary.

First, the June primary is sufficiently close in time that mandating changes to election procedures would disrupt the orderly conduct of Colorado's elections. The primary is just two months away; essential steps in the voting process have already begun; and critical statutory deadlines are imminent. On May 1, 2026—eight days from today—the Secretary is required by law to certify the ballot content for the primary election. Rudy Decl. ¶ 15. Immediately thereafter, counties finalize their ballots and send information to print vendors so ballots can be printed, inserted into envelopes, and mailed to voters. *See id.* When counties submit their print orders, they also provide exported data about which ballot(s) each voter is eligible to receive, so that each voter's individual envelope contains the correct ballot(s). *Id.* ¶¶ 8-9, 16. By law, ballots must be sent to overseas and military voters by May 16, 2026—twenty-three days from today. *Id.* ¶ 15. Altering which categories of voters are eligible to receive the Party's primary ballots mere days before these deadlines is precisely the kind of eleventh-hour disruption *Purcell* seeks to avoid. *See,*

*e.g.*, *Veasey v. Perry*, 769 F.3d 890, 893-94 (5th Cir. 2014) (applying *Purcell* to reverse district court ruling issued nine days before early voting was to start and summarizing Supreme Court orders issued without elaboration staying injunctions issued 1-2 months before an election).

Second, an injunction would undermine the State's ability to rely on its time-tested electronic systems for ensuring that the right ballots are provided to the right voters. The State relies on SCORE to automatically identify which ballot(s) each voter is eligible to receive in a primary election, and that is the data provided to print vendors. Rudy Decl. ¶¶ 8-9, 15-16. Because the Party did not opt of the June 2026 primary before October 1, 2025, SCORE is currently programmed so that all unaffiliated voters will be mailed both a Republican and a Democratic ballot for the June primary, as required by law. *See* C.R.S. § 1-4-101(2)(b). Thus, if this Court were to mandate a closed primary, the State, the counties, and their vendors would need to try to devise new and untested processes for ensuring that envelopes mailed to Colorado's over two million unaffiliated voters do not contain Party ballots. Rudy Decl. ¶¶ 5, 22-23. Even if such plans could be developed in a few weeks, such substantial changes would risk injecting human error. *Id.*

Similarly, election personnel rely on SCORE to identify which ballots voters are eligible to receive when voting in person. *Id.* ¶ 25. SCORE is also used as a failsafe to ensure election judges do not accept ballots from ineligible voters. *Id.* ¶ 26. If the Party's Motion were granted, SCORE could not be used for those purposes for unaffiliated voters, because its programming would show that unaffiliated voters are eligible to receive and submit Republican ballots (creating a risk that unaffiliated voters could inadvertently receive a Republican ballot). Again, counties would need to develop new manual processes; election judges would need to be retrained; and the risk of human error would proliferate. *Id.* ¶¶ 22-26.

Nor is it possible to reprogram SCORE at this late date to reflect that unaffiliated voters should no longer be mailed or eligible to vote Republican ballots. When Proposition 108 was first implemented, roughly 1,500 hours of development were required to reprogram SCORE to reflect the law's requirements. *Id.* ¶ 11. Reprogramming SCORE to exclude unaffiliated voters from a major party's primary would take approximately seven months' worth of development. *Id.* ¶ 18. Introducing new code into SCORE is a meticulous, time-consuming process that involves both quality assurance and end-user testing to ensure the code functions properly and mitigates the risk of triggering other errors in the system. *Id.* ¶ 12. It is impossible to undertake that endeavor before the June primary without risking introducing widespread error into SCORE. Indeed, because any errors in SCORE during an election period could pose major risks to the orderly conduct of Colorado's elections, the Secretary's Office routinely implements a "blackout period," beginning on the date the ballot content is certified, in which no new code development may be introduced to SCORE. *Id.* ¶ 19. That blackout period begins on May 1, 2026. *Id.* ¶ 21.

