**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01948-PAB-KAS

COLORADO REPUBLICAN PARTY, an unincorporated nonprofit association,
on behalf of itself and its members,

      Plaintiff,

v.

JENA GRISWOLD, in her official capacity as Colorado Secretary of State,

      Defendant,

and

NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, JEFF HURD,
in his capacity as a candidate for U.S. Representative for Colorado's 3rd
Congressional District, LAUREN BOEBERT, in her capacity as a candidate
for U.S. Representative for Colorado's 4th Congressional District, JEFF CRANK,
in his capacity as a candidate for U.S. Representative for Colorado's 5th
Congressional District, and GABE EVANS, in his capacity as a candidate for
U.S. Representative for Colorado's 8th Congressional District,

      Intervenor-Defendants.

---

**[PROPOSED] National Republican Congressional Committee, Congressman
Jeff Hurd, Congresswoman Lauren Boebert, Congressman Jeff Crank, and
Congressman Gabe Evans's Response in Opposition to Plaintiff's Motion for
Temporary Restraining Order and/or Preliminary Injunction**

---

Intervenor-Defendants National Republican Congressional Committee (NRCC),

Congressman Jeff Hurd, Congresswoman Lauren Boebert, Congressman Jeff Crank,

and Congressman Gabe Evans respectfully submit this response in opposition to

Plaintiff Colorado Republican Party's (CRC) emergency motion for a temporary

restraining order and preliminary injunction.

**Introduction**

Colorado has had a semi-open primary system for major political parties since the voters adopted it in 2016. The CRC has nominated its candidates in these semi-open primaries for the last four election cycles. It is no hardship to confirm—on the eve of the primary elections—that it will have to do so a fifth time. On March 31, this Court held that Colorado's requirement that any decision to opt out of the semi-open primary system be by a vote of 75% of the entire CRC membership was unconstitutional because it did not provide the CRC a meaningful opportunity to close its nominating process to outsiders. This means that in future years—barring a change in state law or CRC bylaws—the CRC may elect to opt out of the semi-open primary process and nominate candidates by party conventions. This does not mean that the CRC is entitled to demand "emergency" relief from this Court that would require the state to overhaul its impending primary election and force Intervenors to adjust and abandon campaign plans they made and executed on months ago.

**Relevant Factual and Procedural Background**

In 2016, Colorado voters approved Proposition 108, a ballot initiative creating a semi-open primary system, which permits voters not affiliated with a political party to vote in major parties' nonpresidential primary elections. While "[e]ach political party that is entitled to participate in the primary election must have a separate party ballot for use by electors affiliated with that political party," Colo. Rev. Stat. § 1-4-101(2)(a), unaffiliated voters receive a mailing containing the primary ballots of all major political

2

parties, and these voters "may cast the ballot of only one major political party," § 1-4-101(2)(b). The primary election for each major political party must occur at the same time and "be conducted by the same election officials." § 1-4-101(2)(d). Proposition 108 requires major political parties to nominate candidates for the general election through this semi-open primary system, unless they opt out by a vote of 75 percent of the entire membership of their state central committee no later than October 1 of the odd-numbered year preceding an election. § 1-4-702(1).

The CRC challenged the constitutionality of the semi-open primary system on July 31, 2023. (Compl., Doc. 1.) On December 22, 2023, the Party filed a motion for a preliminary injunction, asking the Court to enjoin the Secretary from enforcing the semi-open primary system. (Mot. for Prelim. Injunc. at 15, Doc. 39.) The Court denied the motion on February 2, 2024. (Order, Doc. 69.) At the hearing on the CRC's motion for preliminary injunction, the Deputy Elections Director for the Secretary of State testified that the "Secretary's Office would need between six to nine months to develop, test, and implement coding changes to the SCORE system [the statewide voter registration database and system for managing elections] in order to alter the system's process issuing primary ballots to unaffiliated voters." (*Id.* at 9–10.)