Third, an injunction would create widespread voter confusion. When Proposition 108 first became law, the State implemented a carefully planned year-long multimedia voter-education effort. *Id.* ¶ 29. It would be impossible to effectively educate voters before June, particularly while election officials are occupied with other critical duties in preparing for and running the election. *See id.* ¶ 29. And any failure of publicity means some unaffiliated voters will not learn about the changes in time, and voters who might have chosen to affiliate with the Party to vote in its primary will not know they need to do so. *See id.* ¶ 30; *see Veasey*, 769 F.3d at 894 ("inconsistent treatment of voters . . . raises a significant constitutional concern, particularly when [it] is virtually guaranteed by the late issuance of the injunction").

Finally, while the Party has not sought relief allowing it belatedly to opt in to a convention or assembly—the only other processes available by law—such relief would pose similar risks to June's election. Rudy Decl. ¶ 31. Counties and their vendors would be unable to rely on SCORE to determine which ballots are mailed to unaffiliated voters, and they would need to avoid sending Republican ballots altogether. Election personnel could not rely on SCORE when issuing in-person ballots or accepting completed ballots. Voter confusion would be even more widespread, since both unaffiliated and Republican voters expecting to vote in the primary would be unable to do so. And the injunction would undermine the reliance interests of, and create substantial uncertainty for, Party candidates who have already gained access to the primary ballot through the assembly or petition processes. *Id.*[4] Under *Purcell*, these harms should be dispositive.

### B.  The Party misunderstands *Purcell* and Colorado's election procedures.

The Party's efforts to avoid *Purcell* are unpersuasive. First, the Party suggests *Purcell* applies only to injunctions issued in even closer proximity to an election. But *Purcell* does not hinge on any formulaic number of days between the relief sought and the election affected. Rather, the relevant inquiry is how significantly the injunction would disrupt established election procedures and the likely harms. *E.g.*, *Veasey*, 769 F.3d at 893-94 (focusing on the "logistical problems" posed by a late injunction, including that it would be "'extremely difficult, if not impossible,' for the State to adequately train its" polling workers before voting began, and the state's inability to reprint election manuals would require information to be conveyed by word of

---

[4] Colorado law recognizes and accounts for these risks by requiring major parties to opt out approximately nine months before a state primary election. C.R.S. § 1-4-702(1). If a major party opts out by October 1, the Secretary's Office has adequate time to implement the needed SCORE redevelopment, voters can be educated, and candidates can plan accordingly.

mouth and likely "result in markedly inconsistent treatment of voters at different polling places").

Here, the evidence clearly establishes concrete disruption and the likely attendant harms. Further,

courts have applied *Purcell* to prevent injunctions to state election procedures on timeframes

similar to the one in this case. *E.g.*, *Robinson v. Callais*, 144 S. Ct. 1171 (2024) (relying on *Purcell*

in staying April 30, 2024 order affecting congressional district map for November election).

Second, the Party speculates that the Secretary's concerns about last-minute changes to

election procedures are overblown, but its argument fundamentally misunderstands how SCORE

functions and how elections are administered. The Party theorizes that no harm would result from

ordering a closed primary because minor parties could announce whether they would include

unaffiliated voters in their primaries until April 16, 2026. Mot. at 6. But, tracking Proposition 108's

legal framework, SCORE was already programmed to allow this selection. As a result, there is no

need to reprogram SCORE when minor parties open their primaries to unaffiliated voters. Rudy

Decl. ¶ 35. Further, because minor party ballots are not automatically mailed to unaffiliated voters

(unaffiliated voters must request one), changes to unaffiliated voters' participation do not implicate

the mailing lists sent to print vendors after May 1 or the ballots transmitted on May 16. *Id.* ¶ 34.

Third, the Party presumes that, because SCORE knows which voters are unaffiliated, it

should be simple to change which ballots they receive. Mot. at 7. But as discussed above, SCORE

is programmed to assign ballots to voters based on pre-determined criteria that cannot be changed

at this late stage, and counties and vendors rely on those assignments to complete ballot envelopes.

Rudy Decl. ¶¶ 16, 24-26. For each unaffiliated voter, SCORE's programming automatically

assigns the voter to receive both Republican and Democratic ballots, and the print orders sent to

10

vendors reflect this. *Id.* ¶ 8. As a result, any changes to the process would require workarounds outside of SCORE, injecting untested procedures and the risk of human error. *Id.* ¶¶ 22-23.