After engaging in discovery, the Secretary filed for summary judgment on April 4, 2025 (Doc. 102), and the CRC filed for partial summary judgment on April 8, 2025 (Doc. 105). On March 31, 2026, the Court denied the Secretary's motion and granted the CRC's motion for partial summary judgment on its as-applied First Amendment claim, holding that "Colo. Rev. Stat. § 1-4-702(1), requiring that 'at least three fourths of the

total membership of the party's state central committee votes to use the assembly or convention nomination process' before a major party can opt for an assembly or convention nomination process is unconstitutional." (Order at 21–22, Doc. 130.) The CRC filed its emergency motion for TRO and preliminary injunction (PI Motion) just under three weeks later, on April 20, 2026. (Doc. 134.)

The CRC's PI Motion asks the Court to direct the Secretary "to exclude unaffiliated voters from participating in the Republican primary portion of the June 30, 2026 Colorado Primary Election." (*Id.* at 1.) The Secretary is required to deliver the Primary Election ballot order and content to county clerks no later than next Friday, May 1, 2026, Colo Rev. Stat. § 1-5-203(1)(a), and county clerks must begin mailing ballots to military and overseas no later than Saturday, May 16, 2026, § 1-8.3-110(1).

**Legal Standard**

A party seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable injury absent the injunction, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff bears the burden of proving each factor by a preponderance of the evidence. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003). Here, the injunction sought by the CRC is one "disfavored" in the Tenth Circuit because it requires a "mandatory" injunction that would alter Colorado's election planning at the eleventh hour. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). The CRC thus "must make a strong showing" that "the likelihood-of-success-on-the-merits and the balance-of-harms

4

factors … tilt in [its] favor." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted). Of course, the CRC has already prevailed on the merits of its as-applied claim. (Doc. 130.) Hence, it need only make a "strong showing" on the balance of harms factors.

## Argument

### I.    The CRC's Desired Injunction is Prohibited by *Purcell v. Gonzales*

A bedrock principle in election law is that federal courts should "not alter the election rules on the eve of an election." *Abbott v. League of United Latin Am. Citizens*, 607 U.S. ----, 146 S. Ct. 418, 419 (2025) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam)). This "bedrock principle" was first clearly articulated in *Purcell v. Gonzalez*, where the Supreme Court vacated a Ninth Circuit order enjoining Arizona voting rules weeks before an election. 549 U.S. 1, 4–6 (2006). The CRC cannot escape *Purcell* here.

To its credit, the CRC anticipates the applicability of *Purcell* to its late request for emergency relief. (PI Mot. at 14–15.) But it whistles past the graveyard, conclusively stating that its motion is not brought "on the 'eve of an election.'" (*Id.* at 15.) But, in the context of the changes necessary to affect the CRC's requested relief, we are well past midnight on election eve.

The Supreme Court regularly stays injunctions issued weeks or more before elections without any stated reason except for the injunction's lateness—or indeed no reason at all. *See, e.g.*, *Robinson v. Callais*, 144 S. Ct. 1171 (2024) (staying injunction issued 189 days before election); *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (staying

5

injunction issued two months before election). This practice enforces a principle that seeks to protect a broader public interest in having clear and settled rules. *See Purcell*, 549 U.S. at 4–5. Late-breaking orders changing those rules "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.*

Any argument that the CRC's requested injunction is somehow harmless on *Purcell*'s score ignores the history of this case and testimony at the hearing on the CRC's first motion for preliminary injunction. As noted above, the Deputy Elections Director testified that changes to the SCORE system necessary remove Republican primary ballots from unaffiliated voters' ballot packets would take months to implement. There are less than three weeks until ballots must be mailed to military and overseas voters. *See* Colo Rev. Stat. § 1-8.3-110(1) (mandating mailing of these ballots by county clerks no less than 45 days before primary election day). It is simply too late to order a sweeping change of this nature to an election that has been planned for months.

### III.    The CRC's Desired Injunction is Barred by Laches

The CRC's PI Motion is also barred by the doctrine of laches. *See Garcia v. Griswold*, No. 20-cv-1268-WJM, 2020 WL 4926051, at *3–4 (D. Colo. Aug. 21, 2020) (applying laches to deny preliminary injunction on eve of election). The elements of laches—which operates as an affirmative defense—are: "(1) full knowledge of the facts; (2) unreasonable delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another." *Herald Co. v. Seawell*, 472 F.2d 1081, 1099 (10th Cir. 1972). Here, the CRC never asked the Court to expedite its ruling on its motion for partial summary judgment, waited almost three weeks after the issuance of the Court's

order granting partial summary judgment, and there was reliance by Intervenors on the ability of unaffiliated voters to participate in Colorado's semi-open primary.