Finally, the Party flippantly asserts that the "only change" that its requested relief would require is that "the unaffiliated voter packet would not include a Republican Party ballot." Mot. at 8. But as described above and in Ms. Rudy's declaration and prior testimony, the processes for assigning and mailing the correct ballots to each voter are complex, automated, and not easily changed. Rudy Decl. ¶¶ 18-30; Hr'g Tr. Vol. 1, 267:21-275:13.

**III.    Laches bars the Party's claim.**

The Party's 20-day filing delay forecloses its emergency request. That factional infighting prevented the Party from seeking relief on a timeline consistent with an "emergency" motion neither excuses its delay nor lessens the prejudice to the Secretary and Colorado voters.

Laches is "principally a question of the inequity of permitting the claim to be enforced." *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1091 (10th Cir. 2014) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)). Laches bars relief on a showing of "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Id.* (quotation omitted).

The second factor—prejudice to the Secretary—is beyond question. *See supra* § II. In election challenges, "every hour matters," and even a few days' delay expends "precious time." *Garcia v. Griswold*, No. 20-cv-01268-WJM, 2020 WL 4926051, at *4 (D. Colo. Aug. 21, 2020)

(finding laches applied based on ten-day filing delay). The Party's three-week silence leading up to its newfound "emergency" wasted time Colorado's election officials simply do not have here.[5]

The Party makes no attempt to reckon with that prejudice, instead devoting five pages of its Motion to an explanation of the intra-Party conflicts that led to its lack of diligence. *See* Mot. 8-14. But even accepting that explanation arguendo, indecision cannot excuse delay. In the Party's telling, its duly elected chairman, general counsel, and executive committee declined to file the instant Motion despite being repeatedly presented with the opportunity to do so. Haberbush Decl. Exs. C, D; Grossman Decl. ¶ 5; *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1338 (10th Cir. 1982) (laches applies "where a party, having knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own"). Counsel for the Party abided by those decisions, waiting until a "new acting Chairman assumed authority" and "authorized" the Motion's filing on April 17. Haberbush Dec. ¶ 11; *see Archer*, 638 F. Supp. 3d at 1258 ("[P]arties are bound by the actions of their attorneys when considering delay[.]").

In short, the only thing preventing the Party from acting with appropriate diligence and speed was the Party itself. Far from "excusing" the Party's delay, the Party's asserted facts[6] only confirm that its decision to wait for weeks to file the Motion was both informed and deliberate.

---

[5] *McCarthy v. Briscoe*, 429 U.S. 1317 (1976) (Powell, J., in chambers) is easily distinguishable. There, Texas's laches defense concerned the feasibility of determining whether a candidate had "substantial voter support" before the 1976 election, not the administration of the election itself. *Id.* at 1322; *see also id.* at 1323 n.4 (separately concluding, without discussion of evidence, that "there appears to be ample time" to add a name to the ballot). Justice Powell's assessment of the feasibility of adding a single name to Texas's ballot half a century ago has little bearing on the Party's belated request to overhaul, in a matter of days, the computer code and monumental human effort associated with rerouting mail ballots to millions of Colorado voters in 2026.

[6] The Party's laches rebuttal relies on its express waiver of privilege over "particular" attorney-client communications. Mot. at 12, n.5. By affirmatively placing advice of counsel at issue, the

12

**IV.**    **The remaining equitable factors strongly favor the Secretary.**

*Irreparable harm.* The Party must establish that it will suffer irreparable harm that is "both certain and great," and not "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quotations omitted). And while the Party asserts that "a showing of the infringement of a constitutional right requires no further showing of irreparable injury," Mot. at 6, it ignores that courts "must nonetheless engage in [the] traditional equitable inquiry as to the presence of irreparable harm," *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). The truism that constitutional harm is irreparable can only extend so far, particularly when this Court has already crafted an appropriate declaratory remedy to address the Party's proffered constitutional violation. *See* MSJ Order at 20-22.

Further, the Party's delayed filing of its Motion undermines its claim that it will suffer irreparable harm absent an injunction. *See Fish*, 840 F.3d at 753 ("[D]elay in seeking preliminary relief cuts against finding irreparable injury." (quotations omitted)); *Colo. Union of Taxpayers v. Griswold*, No. 20-cv-02766-CMA-SKC, 2020 WL 6290380, at \*3 (D. Colo. Oct. 27, 2020) (even in First Amendment cases, a plaintiff's delay "weighs heavily against" preliminary relief).