*First*, it cannot be questioned that CRC had full knowledge of the relevant facts— it brought this lawsuit in 2023, sought a preliminary the same year, and then, after extensive discovery, moved for partial summary judgment last spring.

*Second*, the CRC unreasonably delayed in seeking the relief it now asks for—an exclusion of unaffiliated voters from Colorado's semi-open primary election. While the CRC's motion for partial summary judgment was brought in the spring of 2025, it never once asked the Court to consider expediting its ruling as time passed. Given that the CRC's motion was pending before the October 2025 deadline to opt-out for 2026 primary election under Colo Rev. Stat. § 1-4-702(1), the CRC could have (and perhaps should have) requested expedited relief to preserve an opt-out request if it won summary judgment—a ruling it eventually received. The party's further delay of almost three weeks after the ruling to bring this "emergency" motion makes matters worse. In the context of the relief it seeks—wholesale changes to the way an impending primary election is administered and who may vote in the Republican primary elections—even this delay is too long. The CRC makes much of the Supreme Court's decision in *McCarthy v. Briscoe*, 429 U.S. 1316 (1976), where the Court ordered Senator McCarthy's name be placed onto the presidential ballot just over a month before election day. (PI Mot. at 9–10.) But this case is much more like the Fourth Circuit's decision regarding another Texan presidential candidate in *Perry v. Judd*, 471 F. App'x 219 (4th Cir. 2012). There, former Texas Governor Rick Perry (along with a host of

similarly unsuccessful presidential candidates) sued members of the Virginia Board of Elections to challenge Virginia's—later confirmed to be unconstitutional—requirement that presidential candidates use only Virgina residents to circulate their legally required petitions for ballot access. *Id.* at 220. Despite knowing Virginia's law regarding petition circulators, and despite having been a presidential candidate for several months, Perry waited to bring his suit until his petitions were deemed insufficient less than a month before the deadline to mail ballots to military and overseas voters. *Id.*

Although the court held that Perry's challenge to Virginia's residency requirement for presidential candidate petition circulators was likely to succeed on the merits, the district court denied him an injunction requiring his name to appear on the ballot. *Id.* at 223. Why? Laches. The Fourth Circuit affirmed. It held that because Perry's injury was apparent as soon as he became a candidate for President in August of 2011, he should have sought relief before his petitions were deemed insufficient. *Id.* at 224. It chastised Perry because he "had every incentive to challenge the requirement at that time. Success in an early constitutional challenge would have allowed Movant to maximize the number of his petition circulators and minimize the amount of time it took to acquire the requisite 10,000 signatures." *Id.* So too here. With respect to the 2026 primary elections—the elections the CRC seeks to upend at the last minute—the party timely asked for relief in its motion for partial summary judgment. But when a ruling on this motion was not forthcoming in advance of the October 1, 2025 deadline for its opt out under Colo Rev. Stat. § 1-4-702(1), the CRC should have requested expedited relief. It did not, and instead waited until—almost three weeks—after the Court issued its March

31, 2026 order. "This deliberate delay precludes the possibility of equitable relief. For 'equity ministers to the vigilant, not to those who sleep upon their rights.'" *Id.* (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs,* 60 F.3d 867, 879 (1st Cir.1995)).

*Third* and finally, as outlined in Intervenors' motion to intervene, there has been intervening reliance by the Intervenors and they will be prejudiced if the Court grants the extraordinary relief the CRC seeks at this late hour. Each Intervenor has made strategic plans regarding their investment of limited campaign resources in the expectation that the Republican primary election would permit the participation of unaffiliated voters. (*See* Mot. to Intervene at 2-4, Doc No. 145.) Under these circumstances, laches bars the CRC's requested injunction at this late hour.