*Balance of equities and public interest.* The last two factors, the balance of equities and the public interest, "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and they both weigh heavily in the Secretary's favor here.

---

Party has waived privilege as to *all* communications concerning the Motion. *Frontier Refin., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 (10th Cir. 1998) (litigant cannot invoke privilege "as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion"); *e.g., Hartleib v. Weiser Law Firm, P.C.*, 861 F. App'x 714, 721 n.3 (10th Cir. 2021) (waiver extends to information concerning same subject matter). The Secretary reserves the right to pursue complete disclosure of all communications on this subject matter and elicit testimony on the same at any hearing.

"[T]he State has a significant interest in ensuring the proper and consistent running of its election machinery." *See Veasey*, 769 F.3d at 896. The Party's speculation that the Secretary can easily change the election protocol at this late stage, Mot. at 6-8, is unsupported by any evidence whatsoever. The fact that minor parties may decide to participate in closed primary elections "as late as April 16, 2026" under C.R.S. § 1-4-1304(1.5)(c), does not alter the substantial, documented burden the State would suffer if this Court were to order an extra-statutory closed primary for a major party so close to the primary election. *See* Rudy Decl. ¶¶ 32-35; *supra* § II.A.

The Party's requested injunction would require a massive and uncertain undertaking, imposing costs and burdens on Secretary staff, county officials, and election judges in every corner of the State. *See* Rudy Decl. ¶¶ 22-30. And because the SCORE database cannot be updated in time to implement that change, *id*. ¶ 18, every link in the election chain would be susceptible to gaps in education and training, as well as ordinary human error, *see id*. ¶¶ 22, 24, 26; *see, e.g.*, *Veasey*, 769 F.3d at 896 ("Inconsistencies . . . seem almost inevitable given the logistical problem of educating all of these [election] officials within just one week."). And while human error is often excusable, the consequences of that error in an election context can be dire, as public trust in the election process is paramount to a functioning democratic process.

The Party relies heavily on the proposition that the State has no interest in enforcing an unconstitutional law. Mot. at 6. But the Secretary is not seeking to enforce the three-fourths voting threshold at this stage, and no injunction is necessary to prevent such enforcement. *See* MSJ Order at 21-22. To the contrary (and as discussed above), the Party requests an injunction that would direct the Secretary to violate *unchallenged* statutory deadlines and other provisions, which have been duly enacted into law by and for the people of Colorado, and which the MSJ Order did not

14

disturb. *Supra* § I. It is decidedly contrary to the public interest to enjoin the Secretary from performing her undisputedly lawful duties.

Finally, third-party rights weigh heavily against the Party's requested injunction. More than half of Colorado's electorate are unaffiliated voters who have been permitted to vote in the Party's primary election for the past eight years. Rudy Decl. ¶¶ 5, 29-30. Since it is inevitable that many of those voters will not learn of this Court's decision, unaffiliated voters who might have chosen to affiliate with the Party to participate in its primary may not know they need to do so. *Id*. ¶ 30. Likewise, Party candidates have spent time, money, and tremendous effort running their campaigns in reliance on the Party's participation in a semi-open primary. *Id.* ¶ 31. Disrupting those expectations mere weeks before ballots are distributed would be fundamentally unfair to those candidates, as well as to the Coloradans who have supported them.

## CONCLUSION

For these reasons, this Court should deny the Party's Motion in full.

Respectfully submitted this 23rd day of April, 2026.

PHILIP J. WEISER
Attorney General

/s/ Talia Kraemer
**Emily Burke Buckley**, Senior Assistant Attorney General
**Kyle M. Holter**, Assistant Attorney General
**Talia Kraemer**, Senior Assistant Attorney General
**Kolya D. Glick**,* Senior Assistant Attorney General
Public Officials Unit | State Services Section
1300 Broadway, Denver, CO 80203
Telephone: 720.508.6000
emily.buckley@coag.gov; kyle.holter@coag.gov;
 talia.kraemer@coag.gov; kolya.glick@coag.gov
*Attorneys for Defendant*
*Practice in Colorado temporarily authorized pending
 admission under C.R.C.P. 205.6

15