## II.    The Balance of the Equities Strongly Favors Defendants

Similarly, the balance of equities weighs strongly in Intervenors' favor. An injunction barring unaffiliated electors from voting in Colorado's Republican primary election, as state law presently allows, would impose significant disruption to campaigns, candidates, and political committees on the eve of the Republican primary elections. Just as problematic, a judicial order requiring one major political party (the Republican Party) to close their primary elections while allowing the other major political party (the Democratic Party) to proceed with open primaries would result in a distinct competitive disadvantage to Intervenors. As argued in the motion to intervene, not only would a last-minute change in the rules fundamentally shift the competitive landscape of the Republican primary elections, but denying Intervenors the benefit of valuable electoral information during an open primary (e.g., which unaffiliateds voted a

9

Republican ballot; was this the first time, second time, third time, or fourth time they voted a Republican ballot; did high-propensity unaffiliateds vote a Republican ballot; did low-propensity unaffiliateds vote a Republican ballot; and so on[1]) would significantly disadvantage the candidate Intervenors and the NRCC. *See Bost v. Ill. State Bd. of Elections*, 607 U.S. ----, 146 S. Ct. 513, 520–21 (2026) ("Departures from the preordained rules cause [candidates] particularized and concrete harm. The same is true of competitors in other contests. Each runner in a 100-meter dash, for example, would suffer if the race were unexpectedly extended to 105 meters. Whether a particular runner expects to finish strong or fall off the pace in the final five meters, all would be deprived of the chance to compete for the prize that the rules define. The fastest to run 105 meters has not won the 100-meter dash." (footnote and citation omitted)). This would, at a minimum, inflict a one-sided competitive disadvantage on Republican candidates in the general election versus their Democratic competitors, and would, once inflicted be irreparable. The CRC's requested relief would change the rules of the primary election at the last minute and harm Intervenors.

On the other side of the scale, there is no evidence that allowing a final semi-open primary in the Republican party severely burdens the CRC. Under the Court's March 31, 2026 Order, the CRC is now free to choose a closed-nomination process in future cycles. But the balance tips decisively against the disfavored injunction the CRC seeks for the 2026 primary election cycle.

---

[1] This type of information gleaned from the participation of unaffiliated voters in partisan primary elections is valuable data for candidates and political committees in the general election.

The equities further tip in Intervenors' favor because changing the rules at this late stage and redefining *who* may vote in the Republican primaries will require Intervenors to spend and reallocate limited resources to account for the new electorate composition. For months, candidate Intervenors have spent significant time and resources pursuing unaffiliated voters through outreach, messaging, and partnerships. That work strategically positioned candidates to capture both Republican and unaffiliated votes, making the candidates more competitive in a contested primary. The CRC's requested relief, forcing a last-minute change to the rules, would undermine months of electoral advocacy by closing the primary election to millions of voters (over half the registered electorate in the state) on the eve of the election.

To minimize this harm, if the Court were to grant the requested relief, the candidate Intervenors would have to spend the coming days using limited time, financial, and human resources convincing unaffiliated voters to affiliate with the Republican Party before the affiliation-window closes. *See* Colo. Rev. Stat. § 1-2-219(1) (voters may change their affiliation "at any time up to and including the twenty-second day preceding a primary election"). This means instead of executing on the campaign strategy they developed and invested in months ago based on existing law, candidates will face the unpredictable and potentially expensive choice of hoping they can get by without the information yielded by unaffiliated voters choosing a Republican primary ballot, or trying to convince targeted unaffiliated voters to affiliate with a Republican Party simply to maintain the status quo under which candidates and campaigns have

been operating. This is precisely why courts should not change election rules at the last

minute—especially a rule that overhauls the composition of the electorate.

## Conclusion

Intervenors request that the Court deny the CRC's motion for TRO and

preliminary injunction and thereby allow the 2026 primary election to proceed according

to the rules all voters and participants knew to be applicable in advance.

Respectfully submitted this 23rd day of April 2026.


*s/ Christopher O. Murray*
Christopher O. Murray
Julian R. Ellis, Jr.
Erin M. Gust
**FIRST & FOURTEENTH PLLC**
2 N. Cascade Avenue, Suite 1430
Colorado Springs, CO 80903
Phone: (719) 428-4937
Emails: chris@first-fourteenth.com
         julian@first-fourteenth.com
         erin@first-fourteenth.com

*Attorneys for Proposed Intervenor-
Defendants National Republican
Congressional Committee, Jeff Hurd,
Lauren Boebert, Jeff Crank, and Gabe
Evans*

12